BERNSTEIN LITOWITZ BERGER
    & GROSSMANN LLP
BLAIR A. NICHOLAS (Bar No. 178428)
(blairn@blbglaw.com)
12481 High Bluff Drive, Suite 300
San Diego, CA 92130
Tel:    (858) 793-0070
Fax:   (858) 793-0323

*Attorneys for Plaintiff City of Miami*
*General Employees' & Sanitation*
*Employees' Retirement Trust*

[Additional counsel appear on signature page]

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA
SAN FRANCISCO DIVISION

| | |
|---|---|
| CITY OF MIAMI GENERAL EMPLOYEES' & SANITATION EMPLOYEES' RETIREMENT TRUST, on behalf of itself and all others similarly situated,<br><br>            Plaintiff<br><br>            v.<br><br>RH, INC., GARY FRIEDMAN, KAREN BOONE<br><br>            Defendants. | Case No.<br><br>ECF CASE<br><br>**COMPLAINT**<br><br>CLASS ACTION<br><br>DEMAND FOR JURY TRIAL |

Plaintiff City of Miami General Employees' & Sanitation Employees' Retirement Trust ("Plaintiff") by and through its counsel, alleges the following upon information and belief, except as to those allegations concerning Plaintiff, which are alleged upon personal knowledge. Plaintiff's information and belief is based upon, among other things, counsel's investigation, which includes review and analysis of, (a) regulatory filings made by RH, Inc. ("RH" or the "Company") with the United States Securities and Exchange Commission ("SEC"); (b) press releases and media reports issued by and disseminated by the Company; (c) analyst reports concerning RH; (d) a proprietary investigation by Plaintiff's counsel and (e) other public information regarding the Company.

## I.    **INTRODUCTION**

1.    This securities fraud class action is brought on behalf of all persons and other entities that purchased or otherwise acquired RH common stock from March 26, 2015 to June 8, 2016, inclusive (the "Class Period").  The claims asserted herein are alleged against RH and certain of the Company's current and former senior executives (collectively, "Defendants"), and arise under Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act") and Rule 10b-5 promulgated thereunder.

2.    RH, headquartered in Corte Madera, California, is a leading luxury retailer in the home furnishings marketplace.  The Company operates an integrated business with multiple channels of distribution including over 70 retail stores in the United States, source book magazines and websites.

3.    This case arises from misstatements the Company made regarding its new product line, RH Modern. Specifically, the Company and its executives publicly touted RH Modern as its "finest work ever," a "game-changer" that was poised to double the Company's revenue, and "the most important and significant new home furnishings business to be launched in the last 15 or 20 years."  Bolstering these statements, the Company repeatedly issued revenue guidance that led investors to expect substantial increases in revenue due in significant part to the supposed new revenue to be generated by RH Modern.

4.    In early 2015, the Company's core product line was facing headwinds as same store

sales were decreasing. Specifically, in the RH's earnings report for the first quarter of 2015, the Company announced its comparable store sales were down 9% from the previous quarter.  To reinvigorate RH's earnings, the Company began implementing its critical new product line, RH Modern.  On June 11, 2015, the Company officially announced it would be releasing RH Modern later that fall.  From the start of the Class Period, the Company touted its preparedness for the launch of RH Modern and increased its fiscal 2015 revenue guidance to $2.146 billion to $2.176 billion, representing growth in the range of 15% to 17% from the prior year.  After raising its earnings-per-share ("EPS") guidance to $2.95 to $3.10 for fiscal 2015 the previous quarter, the Company again raised its earnings guidance to a range of $3.02 to $3.15, representing growth in the range of 28% to 33% year-over-year.  RH attributed the growth in revenue and earnings, in large part, to the release of RH Modern.  In the months leading up to the release of RH Modern, the Company continued to tout the new product line, including the Company's ability to have the new RH Modern products in-stock so that customers would receive furniture they ordered in a timely manner.  In truth, the Company was woefully unprepared to launch RH Modern and to capitalize on the new product line. In December 2015, when RH Modern inventory problems began to emerge, the Company repeatedly downplayed the significance of the problems related to RH Modern, preventing investors from learning the full truth.   As a result of these misrepresentations, RH stock traded at artificially inflated prices during the Class Period.

5.     Contrary to Defendants' representations that the Company was prepared for the launch of RH Modern, in reality, the launch of RH Modern was an abject catastrophe. The Company knew that it was not prepared to introduce RH Modern on a timetable and at the quality level that its clients expected, but Defendants nonetheless assured investors of near-term profits to be driven by the new product line.  As Defendants knew during the Class Period, the introduction of RH Modern was beset with a host of problems, including a near-complete lack of inventory, countless shipping delays, customer cancelations and returned products.

6.     The truth began to be revealed on December 10, 2015, when the Company announced that it had missed its earnings projections due, in part, to the fact that RH Modern furniture was not fully in-stock.  As a result of these disclosures, shares of RH declined by

approximately $9 per share, closing at $78.65 per share on December 14.  To stem the decline, the Company made a number of reassuring statements, including touting the launch of RH Modern as "phenomenal" and falsely attributing the low inventory of RH Modern products to a purported strategy of conservatively managing purchases for the new product line.

7.     Then, on February 9, 2016, the Company announced the surprise resignation of its Chief Operating Officer ("COO"), Kenneth Dunaj ("Dunaj"), who just one year prior had been put in charge of inventory management.

8.     On February 24, 2016, the Company announced disappointing earnings for the fourth quarter of 2015 due to shipping delays of the RH Modern furniture.  This disclosure caused RH stock to decline by $13.43 per share.  In an effort to mitigate the market reaction, the Company continued to tout RH Modern as a success and assured investors that the RH Modern inventory problems were behind them.

9.     Then on June 8, 2016, the Company significantly reduced its earnings guidance for fiscal 2016, which the Company attributed to "accommodations largely due to RH Modern production delays."  These disclosures caused RH stock to decline by $7.66 per share.

10.     As a result of Defendants' wrongful acts and omissions, and the precipitous decline in the market value of the Company's common stock, Plaintiff and other Class members have suffered significant damages.

## II.     JURISDICTION AND VENUE

11.     The claims asserted herein arise under Sections 10(b) and 20(a) of the Exchange Act, 15 U.S.C. §§ 78j(b) and 78t(a), and Rule 10b-5 promulgated thereunder by the SEC, 17 C.F.R. § 240.10b-5.  This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. §§ 1331 and 1337, and Section 27 of the Exchange Act, 15 U.S.C. § 78aa.

12.     Venue is proper in this District pursuant to Section 27 of the Exchange Act and 28 U.S.C. § 1391(b).  RH is headquartered in California and conducts business in this District, and many of the acts and conduct that constitute the violations of law complained of herein, including the materially false and misleading statements of fact, occurred in and/or were issued from this District.  In connection with the acts alleged in this Complaint, Defendants, directly or indirectly,

1    used the means and instrumentalities of interstate commerce, including, but not limited to, the

2    mails, interstate telephone communications, and the facilities of the national securities markets.

3    **III.    PARTIES**

4         13.    Plaintiff purchased shares of RH stock on the New York Stock Exchange during the

5    Class Period and suffered damages as a result of the violations of the federal securities laws alleged

6    herein.

7         14.    Defendant RH is incorporated in Delaware and maintains its headquarters in Corte

8    Madera, California.  RH is one of the leading luxury retailers in home furnishings in the United

9    States.  The Company's stock trades on the New York Stock Exchange, which is an efficient

10   market, under ticker symbol "RH."  As of October 31, 2016, there were approximately 41 million

11   shares of RH stock outstanding.

12        15.    Defendant Gary Friedman ("Friedman") is, and was at all relevant times, RH's

13   Chief Executive Officer ("CEO") and Chairman.

14        16.    Defendant Karen Boone ("Boone") is, and was at all relevant times, RH's Co-

15   President and Chief Financial and Administrative Officer.

16        17.    Defendants Friedman and Boone are collectively referred to hereinafter as the

17   "Individual Defendants."   The Individual Defendants, because of their positions with RH,

18   possessed the power and authority to control the contents of RH's reports to the SEC, press

19   releases, and presentations to securities analysts, money and portfolio managers, and institutional

20   investors.  Each of the Individual Defendants was provided with copies of the Company's reports

21   and press releases alleged herein to be misleading prior to, or shortly after, their issuance and had

22   the ability and opportunity to prevent their issuance or cause them to be corrected.  Because of

23   their positions and access to material non-public information available to them, each of the

24   Individual Defendants knew that the adverse facts and omissions specified herein had not been

25   disclosed to, and were being concealed from, the public, and that the positive representations and

26   omissions which were being made were then materially false and/or misleading.

27   **IV.    BACKGROUND**

28        18.    RH is a leading luxury retailer in the home furnishings marketplace that operates

an integrated business with multiple channels of distribution, including over 70 retail stores in the United States, source book magazines and websites.  In early 2015, the Company's core product line was facing headwinds as same store sales were decreasing. Specifically, in RH's earnings report for the first quarter of 2015, the Company announced its comparable store sales were down 9% from the previous quarter.  To reinvigorate RH's earnings, the Company began implementing its critical new product line, RH Modern.  The Company's CEO, Friedman, touted RH Modern as "the most innovative and new concept in the world of home design" and claimed it "represents our finest work to date."  He went on to describe RH Modern as "the most important and significant new home furnishings business to be launched in the last 15 or 20 years."

19.    Prior to the release of RH Modern, Defendants repeatedly assured investors that the Company was prepared for the launch of the product and would have the appropriate amount of inventory in stock so that customers would not experience delays in receiving RH Modern products they ordered. For example, Friedman stated "[o]n the Modern side, and the lead times, the wait times are a real disadvantage for the people in the marketplace today. We are going to compete on speed just like we would our current business."  He continued, "it's going to be a huge competitive advantage versus how the marketplace exists and operates today."

20.    In truth, the Company was woefully unprepared for the RH Modern launch as it knowingly gave vendors unrealistic timelines to manufacture products. This led to the Company having a near-total lack of inventory when the product line was launched leading to severe shipping delays and customer cancelations. Further, many customers who did receive RH Modern products ended up returning the products because they were defective due to the fact that vendors had to rush to create the product.

21.    In addition, after the release of RH Modern, Defendants repeatedly downplayed issues surrounding RH Modern, including low inventory levels, shipping delays, and customer cancelations, thus preventing investors from realizing the true nature and impact of the problems.

## V.    DEFENDANTS' FALSE AND MISLEADING STATEMENTS AND OMISSIONS

22.    The Class Period starts on March 26, 2015, the day the Company reported its results for the fourth quarter and fiscal year 2014, and announced the release of RH Modern later in the

year.  On that day, the Company touted RH Modern as its "finest work ever" and a "game-changer" for the Company.  Based on this, the Company raised its 2015 EPS guidance to $2.95 to $3.10, representing growth in the range of 25% to 31% from fiscal 2014.  The Company emphasized to investors that it would have no trouble meeting the inventory needs that the new RH Modern product line would require.  Boone stressed that the Company would "continue to make inventory investments to make sure that [the Company] improve[s] our in-stocks and make sure we're not having high back orders."  Friedman further emphasized the Company's strong inventory management stating, "Ken Dunaj, our Chief Operating Officer, has recently taken over inventory management. He has a new leader in that area of the business.  I think we have more intelligence, more energy and passion behind inventory management than ever in the history of our Company right now."

23.     On June 11, 2015, during RH's 2015 first quarter earnings call, the Company announced that RH Modern would officially be released in the fall and increased its revenue guidance to $2.146 billion to $2.176 billion, representing growth in the range of 15% to 17%, and raised its EPS guidance to a range of $3.02 to $3.15, representing growth in the range of 28% to 33% from fiscal 2014 based largely on the RH Modern release.  Friedman continued to tout RH Modern, calling it the "most innovative and new concept in the world of home design" and claiming it could double the Company's revenue saying, "could RH Modern, in and of itself, take $4 billion to $5 billion up? Yes, it could."  Friedman assured investors that the RH Modern inventory would be in-stock stating, "[i]nventory at the end of the first quarter was up 24%, and we expect to end the year with inventory growth that is higher than our sales growth given the inventory investments in RH Modern."  Further, Boone stated, "[w]e are adding 1.5 million square foot DC [in] northern California in the coming months, actually it's opening this summer.  That was planned partially for Modern, both to keep up with the growth we have in the core business but also knowing that Modern was coming.  So, we should be very good on supply chain capacity for a while."  The Company also emphasized that not only would its delivery window be comparable with what the Company has done in the past, but would also be an advantage for the Company.  Friedman stated "[o]n the Modern side, and the lead times, the wait times are a real

disadvantage for the people in the marketplace today. We are going to compete on speed just like we would our current business." He continued, "it's going to be a huge competitive advantage versus how the marketplace exists and operates today."

24. On September 10, 2015, approximately a month before RH Modern's official release, Friedman continued to tout RH Modern, stating that the new product line "can be as big as RH is today or bigger than we are today. There is no reason to believe that RH Modern can't be a multi-billion dollar business in the US." He further stated that RH Modern "is the most important and significant new home furnishings business to be launched in the last 15 or 20 years." The Company again raised revenue guidance to $2.158 billion to $2.178 billion, representing growth in the range of 16% to 17% from fiscal 2014. The Company also increased its EPS guidance to a range of $3.06 to $3.16, representing growth in the range of 30% to 34%, based on the RH Modern launch. Friedman also reassured investors that bringing the critical new product line to market would not be a problem for the Company stating, "[s]o the great thing about this and why we can go so fast is we know this business. This is a parallel business with a different aesthetic that can be presented in a compelling way that I think is going to completely open up the aperture and the acceptance of the RH brand." Further, Boone reported that inventory was up 29%, stating that inventory growth "is higher than our sales growth given the inventory investments necessary for the launches of RH Modern and RH Teen."

25. The statements set forth in ¶22-24 were materially false and misleading. Contrary to Defendants' representations that the Company was prepared for the launch of RH Modern, that inventory was adequate, and that customers would not face shipping delays, in reality, the Company had severely inadequate inventory and was woefully unprepared to launch RH Modern. Indeed, the Company knowingly placed orders over vendors' capacity, and gave vendors unrealistic deadlines, leading to the Company having grossly inadequate RH Modern inventory in-stock at the time of the launch. Even when vendors were able to manufacture RH Modern furniture, it was often damaged or unfinished as vendors had to rush to meet unrealistic deadlines, which led to numerous customers canceling their orders or returning defective RH Modern furniture.

**VI.   IN RESPONSE TO BELATED DISCLOSURE OF RH MODERN PROBLEMS, THE COMPANY MAKES FALSE EXCUSES AS INVESTORS SUFFER SIGNIFICANT LOSSES**

26.    On December 10, 2015, just two months after the official launch of RH Modern, the Company disclosed that it had missed its earnings projection due to "deceleration from the second quarter based on a shift in the timing of our new product introductions."  Specifically, the Company announced that the RH Modern source book magazine had been issued a month later than expected and thus sales for RH Modern were also delayed.  The Company further disclosed that while its inventory was up 25% year-over-year, RH Modern furniture was not fully in-stock stating, "[w]e expect RH Modern volumes to build as in-stocks improve."  These disclosures caused RH stock to decline by $3.78 per share, wiping out over $153 million in market value on December 11, 2015.  The market continued to react to the news on December 14, 2015, causing RH stock to decline $5.16 per share, wiping out an additional $210 million in market value.

27.    To stem this decline, Defendants made false statements to  reassure investors about the RH Modern launch, stating "[t]he early data would tell us that [RH Modern is] opening up an entirely new market, it's bringing in new customers, and it's accretive to our current core customers . . . . we're seeing hits on multiple levels, and that's why we're seeing the early response that we're seeing today."  Further, while the Company disclosed that RH Modern was not fully in-stock, it continued to assure investors the Company's industry position was strong, stating that inventory was up 25% year-over-year and that the Company expected "to end the year with inventory growth higher than our sales growth given the inventory investments in RH Modern and RH Teen . . . . The investments we have made in our supply chain and systems infrastructure will enable us to continue to improve our customer experience and support our long term growth."  Boone continued that, despite her previous assurances that the Company would be prepared for the release of RH Modern, the reason the Company was low on RH Modern inventory was because it wanted to be conservative initially in purchasing inventory, stating, "[l]et me just clarify, it's not that we were in and then we were out, it's really just a build of getting some of those most initial products.  Its every week we get more of the initial runs of things, and a certain -- we certainly

want to be conservative with how we buy the inventory."  Friedman further reassured investors that the RH Modern launch had been successful and that the lack of inventory was because demand for the product was so high stating, "the best sellers in a new business are always going to sell out, and you're going to always have to respond and catch up with those."  Based on these statements, the Company further raised its revenue guidance to a range of $2.17 to $2.18 billion, representing growth in the range of 16% to 17% and also raised its EPS guidance to a range of $3.11 to $3.16 or 32% to 34% increase from fiscal 2014.

28.    On February 9, 2016, the Company announced that its COO, Dunaj, would be resigning from the Company just one year after he was put in charge of inventory management. Analysts noted that the reasons behind Dunaj's resignation seemed strange.  For example, analysts from Buckingham Research stated "[w]hile we were not given any indication as to the nature of Ken Dunaj's resignation other than for personal reasons, we note that the company did not have a good explanation as to the timing of Mr. Dunaj's resignation."

29.    On February 24, 2016, the Company released its 2015 fourth quarter earnings results one month early and announced disappointing earnings.  The Company further disclosed that it would be investing $8-$10 million in customer accommodations during the first quarter due to "higher cancellation rates, shipping delays, and our overall initiative to elevate the customer experience . . . . We anticipate that these investments will moderate by the end of the second quarter as we reach optimal in-stock levels for RH Modern and improve our execution."  These disclosures caused RH stock to decline by $13.43 per share, wiping out over $546 million in market value.

30.    However, in an effort to stop this decline, the Company downplayed its poor quarterly performance, and falsely reassured investors that the problems related to RH Modern were over.  Specifically, in the Company's earnings call for the fiscal fourth quarter ended December 31, 2015, Friedman stated, "we're on the backside of the mountain, if you will.  So I think we are on the backside of this now. I think we're past the peak. The in stocks in Modern are going up."  Friedman assured investors that 70% of RH Modern products were in-stock stating, "[w]e're currently in the 70% range as far as our in stocks today, and we expect that to build to the mid-80%s by the end of the quarter which is more at a normalized level."  Defendants also offered

1   two reasons for its poor performance that shifted blame away from the Company itself.  First,

2   Friedman stated, "we are experiencing shipping delays as certain vendors are struggling to ramp

3   up production of this new product line."  Second, the Company blamed the underperformance on

4   "markets affected by energy, oil, or currency fluctuations."

5        31.    While these statements mollified the market, analysts continued to raise questions

6   about the Company's inventory levels related to RH Modern.  For example, on May 9, 2016,

7   analysts from BB&T Capital Markets surveyed 50 RH Modern products in order to determine how

8   many were currently in-stock.  The analysts found that only 40% of RH Modern products were in-

9   stock and that the survey results "run counter to management's late March commentary [that] 70%

10   of RH Modern inventory was currently in stock."  The analysts noted that the "survey results

11   indicate RH has made scant progress in 'catching up' with RH Modern backorders."

12        32.    The statements set forth in ¶26-31 were materially false and misleading.  Contrary

13   to Defendants' representations that the RH Modern launch was a remarkable success, in reality,

14   the launch of RH Modern was plagued by a severe lack of inventory leading to numerous shipping

15   delays, and customers canceling orders and returning defective RH Modern furniture.  Further,

16   Defendants' representations that the problems surrounding RH Modern were in the past, and were

17   the result of factors external to the Company, were materially false and misleading.  In truth, RH

18   Modern inventory was grossly inadequate throughout the Class Period.

19        33.    Then, on June 8, 2016, just two months after Defendants had assured investors that

20   the worst problems related to RH Modern were over, the Company announced that it was

21   dramatically lowering its earnings guidance for fiscal 2016 "largely due to RH Modern production

22   delays during the first half."  On the same day, the Company held a conference call with analysts

23   and investors to discuss the Company's earnings and operations for the first quarter of 2016.

24   During that call, Boone disclosed the Company had "invested approximately $18 million during

25   the first quarter in customer accommodations and related expenses, largely as a result of RH

26   Modern production delays," nearly twice as much as the Company stated it would spend to

27   accommodate customers just months earlier.

28        34.    Analysts noted their shock and disappointment in the true state of RH's operations.

For example, analysts from BB&T Capital Markets stated they were "flabbergasted by how quickly the wheels appear to be falling off of RH, and think the last two quarters' debacles cast significant doubt on management's credibility and ability to achieve its long-term financial targets."

35.     As a result of these disclosures, RH stock declined by $7.66 per share, wiping out over $311 million in market value on that day alone.

## VII.   LOSS CAUSATION

36.     During the Class Period, as detailed herein, Defendants made materially false and misleading statements and omissions, and engaged in a scheme to deceive the market.  This artificially inflated the price of RH common stock and operated as a fraud or deceit on the Class (as defined below).  When Defendants' prior misrepresentations and fraudulent conduct began to be revealed on December 10, 2015 and February 24, 2016, Defendants made falsely reassuring statements to prevent the stock from declining further.   Then, when Defendants' prior misrepresentations and fraudulent conduct were fully revealed on June 8, 2016, the price of RH common stock fell precipitously again, as the prior artificial inflation came out of the stock price. As a result of their purchases of RH common stock during the Class Period, Plaintiff and other members of the Class suffered economic loss, *i.e.*, damages, under the federal securities laws.

## VIII.   CLASS ACTION ALLEGATIONS

37.     Plaintiff brings this action as a class action pursuant to Rule 23 of the Federal Rules of Civil Procedure on behalf of all persons who purchased the common stock of RH during the Class Period (the "Class").  Excluded from the Class are Defendants and their families, directors, and officers of RH and their families and affiliates.

38.     The members of the Class are so numerous that joinder of all members is impracticable.  The disposition of their claims in a class action will provide substantial benefits to the parties and the Court.  As of December 2, 2016, there were approximately 41 million shares of RH stock outstanding.

39.     Questions of law and fact common to the members of the Class which predominate over questions which may affect individual Class members include:

(a)     Whether Defendants violated the Exchange Act;

(b)     Whether Defendants omitted and/or misrepresented material facts;

(c)     Whether Defendants' statements omitted material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading;

(d)     Whether Defendants knew or recklessly disregarded that their statements and/or omissions were false and misleading;

(e)     Whether the price of RH common stock was artificially inflated;

(f)     Whether Defendants' conduct caused the members of the Class to sustain damages; and

(g)     The extent of damages sustained by Class members and the appropriate measure of damages.

40.     Plaintiff's claims are typical of those of the Class because Plaintiff and the Class sustained damages from Defendants' wrongful conduct.

41.     Plaintiff will adequately protect the interests of the Class and has retained counsel experienced in class action securities litigation.  Plaintiff has no interests which conflict with those of the Class.

42.     A class action is superior to other available methods for the fair and efficient adjudication of this controversy.

**IX.     INAPPLICABILITY OF STATUTORY SAFE HARBOR**

43.     RH's "Safe Harbor" warnings accompanying its forward-looking statements issued during the Class Period were ineffective to shield those statements from liability.

44.     Defendants are also liable for any false or misleading forward-looking statements pleaded herein because, at the time each such statement was made, the speaker knew the statement was false or misleading and the statement was authorized and/or approved by an executive officer of RH who knew that the statement was false.  None of the historic or present tense statements made by Defendants were assumptions underlying or relating to any plan, projection, or statement of future economic performance, as they were not stated to be such assumptions underlying or

relating to any projection or statement of future economic performance when made, nor were any of the projections or forecasts made by Defendants expressly related to, or stated to be dependent on, those historic or present tense statements when made.

## X.   PRESUMPTION OF RELIANCE

45.     At all relevant times, the market for RH common stock was an efficient market for the following reasons, among others:

(a)     RH stock met the requirements for listing, and was listed and actively traded on the New York Stock Exchange, a highly efficient and automated market;

(b)     As a regulated issuer, RH filed periodic public reports with the SEC and the New York Stock Exchange;

(c)     RH regularly and publicly communicated with investors via established market communication mechanisms, including through regular disseminations of press releases on the national circuits of major newswire services and through other wide-ranging public disclosures, such as communications with the financial press and other similar reporting services; and

(d)     RH was followed by several securities analysts employed by major brokerage firm(s) who wrote reports which were distributed to the sales force and certain customers of their respective brokerage firm(s).  Each of these reports was publicly available and entered the public marketplace.

46.     As a result of the foregoing, the market for RH securities promptly digested current information regarding RH from all publicly available sources and reflected such information in the price of RH common stock.  Under these circumstances, all purchasers of RH common stock during the Class Period suffered similar injury through their purchase of RH common stock at artificially inflated prices and the presumption of reliance applies.

## COUNT I

### For Violation of Section 10(b) of the Exchange Act and Rule 10b-5 Against All Defendants

47.     Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein.

48.     During the Class Period, Defendants carried out a plan, scheme, and course of

conduct which was intended to and, throughout the Class Period, did: (i) deceive the investing public, including Plaintiff and other Class members, as alleged herein; and (ii) cause Plaintiff and other members of the Class to purchase RH common stock at artificially inflated prices.

49.     Defendants: (i) employed devices, schemes, and artifices to defraud; (ii) made untrue statements of material fact and/or omitted to state material facts necessary to make the statements not misleading; and (iii) engaged in acts, practices, and a course of business which operated as a fraud and deceit upon the purchasers of the Company's common stock in an effort to maintain artificially high market prices for RH common stock in violation of Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.

50.     Defendants, individually and in concert, directly and indirectly, by the use, means or instrumentalities of interstate commerce and/or of the mails, engaged and participated in a continuous course of conduct to conceal adverse material information about the Company's financial well-being, operations and prospects.

51.     During the Class Period, Defendants made the false statements specified above, which they knew or recklessly disregarded to be false or misleading in that they contained misrepresentations and failed to disclose material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

52.     Defendants had actual knowledge of the misrepresentations and omissions of material fact set forth herein, or recklessly disregarded the true facts that were available to them. Defendants engaged in this misconduct to conceal RH's true condition from the investing public and to support the artificially inflated prices of the Company's common stock.

53.     Plaintiff and the Class have suffered damages in that, in reliance on the integrity of the market, they paid artificially inflated prices for RH common stock.  Plaintiff and the Class would not have purchased the Company's common stock at the prices they paid, or at all, had they been aware that the market prices for RH common stock had been artificially inflated by Defendants' fraudulent course of conduct.

54.     As a direct and proximate result of Defendants' wrongful conduct, Plaintiff and the other members of the Class suffered damages in connection with their respective purchases of the

Company's common stock during the Class Period.

55.     By virtue of the foregoing, Defendants violated Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.

## COUNT II

### For Violation of Section 20(a) of the Exchange Act Against the Individual Defendants

56.     Plaintiff repeats, incorporates, and realleges each and every allegation set forth above as if fully set forth herein.

57.     The Individual Defendants acted as controlling persons of RH within the meaning of Section 20(a) of the Exchange Act.  By virtue of their high-level positions, participation in and/or awareness of the Company's operations, direct involvement in the day-to-day operations of the Company, and/or intimate knowledge of the Company's actual performance, and their power to control public statements about RH, the Individual Defendants had the power and ability to control the actions of RH and its employees.  By reason of such conduct, the Individual Defendants are liable pursuant to Section 20(a) of the Exchange Act.

## XI.   PRAYER FOR RELIEF

WHEREFORE, Plaintiff prays for judgment as follows:

A.     Determining that this action is a proper class action under Rule 23 of the Federal Rules of Civil Procedure;

B.     Awarding compensatory damages in favor of Plaintiff and other Class members against all Defendants, jointly and severally, for all damages sustained as a result of Defendants' wrongdoing, in an amount to be proven at trial, including interest thereon;

C.     Awarding Plaintiff and the Class their reasonable costs and expenses incurred in this action, including attorneys' fees and expert fees; and

D.     Awarding such equitable/injunctive or other further relief as the Court may deem just and proper.

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

## XII.  <u>JURY DEMAND</u>

Plaintiff demands a trial by jury.

Dated:  February 2, 2017

Respectfully submitted,

BERNSTEIN LITOWITZ BERGER
   & GROSSMANN LLP

*/s/ Blair A. Nicholas*
BLAIR A. NICHOLAS

BLAIR A. NICHOLAS (Bar No. 178428)
(blairn@blbglaw.com)
12481 High Bluff Drive, Suite 300
San Diego, CA 92130
Tel:    (858) 793-0070
Fax:    (858) 793-0323

GERALD H. SILK
(jerry@blbglaw.com)
AVI JOSEFSON
(avi@blbglaw.com)
1251 Avenue of the Americas, 44th Floor
New York, New York 10020
Tel:    (212) 554-1493
Fax:    (212) 554-1444

*Attorneys for Plaintiff City of Miami
General Employees' & Sanitation
Employees' Retirement Trust*