1   BERNSTEIN LITOWITZ BERGER
        & GROSSMANN LLP
2   DAVID R. STICKNEY (Bar No. 188574)
    (davids@blbglaw.com)
3   BRANDON MARSH (Bar No. 268316)
    (brandon.marsh@blbglaw.com)
4   JENNY E. BARBOSA (Bar No. 292385)
    (jenny.barbosa@blbglaw.com)
5   12481 High Bluff Drive, Suite 300
    San Diego, CA 92130
6   Tel:    (858) 793-0070
    Fax:    (858) 793-0323
7
8   *Attorneys for Lead Plaintiffs Public School Teachers'*
    *Pension & Retirement Fund of Chicago and*
9   *Arkansas Teacher Retirement System*
    *and Lead Counsel for the Class*

10

11                  UNITED STATES DISTRICT COURT
                 NORTHERN DISTRICT OF CALIFORNIA
12                       OAKLAND DIVISION

13   IN RE RH, INC. SECURITIES            Case No. 4:17-00554-YGR
     LITIGATION,
14                                        ECF CASE

15                                        **CONSOLIDATED CLASS ACTION
                                          COMPLAINT FOR VIOLATIONS
16                                        OF THE FEDERAL SECURITIES
                                          LAWS**
17

18                                        DEMAND FOR JURY TRIAL

19

20

21

22

23

24

25

26

27

28

## TABLE OF CONTENTS

Page

I.   INTRODUCTION .................................................................................... 1

II.  JURISDICTION AND VENUE ............................................................... 6

III. THE PARTIES........................................................................................ 6

     A.   Plaintiffs ...................................................................................... 6

     B.   Defendants .................................................................................. 7

IV.  SUMMARY OF THE ACTION ............................................................. 8

     A.   The Company Launched RH Modern Without Adequate Inventory ................... 10

          1.   RH Did Not Order RH Modern Products In Time For The Launch ............... 10

          2.   RH Could Not Fulfill Orders Due To Lack Of Inventory ....................... 14

          3.   Customers Faced Long Delays And Cancelled Orders............................ 20

          4.   RH Accumulated Inventory On Its Existing Product Lines In 2015 ............. 22

     B.   RH's Top Executives Knew About The Lack Of RH Modern Inventory, Lead Times, And Cancellations .......................... 26

          1.   Friedman Waited To Finalize Designs ..................................... 26

          2.   Friedman Staged Video And Photoshoots For RH Modern ................... 29

          3.   RH's Inventory Tracking Systems Showed To Executives The Lack Of Inventory................................ 31

          4.   Friedman's Hands-On Management Style................................ 35

          5.   RH's Management Closely Monitored The Overwhelming Complaints About RH Modern.............................. 37

          6.   Friedman Resorted To The Costly "Delight The Customer" Initiative ............................. 39

     C.   Defendants Promoted The Launch Of RH Modern And Inventory Levels........................................ 44

     D.   RH Revealed The Truth About RH Modern Through Partial Disclosures While Continuing To Misrepresent The Launch And Inventory Issues ............................... 55

V.   DEFENDANTS' FALSE AND MISLEADING STATEMENTS AND OMISSIONS ................................................. 67

VI.    ADDITIONAL ALLEGATIONS OF DEFENDANTS' SCIENTER ............................. 77

VII.   LOSS CAUSATION ........................................................................................... 81

VIII.  PRESUMPTION OF RELIANCE ..................................................................... 83

IX.    INAPPLICABILITY OF THE STATUTORY SAFE HARBOR AND
       BESPEAKS CAUTION DOCTRINE ................................................................. 84

X.     CLASS ACTION ALLEGATIONS ................................................................. 85

XI.    CLAIMS FOR RELIEF ..................................................................................... 86

COUNT I  For Violations Of Section 10(b) Of the Exchange Act And SEC Rule
         10b-5 Promulgated Thereunder (Against All Defendants) ............................. 86

COUNT II  For Violations Of Section 20(a) Of The Exchange Act (Against
          Defendants Friedman and Boone) ...................................................... 88

XII.   PRAYER FOR RELIEF ..................................................................................... 90

XIII.  JURY DEMAND ............................................................................................. 90

Lead Plaintiffs, Public School Teachers' Pension & Retirement Fund of Chicago and Arkansas Teacher Retirement System, allege the following based upon personal knowledge as to themselves and their own acts and upon information and belief as to all other matters. Plaintiffs' information and belief are based on the ongoing independent investigation of their undersigned counsel. This investigation includes review and analysis of: (i) RH, Inc.'s ("RH" or the "Company") public filings with the U.S. Securities and Exchange Commission ("SEC"); (ii) research reports by securities and financial analysts; (iii) videos and transcripts of RH's conference calls with analysts and investors; (iv) Company presentations, press releases, and reports; (v) Company marketing material; (vi) news and media reports concerning the Company and other facts related to this action; (vii) price and volume data for RH securities; (viii) information from consultations with relevant experts; (ix) information provided by former RH employees; and (x) additional material and data concerning the Company, as identified herein.

# I. INTRODUCTION

1.      RH, Inc. – known until recently as Restoration Hardware – is a retailer of home furnishings. Lead Plaintiffs bring this class action against the Company and two of its top officers, Gary Friedman (its long-time CEO and Board Chairman) and Karen Boone (RH's Co-President and CFO). This case arises from Defendants' false and misleading statements regarding the launch of RH's new product line, RH Modern, and the Company's inventory levels. Lead Plaintiffs assert claims pursuant to Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 on behalf of themselves and all other purchasers of RH common stock between March 26, 2015 and June 8, 2016 (the "Class Period").

2.      RH sells its home furnishing products directly to consumers through several channels, including over 80 retail stores in the United States, outlet stores, websites and voluminous "source book magazines." In the years leading up to the Class Period, RH experienced significant revenue growth. By the start of the Class Period, however, revenue growth and same-store sales from RH's existing product lines had slowed substantially. RH sought to restore its sales growth by greatly expanding its product assortment through

new brands, particularly "RH Modern."

3.     Defendants heavily promoted to investors the Company's preparation and launch of RH Modern through press releases, dramatic video presentations, photo shoots, and statements during conference calls with securities analysts. Friedman sold RH Modern as "the most innovative and new concept in the world of home design" that "represented our finest work to date." He described RH Modern as "the most important and significant new home furnishings business to be launched in the last 15 or 20 years." Prior to the release of RH Modern, Defendants repeatedly assured investors that RH was prepared for the launch, stating that RH was growing its inventory levels, was making the "necessary" inventory investments, and could "compete on speed" of delivery for RH Modern.

4.     In-stock merchandise of RH Modern was key to the launch. Without adequate inventory, customers who placed orders for RH Modern products would face long delays to receive their products, leading to cancelled orders and costly accommodations. For the launch, RH required a lead time of at a minimum six months from ordering the product from its manufacturers to having it in stock. Even after products were designed, RH needed to complete several steps before the new products would be in stock. RH needed to secure manufacturers (usually in China) with capacity to fulfill orders, order the sample products, approve the samples, source the materials, have the products manufactured, ship them to locations in the United States, control the quality of the products, make any necessary replacement orders, receive replacements, and provide final customer delivery. As explained below, long lead times in the industry are "like physics; it's the law of materials and production."

5.     The Class Period starts on March 26, 2015, when Defendants announced the launch of RH Modern and also claimed that RH was "systematically placing orders now," which "should help us with lead times [and] help us with inventory flow." Defendants emphasized RH's preparedness for the launch throughout 2015. For example, Friedman stated "[on] the Modern side, and the lead times, the wait times are a real disadvantage for the people in the marketplace today" but "[w]e are going to compete on speed just like we

would our current business." He continued, "it's going to be a huge competitive advantage versus how the marketplace exists and operates today." Likewise, while releasing in June 2015 a dramatic video revealing the wide variety of RH Modern furniture, Defendants stated that inventory would grow "ahead of sales."

6. Securities analysts and investors closely watched the launch and implementation of RH Modern. For instance, analysts noted in March 2015 that "[m]anagement . . . expects inventory growth to exceed sales growth in 2015 . . . as RH continues to invest in assortment/category expansion and improved in-stocks." Following Defendants' further promotion of RH Modern and inventories in June 2015, analysts reported that "management expects inventory levels to grow by year end as a higher level is needed to support growth and its new concept/categories." In October 2015, analysts cited RH's purported "better in-stock levels," noting that "[i]nventory for RH Modern and RH Teen are largely in transit" and that "RH continues to expect inventory growth to outpace sales growth for the remainder of 2015, driven by the planned product launches."

7. In truth, however, the preparation and launch of RH Modern were debacles from the outset due to a near-complete lack of inventory. As explained below, Defendants marketed RH Modern before designs were finalized and without placing orders with manufacturers. When Defendants launched the RH Modern website in September 2015 and released the 540-page RH Modern catalog, there was essentially no RH Modern furniture in stock. Friedman, who personally approved the designs for all RH Modern products, delayed finalization of them until just before the release. This prevented RH from even placing inventory orders, much less completing the additional steps in the supply chain for creation of inventory.

8. And, as Friedman knew, the RH Modern catalog featured Photoshopped images of products that did not exist, and the videos through which he promoted RH Modern also showcased unavailable, unfinished products. The Company website also displayed products created in Photoshop that were digitally manipulated and not fully designed. RH created the Universal Product Code ("UPC") so that a customer could order

it, but RH had never even seen the product.  When customers ordered products, the clock started for them.  Without inventory for RH Modern, customers immediately faced lengthy undisclosed delays, sometimes of over a year, and cancelled their orders.  Friedman and Boone – aware of the lack of inventory, pervasive complaints and cancellations from myriad reports and sources – attempted a costly initiative to stem the flood of cancellations. Called the "delight the customer" initiative, it authorized all employees to give unlimited accommodations, such as $10,000 gift cards or entire orders for free, increasing expenses by $18 million in the first quarter of 2016 alone.

9.     Striving to leave the impression that the Company increased its RH Modern inventory ahead of sales, Defendants also reported that the Company's inventory increased for the first three quarters of 2015.  But, in truth, the increased levels of inventory came from RH's *existing* lines.  Excess inventory accumulated because sales growth for the existing product lines had slowed, and customers increasingly returned products.  Eight hundred trailers stored unsold products from the existing line at a distribution center because the facility lacked capacity.  Overflowing with excess inventory on the non-RH Modern lines, RH built additional warehouses and outlet stores.

10.    The truth emerged in a series of partial disclosures and events between December 10, 2015 and June 8, 2016.  On December 10, 2015, the Company disclosed its low "in-stock position" on RH Modern, causing the RH stock price to drop by over 10%, but Defendants continued to omit material facts when discussing publicly the launch of RH Modern.  On February 24, 2016, Defendants further disclosed "shipping delays" for RH Modern that "poor in-stocks . . . suppressed orders," and that resulting financial performance was far below the Company's recent guidance.  RH stock dropped by over 25%.

11.    Defendants blamed RH's vendors, "volatility in the U.S. stock markets," and myriad macro issues for its financial results.  On March 17, 2016, however, BB&T Capital Markets reported that, contrary to Defendants' representations, RH still suffered from "shocking" back orders of RH Modern products and that the problems were "even worse

than we feared." The Company's value fell by $89 million. Finally, on June 8, 2016, RH disclosed "RH Modern production delays" and revealed $18 million in expense for customer accommodations following the RH Modern launch. RH further disclosed that on the non-RH Modern product lines there was "extra inventory" that was "bloating [the] balance sheet" and "overstock . . . across the board," leading to "clearance events" and more outlet stores. RH's stock price plunged again, erasing over $386 million in shareholder value.

12. In total, the Company's share price declined approximately 75% from its Class Period high of $106.49 per share, erasing more than $3 billion in shareholder value. The chart below shows the movement of the Company's stock during the Class Period:



13. In the aftermath, analysts repeatedly questioned management's credibility, stating: "CEO Gary Friedman has stretched the limits of credulity with many of his statements"; "[i]nvestors should not buy management's unconvincing explanations" for poor financial results; "the last two quarters' debacles cast significant doubt on management's credibility"; and RH's "earnings reports have been filled with dubious

excuses and self-inflicted errors." RH's Chief Operating Officer left the Company, and the Company stated that three Co-Presidents, rather than Friedman, would have authority to make decisions going forward.

14.     By this action, investors seek redress for Defendants' violations of the federal securities laws.

## II.    JURISDICTION AND VENUE

15.     This Court has jurisdiction over the subject matter of this action pursuant to Section 27 of the Exchange Act, 15 U.S.C. § 78aa. In addition, because this is a civil action arising under the laws of the United States, this Court has jurisdiction pursuant to 28 U.S.C. §§ 1331 and 1337.

16.     Venue is proper in this District pursuant to 28 U.S.C. § 1391(b) and Section 27 of the Exchange Act, 15 U.S.C. § 78aa. RH is headquartered and conducts business in this District, and many of the acts and transactions that constitute violations of law complained of herein, including the dissemination to the public of untrue statements of material facts, occurred in this District.

17.     In connection with the acts alleged herein, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including but not limited to the mails, interstate telephone communications, and the facilities of a national securities exchange.

## III.   THE PARTIES

### A.    Plaintiffs

18.     On April 26, 2017, the Court appointed the Public School Teachers' Pension & Retirement Fund of Chicago ("Chicago Teachers") and Arkansas Teacher Retirement System ("Arkansas Teacher") as Lead Plaintiffs pursuant to 15 U.S.C. § 78u-4(a)(3)(B).

19.     Chicago Teachers is a public pension fund that manages retirement funds of current and former employees of public and charter schools in Chicago, Illinois. As of June 30, 2016, Chicago Teachers oversaw more than $10 billion in assets for more than 63,000 members. As set forth in the attached certification, Chicago Teachers purchased

RH common stock during the Class Period and suffered damages as a result of the violations of the federal securities laws alleged herein.

20.     Arkansas Teacher is a public pension fund that provides retirement, disability, and survivor benefits to active and retired public school employees and employees of educationally related agencies of the State of Arkansas.  As of April 30, 2017, Arkansas Teacher oversaw more than $15.5 billion in assets for the benefit of over 110,000 members.  As set forth in the attached certification, Arkansas Teacher purchased RH common stock during the Class Period and suffered damages as a result of the violations of the federal securities laws alleged herein

**B.     Defendants**

21.     Defendant RH is incorporated in Delaware and maintains its headquarters at 15 Koch Road, Corte Madera, California.  Effective January 1, 2017, the Company formally changed its name from Restoration Hardware Holdings, Inc. to RH, Inc.  RH's common stock traded in an efficient market on the New York Stock Exchange ("NYSE") under the ticker symbol "RH."  As of October 31, 2016, there were approximately 41 million shares of RH stock outstanding.

22.     Defendant Gary Friedman ("Friedman") is, and was at all relevant times, RH's Chief Executive Officer ("CEO") and Chairman.  Defendant Friedman signed RH's annual reports on Form 10-K for the fiscal years 2014, 2015, and 2016, and also signed the Company's interim quarterly financial reports on Form 10-Q throughout the Class Period.

23.     Defendant Karen Boone ("Boone") is, and was at all relevant times, RH's Chief Financial and Administrative Officer.  On May 10, 2016, Defendant Boone was also named as one of RH's Co-Presidents, along with Eri Chaya and DeMonty Price.  During the Class Period, Defendant Boone led all financial and administrative functions for the Company, including strategic and financial planning, quality, accounting, treasury, tax, internal audit, human resources, investor relations, legal, and facilities.  Defendant Boone signed RH's annual reports on Form 10-K for the fiscal years 2014, 2015, and 2016, and also signed the Company's interim quarterly financial reports on Form 10-Q throughout

1  the Class Period.

2       24.     Defendants Friedman and Boone are collectively referred to hereinafter as

3  the "Individual Defendants."   The Individual Defendants possessed the power and

4  authority to control the contents of RH's reports to the SEC, press releases, and

5  presentations to securities analysts, money and portfolio managers, and investors.   Each of

6  the Individual Defendants was provided with copies of the Company's reports, press

7  releases, and videos alleged herein to be misleading prior to, or shortly after, their issuance

8  and had the ability and opportunity to prevent their issuance or cause them to be corrected.

9  **IV.    SUMMARY OF THE ACTION**

10      25.     RH is a retailer of luxury home furnishings such as couches, chairs, tables,

11  lamps, and rugs.   RH sells its products through its website, numerous retail stores in the

12  United States, and its voluminous and glossy "source books," *i.e.*, product catalogs that are

13  widely distributed to potential customers.   As of April 29, 2017, the Company operated a

14  total of 85 retail stores and 28 outlet stores in 32 states, the District of Columbia, Canada

15  and the U.K.

16      26.     While many retailers have moved away from using large catalogs to sell their

17  products and instead emphasize in-store and online sales, RH emphasizes the importance

18  of its source books to stoke consumer interest and orders.   RH's source books display nearly

19  every item in the product line and reflect the various styles, fabrics, and finishes available

20  for each product.   The source books commonly reach 200-300 pages in length.   The source

21  book most relevant to this case, the RH Modern source book (the "Source Book"), was 540

22  pages.

23      27.     Customer satisfaction and conversion to sales depends heavily on how

24  quickly RH delivers products.   For example, during a September 11, 2013 earnings call,

25  Defendant Boone explained to investors that the Company's "number-one priority [is] to

26  get the inventory balances up . . . [and] reduce our back orders[.]"   On a June 11, 2014

27  investor conference call, Defendant Boone emphasized that "by having better in-stock

28  positions and lower back orders, our conversion improved and we were able to ship and

deliver products to our customers earlier, [which] resulted in additional net revenue growth." RH also informed investors that the Company recognizes revenue on its sales when products are delivered to customers.

28. During the Class Period, RH did not manufacture any of the products it sold; instead, RH contracted with manufacturers. Most of RH's manufacturers – frequently referred to as RH "vendors" – were located overseas. RH sourced approximately 69% of its products from vendors in Asia in fiscal 2013, and that figure rose to 82% in fiscal 2015. In each year, most of the RH products sourced from Asia were from vendors in China.

29. Sourcing products from foreign manufacturers involved significant lead times. As noted in a December 18, 2013 KeyBanc analyst report regarding RH, goods sourced from foreign manufacturers "require longer lead times than domestic manufacturing." Leading up to the Class Period, RH stated that its "typical product lead times [were] 3-9 months" and that the Company was "require[d] . . . [to] provide vendors with significant ordering lead time." Lead times are longer when launching a product line consisting of a high percentage of new products, due to the product assortment and newness.

30. Leading up to the Class Period, the growth rates of RH's in-store sales, total net revenues, and "comparable brand revenue growth," had decelerated.[1] While RH reported comparable brand revenue growth of 31% for its fiscal year ending February 1, 2014, it declined to 20% for the year ending January 31, 2015. For the same period, RH's in-store sales growth rate declined even as its total leased selling square footage continued to climb, and the costs of its goods increased significantly. To restore growth, RH announced its entry into new categories of furnishings, particularly the "modern" segment.

---

[1] RH defined "comparable brand revenue growth" as "including retail comparable store sales, including Baby & Child Galleries, and direct net revenues. Comparable brand revenue growth excludes retail non-comparable store sales, closed store sales and outlet store net revenues. Comparable store sales have been calculated based upon retail stores, excluding outlet stores, that were open at least fourteen full months as of the end of the reporting period and did not change square footage by more than 20% between periods."

## A.    The Company Launched RH
## Modern Without Adequate Inventory

31.    In March 2015, Defendants announced the fall launch of a "game-changing" new product line.  Defendant Friedman personally oversaw the design, preparation, and launch of RH Modern.  Although RH needed to order RH Modern products from its vendors **by March 2015 at the latest** (approximately six months before the launch date) to have any significant inventory at the time of launch, Defendant Friedman delayed product development through changes to product assortment until the time of RH Modern launch.  Contrary to public statements that RH was building inventory in 2015 and would grow inventory ahead of sales, RH failed to place advance orders and had essentially **no stock** of RH Modern products at the time of launch.  Customers immediately faced undisclosed and indeterminate delays, causing pervasive customer dissatisfaction, written complaints, and order cancellations.

### 1.    RH Did Not Order RH Modern
### Products In Time For The Launch

32.    Multiple former RH employees explain that RH needed to order RH Modern products far in advance of the launch date in order to have RH Modern inventory available to fulfill customer orders at the time of the RH Modern launch.

33.    RH's Director of Product Development from April 2009 to May 2015, for instance, explained that ordering in advance of a launch is "kind of like physics; it's the law of materials and production."[2]  He explained that it takes at least six months from finalization of design to deliver product.  After the product design is finished, it takes three

---

[2] RH's Director of Product Development from April 2009 to May 2015 oversaw product development.  He worked on the RH Modern line, and oversaw vendors and designers in their efforts to design new products to present to Defendant Friedman.  He worked directly with the executive team to review products and product strategies, and to manage styling direction.  He was also responsible for working with manufacturers to get the goods produced and secure samples to be photographed for marketing efforts, and worked with various teams to style RH's source books.  He had access to RH's various product and tracking databases and assisted with efforts to standardize and streamline the information in these databases.

to four weeks to make the first sample.  Then there is transit time.  There may be changes that need to be made once RH sees the actual product, which could add more time on as RH waited to get a new sample that also needs to be approved.  Once RH has the correct sample, RH has to wait 90-120 days for the first orders to get to the port, which could be China or India, for example.  It then takes 30 days to ship product on the water from China and 45 days on the water from India.  It then takes another 2-3 weeks for the product to get through customs and to the RH distribution center.  Finally, RH has to ship the product to the customer, which takes another week or two.  According to RH's Director of Product Development from April 2009 to May 2015, it was plainly obvious to Friedman, Boone, and other executives at the time of the launch that if they had not ordered the inventory, they would have six-month delays to get the RH Modern orders filled.

34.    RH's Buyer from 2014 to 2016 similarly agreed that for the launch of RH Modern, they should have ordered product six months in advance.[3]  RH's Northwest Commercial Territory Leader from May 2015 to May 2016 also confirmed the lead time of at least six months, especially when the RH Modern products were coming from overseas.[4]  He agreed that when doing a big launch, you have to think about lead time, and also have a certain amount of that product in stock for the first orders that come in.  He also stated that it was correct that before a launch, a company will typically order stock six months ahead of the launch to check for quality and have items in stock.  According to RH's Northwest Commercial Territory Leader from May 2015 to May 2016, it was apparent that

---

[3] RH's Buyer from 2014 to 2016 worked at RH headquarters and was responsible for product selection, development and purchasing of hard goods, and furniture for RH Modern and RH's other lines.  Inventory level was a part of his job scope.  He also managed and organized conference calls with vendors to discuss items past due, to address manufacturing issues and get new due dates in place.  In addition, he worked on a number of Defendant Friedman's personal residences.  Anything that dealt with getting product into the store came from his team.  His team was responsible for both in-distribution-center deliverables and samples for new store openings.

[4] RH's Northwest Commercial Territory Leader from May 2015 to May 2016, based in the San Francisco region, has worked in the design industry for 20 years and was responsible for sales and business development for RH.  He reported to Claire Eeles, RH's current Senior Vice President of Global Business to Business, and Eeles reported to Defendant Friedman.

RH was going to have long lead times when it launched RH Modern, and RH had not ordered anything.

35.    RH's Customer Service Lead Assist until April 2016 also stated that RH should have ordered the RH Modern product at least six months in advance of the launch to ensure that they had quality stock on hand for the launch.[5]  She stated that RH should have had the Modern products in stock in March 2015 based on how the business works.

36.    RH's former employees also explained the particular importance of ordering products well in advance of the launch given that vendors for the RH Modern launch were the same vendors for RH's other product lines.  RH's Supply Chain Operations Analyst and Project Manager from 2012 to October 2015 explained that for RH Modern, RH used vendors who were producing other lines, some of whom were already having problems getting RH's regular product in on time.[6]  Yet, RH increased the production burden for the RH Modern line on top of that.  RH's Buyer from 2014 to 2016 explained that the vendors were telling RH in mid-2015 that they were already at capacity, and that if those vendors were still producing for other lines as well, RH should have ordered Modern more than six months ahead of time.  He noted that when a vendor tells you that they have hit capacity, then there is nothing they can do.  You can only move a machine so fast.  "It was all ill prepared," he remarked.

37.    RH's Director of Product Development from April 2009 to May 2015 also agreed that because RH was using already busy vendors from its other lines to now produce for Modern as well, the delays were inevitable.  He explained that a lot of the manufacturing

---

[5] RH's Customer Service Lead Assist until April 2016 was employed in customer service positions at RH for years leading up to the Class Period.  She had access to RH's inventory and ordering systems, handled customer escalations and accommodations, and oversaw a team of individuals in customer service.  In her most recent position at RH, she reported to Karen Ferguson, who supervised corporate escalations and reported directly to Defendant Friedman.

[6] RH's Supply Chain Operations Analyst and Project Manager from 2012 to October 2015 began working on RH Modern a couple of months before the collection launched and was responsible for providing Company-wide reporting on returns, exchanges, and sales.  She also worked with new RH vendors to make sure the contracts and paperwork were completed and that the vendors understood the process and requirements.

for RH Modern was done in factories with which RH had been working on RH's Interiors line. RH's Director of Product Development from April 2009 to May 2015 estimated that 100% of the vendors for RH Modern were repeat vendors. Most had been working with RH for 7-10 years or more. He would estimate that RH used 10-12 vendors depending on the category. For instance, there were 4-5 different vendors for the lighting category. The vendors were in different countries, including Vietnam, China, and India. For RH Modern, the vendors were located primarily in China and Vietnam. It would depend on the category of product, but a significant amount of the RH Modern product comes from China.

38. The product delays for the RH Modern launch were exacerbated because of the large percentage of products in the RH Modern line that were entirely new products. According to RH's Director of Product Development from April 2009 to May 2015, because of all of the new products in the RH Modern line, it was obvious that RH needed to order inventory even more than 7 months in advance of the launch. With other RH product launches, the percentage of new products was lower than with RH Modern. For instance, only 30% of the products in the RH Interiors catalog was new. In addition, RH's Director of Quality Assurance, Technology Division, from December 2015 to June 2016 explained that in retail the very first thing you do if you are going to launch a new brand is ensure that you have inventory records.[7] However, with the RH Modern launch, there were brand new SKUs that did not exist in RH's inventory management system, and that if RH does not have those items in the system, then it is extremely difficult to fulfill orders. Once you launch and all those items are up on the website but you cannot fill them for 6-7 months, he explained, you are going to lose 90% of the orders.

---

[7] RH's Director of Quality Assurance, Technology Division, from December 2015 to June 2016 worked at RH headquarters and was responsible for Quality Assurance and Engineering within the organization. He worked to redefine the Company's engineering practices to better meet the business demands of RH's current and new brands. He assessed and managed quality issues that arose within the Company's inventory management system and supply chain application, as well as the merchandising and tracking systems. He was also involved in redesign efforts of the Company's website. He has worked within the retail industry for 20 years, primarily in the quality assurance field.

### 2. RH Could Not Fulfill Orders Due To Lack Of Inventory

39.    Given RH's failure to place timely orders with its vendors for the Modern launch, RH did not have stock to fulfill customer orders when it released the Modern Source Book.

40.    RH's Customer Service Lead Assist until April 2016 explained that when the RH Modern Source Book came out, there was not one piece of Modern furniture in stock; there was nothing. She stated that the public statements that RH was building inventory in 2015 and would grow inventory ahead of sales at the end of Q4 (*see* ¶¶128, 148, 183, 193 below) were misleading. Employees heard about those statements, "but we also knew that was not the case." She stated that that was not happening, and employees knew at the time that it was not true. RH's Customer Service Lead Assist until April 2016 further stated that Boone's statement in December 2015 about having inventory growth ahead of sales growth in Q4 mostly because of the "cadence of newness" (*see* ¶¶148, 193 below) was "absolutely" false because in December 2015 "we knew there was no inventory." She stated that she understood Boone's statement, "cadence of newness," to refer to RH Modern.

41.    RH's Northwest Commercial Territory Leader from May 2015 to May 2016 confirmed that there was a disconnect between statements that RH was going to sell product, and the reality that the Company had not preordered any from its vendors by the time of the launch. RH's Manager of Financial Planning and Analysis throughout the Class Period explained that when the Company put out a Source Book, it gave an indication to the public that product is available, but product was not available for RH Modern.[8] The product was not in stock and was back ordered for months. According to him, the issue

---

[8] RH's Manager of Financial Planning and Analysis throughout the Class Period worked at corporate headquarters and reported directly to RH's Senior Director of Finance. As a member of the FP&A team, he was responsible for forecasting financials for the year, closing out the month, providing guidance for the earnings calls, and supporting the business and the planners and merchants in driving revenue and profitability. The FP&A team, who worked closely with Defendant Boone, provided analyses that were used in the earnings and revenue projections that RH published. The FP&A team was also responsible for providing Defendant Boone with an up-to-date "CFO Package" every week that contained information on sales, demand, and how the Company was converting demand to net sales.

was when Modern launched, RH basically had no inventory in stock, and as a result, when RH received a lot of customers' orders, they could not fill them.   RH's Product Development Leader in Dining Furniture until September 2016 also stated that, as far as Furniture and Textiles, there was nothing in stock at the time the website and Source Book launched.[9]  When customers started placing orders, RH had no stock, she stated.

42.     RH's Buyer from 2014 to 2016 similarly explained that when Modern launched, RH had some Modern product on display in the retail stores to show the product to customers.  However, by the time of launch, RH had not ordered the Modern inventory, depending on the team and on some of the finishes.  The brown and brass orders had been placed for certain items, but the majority of the line, no matter what the category, was not in stock.  RH's Buyer from 2014 to 2016 related that there were RH products listed on the RH website for sale that had not even been produced at the time of launch.  According to RH's Associate Store Leader from May 2013 to April 2016, RH had not ordered any RH Modern product for the stores at the time it launched other than floor samples, there was absolutely nothing in stock for RH Modern when it launched, and employees who saw the ship dates for RH Modern product concluded that the Company was making product as it was selling it.[10]  Other than the floor samples, she explained, "nobody had any stock."

43.     As RH's Customer Service Lead Assist until April 2016 explained, the problem was that there was no actual merchandise to ship when the Source Book was released.  RH's Buyer from 2014 to 2016 stated that before the launch it was foreseen

---

[9] RH's Product Development Leader in Dining Furniture until September 2016 worked at RH starting in 2014.  She reported directly to RH's Chief Creative Officer, Eri Chaya, and was responsible for every aspect of the product development life cycle, including product concepts, samples, productions, and marketing online and in source books.  She was in charge of quality control, vendor management, and worked on customer relations issues as well.

[10] RH's Associate Store Leader from May 2013 to April 2016 was an assistant store manager at an RH location and was directly responsible for inventory and human resources at that location.  She frequently interacted with customers about placing orders, including whether products were in stock, and how long it might take to receive a particular product.  She was able to access RH's inventory system and ordering system in the store and could order products that the store did not carry in stock.

internally that there would be delays because there was no inventory.  As RH's Manager in Operations throughout the Class Period explained, the main problem was that nothing was ordered on time.[11]

44.     RH even had difficulty placing floor models of RH Modern products in its retail stores for display at the time of launch, let alone having inventory for customer orders.  RH's Senior Project Lead for Quality and Innovation from April 2015 to June 2016 stated that when RH opened the RH Modern store on Beverly Boulevard in Los Angeles, a lot of the Modern products were not ready; hence, a lot of sample products were used on the showroom floor to populate the building for the opening.[12]  RH used just a sample of a sofa or a lamp to make the place "look full."  By sample, she meant a piece of furniture that was used for photography or for product development.  She confirmed that RH was scraping the barrel to find products.  RH's Store Planning Analyst from August 2015 to January 2016 similarly stated that it seemed to him that they had almost no inventory for Modern when he did the store openings.[13]  He explained that there was nothing available, so then they had to have the vendors rush and produce one-offs so that a store would have an item.  RH's Senior Online Marketing Manager from 2014 to June 2016 similarly

---

[11] RH's Manager in Operations throughout the Class Period worked closely with the product development, merchandising and planning teams.  She worked on negotiating vendor contracts and worked with vendors on getting products to RH.  She had access to the Company's inventory database, which would show daily inventory levels for every product SKU.

[12] RH's Senior Project Lead for Quality and Innovation from April 2015 to June 2016 worked for RH from 2012 to June 2016 as a project leader in various departments.  In her most recent position, she worked with a team of individuals, as well as various departments, including merchants, customer service, and quality assurance, to improve business efficiencies.  She also worked on the opening of the RH Modern gallery on Beverly Boulevard in Los Angeles, as well as the Company's "delight the customer" initiative.

[13] RH's Store Planning Analyst from August 2015 to January 2016 worked for RH from November 2011 to January 2016.  He worked at RH headquarters and in his most recent position, he was responsible for inventory management on the store planning side, as well as new store openings. In his last year with the Company, he was involved in five to six new store openings.

explained that at the time of the RH Modern launch, RH was still working on getting the new product into stores.[14]

45.    RH's Design Leader for Design and Architecture from November 2014 to February 2016, whose team worked with Senior VP Steve Sebastian and CEO Gary Friedman, and met with Friedman once per week to go through the project, stated that the RH galleries with which she worked had minimal RH Modern furniture when they opened.[15]   She explained that there were no items in stock for customers when the stores opened.

46.    RH's Buyer from 2014 to 2016 explained that because RH did not have inventory at the time of the launch, RH had to spend a lot of money on expensive air shipments in order to get an item to stores in time for the launch.   Vendors would air ship, at a cost of thousands of dollars, samples from the factory to stores for openings.   RH would air ship cabinets at $13,000-14,000 per piece just for shipping.    Due to last-minute decisions, RH would ship several of these cabinets for each of its 5-6 stores in order to have product for the store opening.   He explained that RH spent $200,000 on air ship charges for the Modern launch for one store.

47.    RH's Buyer from 2014 to 2016 was personally involved in these special deliveries, sending emails to his superior, Logistics, the VP of Merchandising, and Supply Chain employees.   He stated that Friedman would typically be informed of abnormal air lift charges.   Friedman directly participated in store openings.   According to RH's Buyer from 2014 to 2016, Friedman would walk through a store three days before the opening, say that he did not like any of it, and instruct employees to get the product all in brown

[14] RH's Senior Online Marketing Manager from 2014 to June 2016 worked at RH headquarters from 2010 to June 2016.   She was responsible for overseeing all of the email marketing and website analytics for all RH brands, including RH Modern.   She worked closely with RH's website and source book teams.

[15] RH's Design Leader for Design and Architecture from November 2014 to February 2016 was a member of the Gallery Development team at Company headquarters and worked on the construction and design of RH's new galleries in Tampa, Florida, and Nashville, Tennessee.   Each gallery had a floor specifically allocated for RH Modern productions.

instead of the color they had.  He explained that he would be shocked if Friedman did not know RH spent substantial amounts for air shipments.

48.     RH's Customer Service Lead Assist until April 2016 further explained that the launch of RH Modern was a disaster and that she and other employees knew that there was no RH Modern stock leading up to the launch.  She stated that a couple of weeks before the launch of RH Modern, they were told that there was nothing in stock and that RH was only going to place orders with the vendor when orders were placed by the customers. Furthermore, they were only going to order product for customer orders that were placed. RH's Client Services Advocate from June 2015 to December 2016 similarly stated that when RH Modern launched, employees were told that it would take some time to make the product because RH did not actually have any product.[16]  She was informed by her supervisors right when the line launched that RH would order the product with the vendor when the customers placed orders.

49.     RH's Customer Service Lead Assist until April 2016 stated that the total absence of inventory at the time of the RH Modern launch was communicated at staff meetings, and all of this information came from the corporate office.  Corporate advised the senior staff at the Tracy call center, and the information was communicated to leads like her in September 2015 and October 2015.  The leads, like her, handled "escalations" of customer complaints.[17]  She stated that this information regarding RH Modern not being in stock was coming from Gary Friedman.  "He's the one that put it down the pike; everything came from him at that time because that was his baby; the Modern line was his

---

[16] RH's Client Services Advocate from June 2015 to December 2016 worked in RH's Call Center in Tracy, California, and was directly responsible for interfacing with customers and handling customer complaints concerning RH Modern and other product lines.

[17] When an "escalation" occurred, information regarding a customer order was referred to management.  For instance, as RH's Customer Service Lead Assist until April 2016 explained, an issue would be considered an escalation if a customer was not getting delivery on the day promised, if the customer felt overcharged, or if the customer received damaged product.  The team that RH's Customer Service Lead Assist until April 2016 was in dealt with escalations, and lead assists fixed customer issues and compensated customers.

baby." Friedman was "hands on everything," and the purchasing people were all located in Corte Madera. They were having weekly or daily meetings about it, so "there is no way that anyone in the corporate office did not know" that RH was not ordering inventory for Modern until customer orders were placed.

50.     RH's Customer Service Lead Assist until April 2016 was told by a supervisor that the objective was for customers to place the orders, and after RH received so many orders, RH would place the order with the vendor. The understanding was that once RH got about 20 orders in for a bed, for instance, then RH would place the orders with the manufacturers. RH's Customer Service Lead Assist until April 2016 stressed that RH had not produced anything at the time of the launch, and explained that RH was trying to sell something that it did not even have. RH's lack of adequate inventory persisted in early 2016. For instance, in March 2016 Defendant Friedman stated that the in-stocks on RH Modern were "in the 70% range." RH's Director of Quality Assurance, Technology Division, from December 2015 to June 2016 stated that, based on what he saw in the Company's inventory system, there was "no way they could have been at 70%, looking at all the records I had and was looking at."[18] RH's Director of Quality Assurance, Technology Division, from December 2015 to June 2016, who has been in the industry for about 20 years, and had worked at Gap, Inc. and multiple e-commerce and other retailer organizations, stated that "this is basically the worst storm I've ever seen happen." He stressed that a basic premise was that if RH did not have inventory, it should not have been selling the product.

---

[18] RH's Director of Quality Assurance, Technology Division, from December 2015 to June 2016 worked at RH headquarters and was responsible for Quality Assurance and Engineering within the organization. He worked to redefine the Company's engineering practices to better meet the business demands of RH's current and new brands. He assessed and managed quality issues that arose within the Company's inventory management system and supply chain application, as well as the merchandising and tracking systems. He was also involved in redesign efforts of the Company's website. He has worked within the retail industry for 20 years, primarily in the quality assurance field.

### 3.   **Customers Faced Long Delays And Cancelled Orders**

51.    Customers who ordered RH Modern products around the time of the launch faced immediate, lengthy delays.  RH's Customer Service Lead Assist until April 2016 stated that in the beginning when RH Modern launched, every order that was placed went on back order because it was not in stock.  She explained that the biggest issue for employees taking escalation calls was that customers ordered Modern furniture, but then there was a six-month delay.  A lot of the orders were coming in 8-12 months later and "it was crazy," she stated.  Customers were calling to ask where their orders were, and then employees found out that nothing was made.  RH's Director of Quality Assurance, Technology Division, from December 2015 to June 2016 also stated that it was taking 6-9 months, "if you're lucky," from the time the customer placed an order for them to receive it.

52.    RH's Client Services Team Lead from April 2013 to July 2016 confirmed that when RH Modern launched in October 2015, the customer service complaints began immediately.[19]  He also confirmed that "absolutely" the delays for customers to receive the product began immediately and "there was no stock."  RH's Buyer from 2014 to 2016 similarly stated that immediately after the RH Modern launch, customers suffered long delays because there was no RH Modern inventory.  He stated that certain items were not expected to arrive in the RH distribution centers until May or June 2016 even though the concept was launched on the website in September or October of 2015.  There were delays of about nine months right at the time of launch.

53.    RH's Product Development Leader in Dining Furniture until September 2016 similarly stated that RH Modern customers placing orders in October 2015 were not getting their merchandise until August or September of 2016.  She stated that there were a lot of

---

[19] RH's Client Services Team Lead from April 2013 to July 2016 was responsible for training, mentoring and overseeing a team of customer service representatives.  His call center handled all types of customer calls, including orders, complaints, and returns.  The Tracy location where he worked housed both a call center and a product distribution center.  He would personally visit the distribution center from time to time.

unhappy people, and customers were cancelling due to shipping delays. RH's Manager in Operations throughout the Class Period similarly confirmed that customers were cancelling orders because of the delays with the RH Modern collection, and that there were really long delays for orders when RH Modern launched in October 2015. RH's Senior Vice President of Product Development and Design from October 2015 to June 2016 similarly confirmed that customers were cancelling orders due to shipping delays, such as waiting eight months for a sofa.[20]

54.     RH's Northwest Commercial Territory Leader from May 2015 to May 2016 also confirmed that when RH Modern launched, no one in his division could even sell it, and they were told not to sell it, because nothing was available. He stated that the Company had not ordered anything to have in stock. He further stated that people were shocked that RH Modern had such long lead times, and added that "No company does that." RH's Buyer from 2014 to 2016 recalled that around November and December 2015, the Company did not even have wood swatch samples in the stores to sell product. The vendors could not even make the 6x6-inch wood swatch sample because they did not have enough wood.

55.     RH's Associate Store Leader from May 2013 to April 2016 similarly explained that when RH Modern launched, it was "back ordered so bad that no one had RH Modern at that point." According to her, as soon as Modern went live, the vast majority of products were showing delivery in the six month timeframe. She recalled looking at a Shagreen bathroom set about 2-3 weeks after the launch that showed a year wait. She stressed that this was not a sofa, it was a set that included tissue covers and such. She did not understand why those types of products would take that long. She had not experienced delays to that extent prior to the RH Modern launch. Previously, every once in a while, very sporadically, one particular fabric in one particular sofa may show a 3-4 month back order, but it would be something they could substitute another similar product for. "We

---

[20] RH's Senior Vice President of Product Development and Design from October 2015 to June 2016 worked in the RH Baby, Child and Teen departments. In her role as Senior Vice President, she was responsible for planning the direction that her department would take for the current season. She also assisted with product design and bringing products to the market.

never saw six months to a year in regular RH or even in RH Baby and Child." Some pieces had nine-month delivery timeframes. She recalled that about a month after launch, "we were drowning." She explained that the required deposit for anything from RH Modern was half the price of the item. Hence, RH was asking people to put down a large amount of money and wait to receive it.

### 4. RH Accumulated Inventory On Its Existing Product Lines In 2015

56.  RH's inventory of merchandise increased as products from its existing, non-RH Modern lines accumulated.

57.  RH's Store Operations and Communications Analyst until June 2016 explained that RH's internal data showed that surplus inventory of existing product increased significantly year over year from 2014 to 2015.[21] RH sold only first-quality product at its retail stores, meaning anything less than brand-new, boxed product became inventory for RH outlet stores. He stated that due to growing inventory, there was quite a big push to open up as many outlets as RH could. RH's Buyer from 2014 to 2016 similarly confirmed that there was a lot of aged inventory and product overstock on the original RH line. RH's Senior Director of Merchandise Planning, Outdoor and Dining, from October 2012 to July 2015 confirmed that when she left the Company in July 2015, the inventory level for RH's Outdoor line was about 80% over plan.[22]

58.  RH's Client Services Team Lead from April 2013 to July 2016 explained that approximately 60-80% of RH's inventory in mid-2015 was product that had been returned to RH from customers and/or was damaged product. RH was "absolutely" having big inventory problems at the time. According to him, RH had a lot of customers return

---

[21] RH's Store Operations and Communications Analyst until June 2016 worked in RH's Outlet Division at Company Headquarters from 2014 to June 2016 and was directly responsible for ordering supplies for all the RH outlet stores.

[22] RH's Senior Director of Merchandise Planning, Outdoor and Dining, from October 2012 to July 2015 was responsible for inventory management for RH's outdoor business, dining, table tops, cabinetry, and hardware.

inventory in mid-2015, and a lot of inventory was returned by customers who simply did not like the products or because it was not the product that they had ordered.  He explained that RH only inspected for quality the first certain number of cartons of products that RH received from overseas.  RH only inspected the first batch or first shipment, but they were getting 500-600 pieces in, so only inspecting the first shipment of product weighed heavily on the problems RH was having with inventory.  RH's Client Services Team Lead from April 2013 to July 2016 confirmed that there was "absolutely" a lot of inventory that was damaged and inventory that went to outlets because the quality was not what it was supposed to be.  He also recalled that insect infestation was a big problem in Summer 2015.  His offices were infested by furniture sent by the manufacturer to his warehouse, and the customers were experiencing this problem as well.  Employees started getting a lot of calls from customers saying that the tables were infested.  RH employees knew these complaints were true because the tables in their conference room were infested as well.  The whole office had to be fumigated because the tables had bugs that spread to the cubicles.  The bugs were everywhere; they were very small and looked like beetles with wings.

59.     RH's Buyer from 2014 to 2016 similarly stated that inventory at RH was growing in 2015 because of additional unsold product from the existing RH line and not from RH Modern inventory, because in 2015 the majority of the RH Modern product would not have been in stock.  Inventory for the existing line was growing in 2015 because the product was "not selling as well" and not "moving as quickly."  Modern did not launch until around October 1, 2015, so the inventory at that time would have been the existing line.  He explained that Friedman had knowledge that the Company was sitting on surplus items through the weekly sales and inventory reports, which he believes were sent to Friedman every week in 2015 either in soft copy or hard copy.  RH's Buyer from 2014 to 2016 further stated that Boone definitely received the weekly inventory reports, he would be "shocked" if Friedman did not receive the reports, and the inventory reports "absolutely" contained information on what needed to be marked down because there was excess inventory.

60.     RH's Manager of Financial Planning and Analysis throughout the Class Period explained that RH's outlet stores did not make much money; rather they were simply an avenue to eliminate excess inventory and there was always excess inventory. RH's Store Operations and Communications Analyst until June 2016 explained that RH's distribution centers had too much inventory to house, including inventory that would not normally be sent to outlets. As a result, RH held warehouse sales in different locations across the country both in the winter of 2015 and winter or fall of 2014. According to RH's Customer Service Lead until June 2016, RH had so much damaged product that it held warehouse sales at RH's Tracy location in 2015.

61.     RH's Manager in Operations throughout the Class Period confirmed that in 2015, there was a problem of excess inventory on non-RH Modern lines and stated that there was over $200 million of the wrong inventory. "The inventory on hand was out of control," she stated. Rugs was one of the areas she worked in, and one of the vendors, Ben Soleimani, dictated how much RH bought. Soleimani shipped the wrong rugs, but because RH prepaid him, RH performed emergency photo shoots and created new SKUs. She stated that RH had $170 million of rug inventory on hand. RH's Supply Chain Operations Analyst and Project Manager from 2012 to October 2015 explained that the rug vendor was "Gary [Friedman]'s buddy," they were close, and Friedman sponsored the vendor's polo team. She explained that there were reports on the issue with the rug vendor and it was "a well-known and documented issue."

62.     RH's Manager of Financial Planning and Analysis throughout the Class Period similarly stated that there was a huge inventory issue with the original RH line, which was why RH was building additional outlet stores and warehouses. He stated that there were approximately ***800 trailers of products*** from the existing RH collections parked at a distribution center, and the trailers could not be unloaded because the facility had no capacity. Every Monday morning, RH's Manager of Financial Planning and Analysis throughout the Class Period attended a meeting with Boone, Chief Operating Officer Ken Dunaj, and the Inventory, Planning, and Finance departments, to review the forecast for the

month and how RH had performed the previous week.  Any inventory issues would be brought up there, and it was also the forum for discussions about warehouse or sample sales or offering promotions.

63.     According to RH's Vice President of Merchandising for Upholstered Furniture from 2016 to April 2017, management was concerned about the excess inventory of the existing line, and it was discussed in meetings and reports.[23]  There were "basic business reviews" on a daily basis, and if a particular department had an area of concern, that department's inventory would be discussed.   According to RH's Manager in Operations throughout the Class Period, Gary Friedman "would get involved" with conversations about inventory and "yell."  She stated that there was a "ton of excess inventory" at the distribution centers because the product was not turning and because Friedman wanted products in numerous colors, which created a lot of inventory that did not sell.

64.     According to RH's Customer Service Lead Assist until April 2016, Defendant Friedman's later June 2016 statement about rationalizing the SKU count and optimizing inventory (*see* ¶¶174, 220 below) referred to liquidating unnecessary inventory from the existing line, stating that "that's exactly what it was."  If the product was not first quality, it would automatically go to the outlets.  If the products were first quality but RH had too much inventory, RH would mark them down to perhaps 40% off, for instance.  Regarding Friedman's June 2016 statement about rationalizing the SKU count at RH, RH's Manager in Operations throughout the Class Period similarly stated that the SKU rationalization process had been going on for a year because "there was a ton of product in the warehouse that wasn't selling or moving."  They were "sitting on a ton of inventory" and it "just wasn't selling."

---

[23] RH's Vice President of Merchandising for Upholstered Furniture from 2016 to April 2017 worked at RH from 2005 to April 2017.  She held numerous positions during her tenure at RH as a buyer or merchant.  As Vice President of Merchandising for Upholstered Furniture, she managed cross-functional teams that interfaced between designers and customers.

**B.      RH's Top Executives Knew About The Lack
Of RH Modern Inventory, Lead Times, And Cancellations**

65.      Both before and after the launch of RH Modern, the Individual Defendants were kept apprised of the Company's RH Modern inventory and customer backlogs, complaints, and accommodations.[24]   As discussed above, they also knew about the accumulation of excess inventory for the existing lines.

**1.      Friedman Waited To Finalize Designs**

66.      Several former RH employees explained that Defendant Friedman delayed the design and finalization of RH Modern products, thus delaying orders to vendors until it was too late.

67.      As RH's Buyer from 2014 to 2016 explained, the Planning Department ordered RH Modern products once the product designs were complete.  According to him, there were a lot of late redesigns of RH Modern product by Defendant Friedman prior to the launch.  He explained that Friedman would ask employees to start over again, which created a backlog of issues from the top down.  These changes would cause big delays, as the product would have to go through testing and sampling.  It created production issues because factories had to start over on their cutting room floor and were stuck with materials that RH no longer wanted to use.  He further stated that Friedman made "start all over again" changes to RH Modern through July, August, and September 2015 until they finished in October 2015.  RH's Director of Product Development from April 2009 to May 2015 explained that through early and mid-2015, Friedman had the final word on how much of the RH Modern would be ordered.

68.      According to RH's Buyer from 2014 to 2016, in the three months leading up to the launch, the team would present product designs to Friedman.  Friedman would reject designs even though it was expressed to him that rejection caused product delays.  RH's Buyer from 2014 to 2016 said that it was "absolutely" obvious that if they were making

---

[24] RH's Customer Service Lead Assist until April 2016 explained that an "accommodation" was when RH gave customers gift cards, free items, or discounts.

last-minute changes, they were not going to have inventory to sell to customers in time.  As he explained, "we were speeding to market literally," and those changes by Friedman slowed down production.  A month would be lost for approving one cabinet.  They then had to get a run of 50 of those and hopefully have no hiccups because they were pushing it so quickly through the factory that there was no time to check for quality issues.  As he further stated, those changes could really push the in-customer-home date to March if the product was ordered in September.

69.    RH's Buyer from 2014 to 2016 estimated that perhaps once a week or every couple of days, Friedman would make design changes that would cause additional delays beyond the time for normal approvals for product fabrication.  He stated that the late changes for RH Modern were unusual for how other companies operate.  When Friedman was still making late changes and revisions to products, it delayed them; they could not get around it.

70.    RH's Manager in Operations throughout the Class Period explained that Defendant Friedman changed his mind on feature colors for products, and that Friedman made constant changes for months.  She stated that Friedman needed to sign off on everything, and sometimes meetings were delayed for months.  If one color was supposed to go into the store as the feature color, Friedman would change his mind and want to switch to a different color, even though they had been producing the first color.  When this happens, RH cannot get the necessary volume.  She explained that the biggest lead time was in fabric items, and when Modern was launched, they made a lot of last-minute decisions of which color was to be featured.  For instance, it was planned all through the initial part of it that an RH Modern product known as the "cloud sofa" would be in one fabric, and Friedman said he wanted to do a different color instead, so you have to start over in the production process to get that color.

71.    According to RH's Manager in Operations throughout the Class Period, the delays resulting from such product changes were well known internally at the Company.  As soon as one of the changes was made, and the planning team had not planned for a

promotion or color change, you had to start over in the timeline. "No one wants those changes to occur when you're going through this," she stated. For example, if it was early on in the process and Friedman wanted to change from linen white to classic, her role would be to say that you could not get the fabric until July 2017, or whatever the case may be. According to her, these numbers were presented to Friedman. Decisions were not made in order to get inventory available at the time of launch. She explained that if a launch was happening in September, but the order was not placed until August, product would not be in stock for people who wanted to buy it. She confirmed that Friedman forced delays in deliveries throughout 2015. Until the catalog got into the hands of the customers, Friedman made changes.

72.    RH's Studio Manager in Catalog Photo Operations from 2012 to 2016 further stated that in the weeks leading up to publication of the RH Modern Source Book, there were a lot of last-minute changes.[25]  Friedman was swapping out products nightly before the book went to print. Employees would work until 2:00-3:00 a.m. reviewing changes. According to him, "It's just complete chaos every day," noting that the chaos was "for sure, absolutely, 100%" driven by Friedman. He stated that when the source book is wrapping and going to press in a couple of weeks and they are still shooting product that is not finished yet, you know you are not going to have enough product at launch. They could not get just one of some products on set to shoot. He noted that if they could not get their hands on five chairs to put around a table to shoot it all the way around, they knew they were not going to have 100 chairs to go to the stores or to the customers at the time of launch. Friedman was making changes at the last possible minute, he explained.

---

[25] RH's Studio Manager in Catalog Photo Operations from 2012 to 2016 managed RH's Photo Department and was responsible for ensuring that stages, products, equipment and personnel were ready for photoshoots. Product photos were used online in the Company's website, in source books, and in Company presentations. He worked closely with producers to ensure that the correct layouts and products were photographed as planned, including RH Modern. He was also responsible for ensuring that design sets were ready for walk-throughs by Defendant Friedman, investors and VIP guests.

CONSOLIDATED CLASS ACTION COMPLAINT
Case No. 4:17-00554-YGR

-28-

73.     RH's Vice President of Merchandising for Upholstered Furniture from 2016 to April 2017 similarly stated that RH was mailing the Source Book based on samples that RH had not yet attempted to manufacture.  RH's Product Development Leader in Dining Furniture until September 2016 further confirmed that there were times when the product development was 85% done, and Friedman would intervene and say he was not satisfied, setting the team back to being only 50% done.  The late decisions by Friedman absolutely caused delays, she explained.  RH's Creative Associate in Design and Planning from 2013 to February 2016 similarly stated that the reason everything was backlogged was that Friedman and Eri Chaya took too long to make decisions and later blamed the problems on gas prices.[26]  She explained that everything takes time in the furniture world.  In the furniture market, it takes time to make items and ship them from overseas.

## 2.     Friedman Staged Video And Photoshoots For RH Modern

74.     The first time RH showed the Modern product in a video to investors (on June 11, 2015), the video showed a wide variety of home furnishings, including furniture, lighting and additional products.  Unbeknownst to investors, the video featured products that were unavailable, unfinished prototypes.

75.     RH's Studio Manager in Catalog Photo Operations from 2012 to 2016 stated that it was "absolutely" obvious internally at the time of the June earnings call that RH was not going to have inventory for a launch a few months later.  Some of the products shown during the June investor video may have been finalized and authorized pieces of furniture, but they were just samples, not the actual product because RH had not decided what it was going to make.  The Studio Manager was involved in the photography of those prototypes at the time.  The products came in pieces, and the RH employees would assemble them.  However, after they were put together, they did not work.  He stated that employees would

---

[26] RH's Creative Associate in Design and Planning from 2013 to February 2016 worked for RH's Chief Creative Officer, Eri Chaya, and was involved in RH's project to build out executive headquarters.

then have to rig the products to make them work, and that this process was happening the night before the video was released in June 2015.

76.    As RH's Studio Manager in Catalog Photo Operations from 2012 to 2016 further explained, a lot of the electric items did not entirely work; the lamps or heavy chandeliers that were featured were not wired; and employees had to wire them for the video. He stated that furniture was held together for the video. Moreover, as he explained, some of the products shown in the June 2015 investor video were not approved products for RH Modern, so they were essentially products that did not exist. The brass lamp that they showed in the video was actually chrome and they had to make it brass for the photo. The photos for the June 2015 investor video were shot the day the video came out, and he wondered about Friedman, "How does he actually get away with what he is saying?" According to RH's Studio Manager in Catalog Photo Operations from 2012 to 2016, RH gave the impression that the RH Modern products would be available in the store when, in fact, RH sent samples to the store in order to have product to show. He stated that when they put the product together, they knew it was not going to come that way when it was delivered to the customer. He stated that employees knew that RH Modern was not going to launch when the Company said it would because RH did not have the products, he said "we knew that wasn't possible" because "we didn't have anything to shoot."

77.    RH's Buyer from 2014 to 2016 explained that at the time of the launch, there were items for sale on the RH website that did not exist because they were not fully designed. He stated, for instance, that a week or two before the RH Modern launch, Friedman decided that he wanted to create a brown oak and stainless steel color combination. As a result, employees Photoshopped those items onto the website. They created the UPC ("Universal Product Code") so that a customer could order it, but RH had never even seen what this item would look like. They simply had a vision of this item, never saw any approvals, and did not know how it was going to result if produced. As RH's Buyer from 2014 to 2016 further explained, Friedman knew that RH was showing fake items because he saw the catalog and was told that they had to use Photoshop.

Friedman would then approve it.  RH's Buyer from 2014 to 2016 was present for some of these discussions in the approval meetings.  RH's Manager in Operations throughout the Class Period similarly stated that in general the development process went until the eleventh hour, items were photographed and digitally manipulated, and catalogs launched long before finishes were approved on the product.  She confirmed that some products shown in the RH Modern Source Book were Photoshopped and did not actually exist.

78.    RH's Studio Manager in Catalog Photo Operations from 2012 to 2016 also described how on several occasions when there was nothing to shoot, RH employees would set up fake photoshoots because investors were going to walk through.  They would have personal assistants, who normally got coffee and lunch, posing as photographers in front of cameras.  He explained that RH did multiple days of such fictitious photo shoots leading up to the launch of RH Modern in 2015.  There were times when he was one of the photographers for the shoots, and he saw Friedman giving these deceptive photo walk-throughs in Summer 2015.  He recalled that there were multiple instances when shareholders were coming through after Friedman had thrown a rage, broken down the set, and gotten rid of all the photo shoot materials.  At 2:00 a.m. Friedman would say that people are coming through and require employees to assemble a fictitious shoot to make it appear that they were busy.

### 3.    RH's Inventory Tracking Systems Showed To Executives The Lack Of Inventory

79.    RH's top executives continuously monitored RH Modern inventory, sales, and back order data through Company databases, reports, and meetings.

80.    RH's Manager in Operations throughout the Class Period explained that RH had an online reporting system called Merchandise Drill Down ("MDD"), and that Friedman would look at that "regularly." MDD is a web-based database that pulls information from the inventory management system.  It shows orders, in transit volume, and in stock volume by SKU.  A user can organize the data at a high level – such as at the collection level or department level – or look at individual items.  According to her,

Friedman looked at it constantly.  Any time she was in a meeting when inventory came up, Friedman was looking at MDD.  She confirmed specifically that in mid to late 2015, there were meetings where Friedman checked MDD.  She did not recall how many meetings occurred like that between April and December 2015, but she recalled he was on MDD during a whole meeting, asking questions about inventory.  He would regularly look at MDD data.

81.    RH's Manager in Operations throughout the Class Period further explained that, in addition to showing inventory, MDD also showed daily sales.  If you wanted to see how sales are comping yesterday to today, that is where you would look to see flash numbers.  It showed what guidance is, what last year was, what this year is, etc.  It also showed back order units, and demand versus on-hand or on-order inventory.  As she explained, it is what you look at for performance, and the CEO has to know what sales are like.  She further confirmed that there were really long delays for orders when RH Modern launched in October 2015, and that on MDD, one could see how many sales there were for a product, as well as open orders, and the facts that there was zero inventory and zero in transit.  Friedman was able to see in MDD that orders were out of line with inventory.

82.    RH's Manager in Operations throughout the Class Period stated that RH employees created "in-stock reports," which showed what the "in-stock" dates were for certain products.  RH's Buyer from 2014 to 2016 also confirmed that at the time of the RH Modern launch, Friedman received reports that showed that, other than the store display items, there was no other RH Modern inventory in stock.  He knew this because his managers would have meetings with Friedman, and then tell him and his team what they needed to focus on now, and that they needed to shift their strategy and focus on the in-stock rate.  He stated that Boone definitely received the weekly inventory reports.  RH's Director of Product Development from April 2009 to May 2015 agreed that if Boone wanted to figure out the very latest inventory statistics at any time, she could just walk down the hall and talk to that person in charge of inventory.  RH's Manager in Operations throughout the Class Period explained that everyone had access to a web-based database

that showed SKU levels on a daily basis.  Merchants were looking at demand versus back orders versus what is actualized sales and "Karen [Boone] had access to that as well."

83.    RH's Customer Service Lead Assist until April 2016 explained that RH also used a system called CW, which was a DOS-based software program.  Everyone had access to CW, and employees could tell immediately what was in stock at the time, and the extent of back orders.  RH's Associate Store Leader from May 2013 to April 2016 similarly stated that the Company used a DOS-based system that allowed employees to view certain inventory levels.  RH's Logistics Support in Supply Chain from April 2015 to January 2017 also stated that CW was the main tool he and those in his department used to check inventory, that the system went back years, and that it showed what inventory was in the distribution center as well as what products were on back order.[27]  CW also showed all of the notes the customer service employees wrote about what was wrong with orders.  They would note if the customer again received the wrong item and whether the order was part of the "customer delight" initiative (*see* ¶¶103-14 below).  RH's Logistics Support in Supply Chain from April 2015 to January 2017 also noted that RH used a system called LeanTMS, which showed where RH products were located.

84.    RH's Customer Service Lead Assist until April 2016 related that three analysts who worked in RH's Tracy facility would export information from CW into Excel. These analysts would send those Excel reports to Friedman.  The reports showed how many orders RH had on the books, how many were back ordered, and the items which were back ordered.  The reports were sent weekly to Friedman.  RH's Customer Service Lead Assist until April 2016 knew the reports were sent to Friedman because within five minutes, Friedman would call one of the people sending the reports to discuss the reports.  Then,

---

[27] RH's Logistics Support in Supply Chain from April 2015 to January 2017 was responsible for finding inventory discrepancies within Supply Chain, including cancellations, overages, shortages, and damages.  His review included inputs from customers, third-party logistics service providers, as well as distribution centers.  The Logistics Support team worked as a liaison between other departments on supply chain issues, and had access to RH's various reporting and tracking systems, including inventory.  He also worked on the Company's "delight the customer" initiative and was responsible for running analytics on product quality issues.

one of the people who worked in the analysts' office, Elizabeth Traina, would come out of the office and stand by the door and state that Friedman was not happy.  RH's Customer Service Lead Assist until April 2016 stated that Friedman responded to the reports in 2015 and into 2016.  She explained that these were inventory and back order reports. "There's no way that Gary did not know; there's absolutely no way he did not know what was going on . . . his thumb was in the pie the entire time."  She further explained that Friedman sometimes responded to the analysts' reports by email or telephone.  Her understanding is that Friedman responded to every report he received, to acknowledge he received it.

85.    RH's Customer Service Lead Assist until April 2016 stated that Friedman had access to CW every day, and made notes on orders.  For instance, Kim Kardashian – the celebrity – called to complain because items had not arrived.  The complaint escalated to the corporate escalation team, who contacted Friedman.   Corporate escalations told Friedman that Kim Kardashian called, that they needed this order, and that they needed him to put a note in the system that it is okay to get the order in now and fly it in.  Friedman noted in the system that it was okay to do what was necessary for that order.

86.    RH's Buyer from 2014 to 2016 described a weekly sales report that each department downloaded and that Friedman received throughout 2015.  The reports showed what items were sold last week, the number of items sold last week, dollars left in the bank, the number of items available to sell, and the projected weeks of supply.  Everyone was fully aware of what was going on at any given time, RH's Buyer from 2014 to 2016 explained.  The reports showed on a SKU-by-SKU basis what inventory you had, and it also had general statistics on RH Modern.  For instance, the information was organized by RH Modern or Classic.  For RH Modern, it would show the sales week over week, the top performing item, how many units were sold, and how much money RH made.  The information was also available by category, such as cabinets, or even further by wood cabinets, or by finish or color or size.  RH's Buyer from 2014 to 2016 stated that every single executive in the Company would receive a copy of the weekly sales report.  Friedman managed the sales and received the reports.  The weekly report also showed that

RH was out of stock on specific items and when RH would receive another shipment of the item. The weekly report showed, for instance, that the next order would not be received until May 2016 even though it was December 2015.

87.   RH's Supply Chain Operations Analyst and Project Manager from 2012 to October 2015 explained that the Company had a system called "GT Nexus" that tracked product shipments from vendors, and that she used GT Nexus to create reports on items, such as the item's actual location and where it was supposed to be located. Her reports were elevated to the VP of Transportation. In the GT Nexus software, vendors could accept the purchase orders in the system, and the system would show when products shipped, and where in transit the products were.

88.   RH's Manager of Financial Planning and Analysis throughout the Class Period recalled attending a meeting in December 2015 with Defendant Friedman and many other C-level executives during which Friedman asked employees to go on the website, pick a product, and see how long it was going to take to ship. "He was freaking out" and getting really angry, RH's Manager of Financial Planning and Analysis throughout the Class Period stated.

89.   The accounts of RH's former employees are corroborated by RH's own allegations in a complaint against two former executives. In January 2017, RH filed a complaint indicating that, in her role as an executive, a former RH executive "received regular financial reports regarding virtually every aspect of the company's business. These reports included details on which products were selling well (and in what regions that occurred), what products had the higher profit margin, which locations were doing better than others, which marketing initiatives succeeded and which ones failed, and more."

### 4.   Friedman's Hands-On Management Style

90.   Several former RH employees explained that during the Class Period, Friedman – who had been CEO since before the Company's 2012 IPO – continued to run RH like a small company. In a Company with concentrated leadership where Friedman needed to approve product designs and purchases, Friedman was well aware of the late

product approvals and the lack of inventory for RH Modern.

91.     RH's Director of Product Development from April 2009 to May 2015 stated that at RH, Friedman mandated that he approve everything.  Friedman is advised by the merchant and planning teams as to expected demand and what will work for the customer. However, Friedman ultimately makes the determination on what will be ordered and often made last-minute changes to product assortment.

92.     RH's Director of Product Development from April 2009 to May 2015 described RH's leadership structure as "flat, small, and concentrated" with teams reporting to Friedman.  The merchants (also known as "buyers") analyze trends and identify needs for the product assortment.  The planning team arrives at a budget for each of the categories of product.  The merchants and planners work together as a team to plan the purchase of product.  According to RH's Customer Service Lead Assist until April 2016, Friedman met with the buyers daily in his office in the six months leading up to the RH Modern launch. She stated that Friedman knew they had not ordered anything besides prototypes prior to the launch, and that she was informed of buyers' interactions with Friedman through the escalation process.  RH's Manager in Operations throughout the Class Period similarly explained that in meetings where Friedman was informed of how changes would delay product, Friedman would respond, "Make the factories move faster!"

93.     As RH's Director of Product Development from April 2009 to May 2015 explained, everything was bottlenecked for approval by Friedman before being sent to the printers.  According to RH's Director of Product Development from April 2009 to May 2015, everyone knew that if they moved forward with something without Friedman commenting on it, "then they may suffer the wrath."

94.     According to RH's Manager in Operations throughout the Class Period, Friedman had to sign off on any design and/or selection of products, and that was how they ended up with inventory management issues.  RH's Buyer from 2014 to 2016 agreed that Friedman was a very hands-on CEO, and that Friedman approved virtually everything that went into the RH Modern catalog.  RH's Senior Director of Merchandise Planning,

Outdoor and Dining, from October 2012 to July 2015 similarly stated that there was a lot of pressure from the top down. RH's Design Leader for Design and Architecture from November 2014 to February 2016 explained that Friedman was very involved in the process. Her team met with Friedman once a week to go through the RH Modern project, and the whole approval process was very slow because they depended on Friedman to make decisions on everything. RH's Inventory Control Manager from 2013 to June 2016 stated that when Friedman passed something, it was "the law cast in stone."[28]

### 5. RH's Management Closely Monitored The Overwhelming Complaints About RH Modern

95. RH's former employees explained that RH's executives, including Defendant Friedman, received weekly reports showing customer complaints and the extent of customer accommodations after the launch. In addition, RH's top executives listened to recorded telephone calls with customers, and emailed RH employees about customer service issues.

96. RH's Customer Service Lead Assist until April 2016 explained that Karen Ferguson handled the severe customer service escalations as well as any escalation that dealt with a famous or wealthy person. Ferguson had a spreadsheet that she would have to submit to Friedman at the end of each day about the escalations she was working on and what they entailed. Friedman "received daily summaries of customer complaints from Ferguson," and RH's Customer Service Lead Assist until April 2016 saw these reports. RH's Customer Service Lead Assist until April 2016 stated that she would be in Ferguson's office speaking about work obligations, and would see an IM (instant message) from Friedman about a customer accommodation on the RH Modern line arrive on Ferguson's computer screen. She stated that when she would stand in Ferguson's office and speak

---

[28] RH's Inventory Control Manager from 2013 to June 2016 worked at RH from 2008 until June 2016. As Inventory Control Manager, he was directly responsible for all corporate accounting and reporting of the distribution center's inventory. He also worked with internal and external auditors concerning fiscal reporting of inventory. The inventory at this facility was specifically marked for retail stores and to fulfill customer orders placed over the phone and online.

1   with her about work obligations, there was always an IM from Friedman open.  Ferguson

2   and Friedman IMed each other throughout the day.

3      97.    RH's Customer Service Lead Assist until April 2016 also explained that since

4   at least 2012, RH provided escalation reports on the accommodations being provided to

5   customers for issues with their orders, such as monetary compensation.  The supervisor

6   over Accommodations, Daniela Hartung, was responsible for such reporting.  The weekly

7   escalation report included the order number, type of problem and the accommodation.

8      98.    RH's Customer Service Lead Assist until April 2016 further explained that

9   "the rule was always if a customer escalated to [Friedman] and said 'I'm going to the

10  media,' Gary was always like, 'Do whatever you have to do, fix this, do whatever it takes,

11  we don't want them going to the media.'"  She felt that Friedman was "absolutely"

12  suppressing public knowledge of customer accommodations and the Modern issues.  RH's

13  Customer Service Lead Assist until April 2016 stated that the IMs between Friedman and

14  Ferguson, and Friedman's concern about media attention, were occurring within a couple

15  weeks of the Modern launch.  Customers started asking about their orders, and Friedman

16  would start IMing Ferguson to say they had a problem and that he needed her to talk to the

17  customer and see if they could come up with an alternative.

18     99.    The escalation reports showed that RH customers were threatening to go to

19  the press or sue RH.  RH's Customer Service Lead Assist until April 2016 further explained

20  that prior to the RH Modern line, there would be a few hundred escalations weekly.  Once

21  the RH Modern line hit its peak and the Company started the "delight the customer"

22  initiative in January 2016 (*see* ¶¶103-14 below), they were dealing with thousands of

23  escalations a week.  The report, she further explained, was in an Excel spreadsheet and

24  went to Friedman every week.

25

26

27

28

100.    RH's Customer Service Lead until June 2016 explained that in 2015, Friedman reviewed the audio of telephone interactions between customers and RH customer service and listened to how employees were speaking to customers.[29]

101.    Friedman's review of RH Modern escalation reports led him to send to employees his January 2016 "WE HAVE LET CUSTOMERS DIE" memo regarding his knowledge of customer complaints, cancellations, and accommodations due to the RH Modern launch.  *See* ¶¶103-14 below.

102.    RH's Customer Service Lead Assist until April 2016 explained that around the time that the "delight the customer" initiative began, Friedman was also receiving customer complaints on his personal cell phone, at home, and via email.  Friedman received calls directly at home and on his cell from customers asking where their furniture was.  Friedman would send all of those calls to Karen Ferguson in corporate escalations.

### 6.    Friedman Resorted To The Costly "Delight The Customer" Initiative

103.    In response to overwhelming complaints and cancellation requests soon after the launch of RH Modern (*e.g.*, ¶¶51-55), Friedman personally initiated task forces to address such issues as well as a "delight the customer" initiative.

104.    RH's Customer Service Lead Assist until April 2016 explained that the RH Modern task forces at corporate began in January 2016 or at the end of December 2015 as the situation worsened.  She stated that employees had lists from the CW system that showed everyone who called wanting to cancel their orders, and that there were about 2,000 orders that customers wanted to cancel because they had been waiting months.  RH moved specific employees from the different departments at the call center to corporate office to work on task forces to deal with these issues.  These employees would call the vendors to

---

[29] RH's Customer Service Lead until June 2016 worked at RH for numerous years until June 2016. As a Lead, she was responsible for interacting with the customer and handling escalations. The Customer Service department was responsible for preparing regular reports on the number of customer complaints that the Call Center received.  These reports were sent to management.  If a Lead could not address a customer complaint, the caller would be routed to the corporate office.

tell them that they needed the vendor to make one quality item and ship it to RH overnight so that RH received it by Friday.  The costs associated with these requests became astronomical.

105.  RH's Manager in Operations throughout the Class Period similarly confirmed that employees were pulled from their day-to-day jobs to manage customer orders.  RH's Manager of Financial Planning and Analysis throughout the Class Period similarly stated that customers were primarily cancelling orders because of the huge backlogs.  The products were back ordered, and they were told the product would not ship for months.  Then they would call and be told that it was delayed for another number of weeks.

106.   Defendant Friedman sent a memo to all RH employees in January 2016 stating that RH's customers were "ON FIRE" and that "WE HAVE LET CUSTOMERS DIE" because customers were so unhappy, and that the job of RH employees was to "delight" the customer.  As RH's Customer Service Lead Assist until April 2016 explained, this "delight the customer" initiative was intended for RH Modern customers.  RH's Associate Store Leader from May 2013 to April 2016 similarly stated that the "delight the customer" initiative grew out of the disaster of the RH Modern launch.  RH's Manager in Operations throughout the Class Period confirmed that customers were cancelling orders because of the delays with the RH Modern collection, and these cancellations were what prompted Friedman's January 2016 memo.  RH's Product Development Leader in Dining Furniture until September 2016 confirmed that "definitely a lot" of customers were cancelling orders due to shipping delays, prompting the "delight the customer" initiative.  RH's Senior Vice President of Product Development and Design from October 2015 to June 2016 similarly noted that customer cancellations were the reason that Friedman sent the first "delight the customer" memo.

107.   Friedman's "delight the customer" initiative made clear to employees that they were authorized to spend unlimited amounts of money attempting to "delight" customers.  As RH's Client Services Advocate from June 2015 to December 2016

explained, the memo instructed employees to do whatever was necessary to delight the customer; anything went.  Employees would give customers whatever they wanted; for example, a sofa, a table, a gift card, etc.  RH's Senior Project Lead for Quality and Innovation from April 2015 to June 2016 stated that almost immediately after the memo was distributed, the Company started incurring substantial costs.  RH's Client Services Advocate from June 2015 to December 2016 agreed that RH started providing customer accommodations immediately after the memo went out and the Company immediately started incurring costs.  RH's Customer Service Lead until June 2016 also stated that in the past, she or management would have to approve customer accommodations, but RH gave the authorization to everyone.  She stated, "It was way out of hand.  It was out of control.  The galleries alone were giving away tens of thousands of dollars' worth of furniture."

108.    Under the "delight the customer initiative," Friedman gave authority to any hourly employee in a store, *carte blanche*, to do whatever they wanted to satisfy the customers.  Employees could give customers $10,000 gift cards or make their whole order free.  The later charge RH took for customer accommodations (*i.e.*, $18 million in the first quarter of fiscal 2016) was a result of this.  RH was also air shipping furniture at a cost of thousands of dollars.  Friedman sent Company-wide memos every week for about two months.

109.    RH's Manager in Operations throughout the Class Period explained that in the "delight the customer" initiative, top priority was given to anything celebrity related, such as Steph Curry's outdoor order, or Jennifer Lopez's pillow replacement.  Those would go to the front of the line.  She also explained how, due to the initiative, if an unhappy customer needed something produced and the fabric was not available at the necessary factory in Mexico, RH would overnight the available fabric from China where it was supposed to be used for another item there.  This was happening daily, on a customer-by-customer basis, and imposing significant costs.  RH's Customer Service Lead Assist until April 2016 similarly explained that employees were giving thousands and thousands of dollars away daily, and recalled one instance in which a customer received a $10,000 order

for free.  RH's Customer Service Lead until June 2016 explained that galleries were giving away $10,000 and $20,000 orders.  RH's Product Development Leader in Dining Furniture until September 2016 stated that RH ended up furnishing customers' homes because they had received the wrong kitchen table.

110.    RH's Customer Service Lead Assist until April 2016 recounted how the Accommodations Supervisor checked the "delight the customer" numbers every day while RH's Customer Service Lead Assist until April 2016 was there.  RH's Customer Service Lead Assist until April 2016 further stated that after RH Modern launched, the financial guidance the Company gave the market was misleading because of the extensive accommodations RH was making on the RH Modern line.  She stated that this was a common topic of conversation at the Company, and that she believes investors were deceived.

111.    Friedman sent out weekly "delight the customer" emails, and held weekly 8-hour conference calls, as part of his initiative and beginning with his January 2016 "WE HAVE LET CUSTOMERS DIE" memo.  As RH's Associate Store Leader from May 2013 to April 2016 explained, the conference calls involved the whole Company (including the store managers, the leaders, and all of corporate).  She stated that on the calls, Friedman would refer to the issues with the vendors, say that they were working on the issues, and that it was not going to get better anytime soon.  RH's Inventory Control Manager from 2013 to June 2016 similarly recalled that Friedman's initial "delight the customer" memo was distributed to everyone in the Company and Friedman sent out an update email weekly.  RH's Logistics Support in Supply Chain from April 2015 to January 2017 also stated that every Monday during the "customer delight" initiative, there were large, Company-wide conference calls in which Friedman participated.

112.    Reproduced here below is a portion of one of Defendant Friedman's periodic "delight the customer" internal emails that followed the initial "WE HAVE LET CUSTOMERS DIE" memo.  In it, Friedman states that "improv[ing] in-stocks and

reduc[ing] back orders" was the first priority, as "a significant amount of our issues are the result of not being in stock, and having orders pushed out multiple times."

From: Gary Friedman <gfriedman@restorationhardware.com>
Date: Sun, Jan 31, 2016 at 12:51 PM
Subject: WE ARE IN THE CUSTOMER DELIGHT BUSINESS 2.0
To: RH All <TeamResto@rh.com>
Cc: Gary Friedman <gf@rh.com>, Gene D'Ovidio <genedovidio@earthlink.net>, Gavin Grover
<ggrover@mofo.com>, Keith Bellling <keith@baysideventures.net>


Team RH,

I believe the massive cultural shift has begun, and the energy
beginning to flow through the organization is palpable.

There have been a few incidents where we have missed the opportunity
to delight customers in the moment due to a lack of crystal clear
expectations and accountability.  It is imperative that every team
member understands they have the power to delight our customers in the
moment and are expected to do so.  Unconditionally.

While harder to measure, my hope is our team members who are servicing
customers are feeling the same cultural shift, and are also being
delighted in the moment by their teammates across the Company.  If
that is not the case, please forward any issues you are encountering
directly to me.

Durning our call last week, we identified many obstacles and
opportunities that would significantly aid in or ability to delight
our customers.  The leadership team and I spent two days last week
prioritizing, and putting an action plan into place.  I wanted to take
a moment to update you on the priorities we have identified and the
action that is being taken. Below is the list, logic, and next steps.

1.  Improve In-stocks and Reduce Back Orders
   - A significant amount of our issues are the result of not being
in stock, and having orders pushed out multiple times
   - We have made the decision to push out the mailing of our Spring
Sourcebook to Fall as there is a risk of starting the season with many
items not in stock, and also the risk of our supplier partners
experiencing issues ramping up production of new products.
   - This will result in a dramatically higher in stock rate in the
Spring season as our supplier partners catch up with RH Modern orders
allowing our in stock percentages to increase.
   - We will mail a smaller, updated RH Interiors book with limited
newness to add a level of freshness, as well as mailing our RH Outdoor
book where in stocks are forecasted to be dramatically improved over
last year.

113.    RH ceased the "delight the customer" initiative in approximately April 2016. RH's Client Services Advocate from June 2015 to December 2016 stated that RH pulled back on the initiative in mid-April so that employees then had to get approvals again.  She stated that the initiative was not correcting the problem; it was merely giving money to customers.

114.    RH's Chief Operating Officer Ken Dunaj left the Company in relation to the RH Modern launch in February 2016.  Defendant Friedman, however, omitted this fact when discussing the departure in the Company's February 12, 2016 announcement of Dunaj's departure.  Similarly, on May 10, 2016, Defendants announced that three RH executives had been promoted to the newly-created position of "Co-President."  As RH's Workforce Management Real-Time Analyst until November 2016 explained, following the "delight the customer" initiative, the Company basically replaced Friedman in terms of decision-making; though Friedman was still CEO, three Co-Presidents made decisions from then on.[30]

C.    **Defendants Promoted The Launch Of RH Modern And Inventory Levels**

115.    On the first day of the Class Period, March 26, 2015, Defendants promoted the launch of the new RH Modern business to investors in a press release, investor video, and investor conference call.  Defendants did not refer to RH Modern specifically by name, but instead stated that RH would launch two new businesses in the Fall, and the business later revealed to be "RH Modern" was "core to RH" and would open up an "entirely new market[]" for the Company as it was "significantly incremental to what we're doing today." Friedman stated that it was a "game-changer" and "represents our finest work ever, and might represent one of the biggest market potentials that we've addressed with a new category, a new business."

---

[30] RH's Workforce Management Real-Time Analyst until November 2016 worked at RH starting in 2014.  He was responsible for monitoring the 400 advocates taking orders from customers.

116.    Following the announcement, analysts asked about the Company's inventory management and supply chain.  In response to a question from analyst Oliver Chen from Cowen and Company asking Defendants about "the inventory needs over the next year," how the "supply chain . . . intersect[s] with the customer experience," and how investors should "think about the magnitude of cash outflows" for inventory purchases, Defendant Boone reassured investors that the Company was making inventory investments so that there would not be "high back orders" and claimed the Company would "grow inventory slightly ahead of sales" given the RH Modern product launch, *i.e.*, the "newness."  Boone responded that "the business does require a night-in-stock position . . . [s]o we will continue to make inventory investments to make sure that we . . . improve our in-stocks and make sure we're not having high back orders."

117.    Also in response to Chen's question regarding the Company's supply chain, Friedman emphasized the Company's bias "to have more control [rather] than less control and to have more control of every aspect of [its] business all the way to the customer," and stressed the importance of "enhanc[ing] the customer experience through improved inventory accuracy and scheduling efficiency."  When asked by Chen specifically "Where are you with lead times roughly," Friedman responded that the Company was "systematically placing orders now," which "should help us with lead times [and] help us with inventory flow."

118.    The Individual Defendants provided further reassurances regarding the Company's inventory practices and the availability of products for consumers.  In prepared remarks during an investor video published on March 26, 2015, Friedman stated that the Company had made "meaningful improvements in how [it] flow[s] and deploy[s] inventory . . . which should lead to improved fulfillment, lower back orders, reduced stops per delivery, lower returns and damages, an improved customer experience, and increased profitability."  Boone also emphasized on the call that the Company works to make sure that "all that product is available for the[ customers] to consume," and stated that RH had "further evolved [its] product development and vendor collaboration processes" and "made

transformative changes on [its] supply chain." Friedman stated that "Ken Dunaj, our Chief Operating Officer, has recently taken over inventory management. He has [been] a new leader in that area of the business. I think we have more intelligence, more energy and passion behind inventory management than ever in the history of our Company right now."

119.    Defendant Friedman also previewed the next quarterly investor conference call, stating that "you will hear more about [RH Modern] on our next call," and in the meantime assured investors that "[o]ver the years, we have demonstrated that we can test, scale, and roll out new ideas predictable and profitably. Much of our success is due to significant infrastructure investments we have made and the unique platform we have built."

120.    Along with these reassurances about the Company's ability to deliver inventory on the new business to customers, Friedman stated that RH's growth for 2016 was based in part on the "two new yet to be disclosed businesses opening in the second half of this year," and that for those businesses, the Company was "on the more conservative size versus aggressive side in how we're planning and forecasting those sales." Friedman stressed that since the Company's IPO, RH had "beat earnings by a significant amount each year," had "materially beaten the earnings guidance that we've given you," and "that's how I'd think about this."

121.    On March 27, 2015, RH filed a Form 10-K with the SEC that promoted the Company's supply chain and ability to fulfill orders in a timely manner. The Form 10-K highlighted that RH had "improved [its] supply chain and fulfillment capabilities, and ha[d] built a scalable infrastructure with significant capacity to support [its] future growth." The 10-K also stated that RH's "enhanced supply chain and fulfillment operations allow [it] to manage customer orders and distribute merchandise to stores and customers in an efficient and cost-effective manner." The 10-K noted that "these upgrades ha[d] improved customer satisfaction by reducing delivery times, reducing damage to merchandise, and improving [the] customer's overall buying experience." In addition, whereas prior RH Forms 10-K had stated that the Company was "implementing new inventory management capabilities

to improve inventory productivity and service levels across [its] supply chain," the Form 10-K filed on March 27, 2015 indicated that those capabilities were now implemented, as they were now being "optimiz[ed] and enhanc[ed]."

122.   In a section titled "Product Development," the 10-K discussed RH's "proprietary product development platform," by virtue of which the Company had "streamlined [its] product development organization and process to shorten product lead times[.]"   The 10-K stated that "[a]s a result of [this] proprietary [platform], [the Company's] typical product lead times are 3-9 months, which enhances [the Company's] ability to introduce more new products with each collection."

123.   Analysts responded to Defendants' statements.  On March 27, 2015, analysts at Wells Fargo stated that the "two new, yet unannounced product categories . . . should help drive a strong [second half] and set up 2016 well."  Similarly, a KeyBanc Capital Markets report dated March 26, 2015 stated that RH "management expects to announce two new product categories in the coming months (with the categories launching in [the second half of 2015]) . . . [and t]hese new product categories should help drive further comp growth and market share gains in the quarters and years ahead."  Analysts were also focused on Defendants' assurances of supply chain and inventory investments.  On March 27, 2015, analysts from Deutsche Bank emphasized that "[o]ther key bull points include . . . better performance on inventory control and the announcement that this line item should be receiving more attention through systems investments."  That same day, a William Blair analyst report noted that "[m]anagement . . . expects inventory growth to exceed sales growth in 2015 . . . as RH continues to invest in assortment/category expansion and improved in-stocks."

124.   On June 11, 2015, Defendants published on the Company's website a "video presentation" for investors and analysts "introducing RH Modern."  During the video, Defendant Friedman stated that "[w]e are excited to unveil today what we believe is the most innovative and new concept in the world of home design, and represents our finest work to date," and displayed a wide range of products, including lamps, couches, desks,

chairs and additional items.  As described above (*see* ¶¶74-76 above), certain of these were not actual products from the line but unfinished "one-offs" that had been hastily constructed by hand shortly before the investor video, and the designs for the products had not yet been provided to RH's vendors.

125.   Following the display of the RH Modern products, Friedman highlighted for investors the importance of the launch of RH Modern:

> ***RH Modern launches this fall with a 300-page source book, a dedicated website, and a significant retail presence***, including a freestanding RH Modern store at our former gallery on Beverly Blvd in Los Angeles, the entire ground floor of our Flatiron gallery in New York City, plus entire floors of our next generation Design Galleries in Atlanta, and opening later this year in Chicago, Denver, Tampa and Austin.
> . . . .
> Later this year, 20 of our largest existing stores will be designed to include 2,000 to 3,000 square feet dedicated to RH Modern.  ***In total, RH Modern will have over 120,000 square feet of selling space in its first year of operation***.  Looking forward, with RH Modern occupying up to 15,000 square feet in our future next generation design galleries and the possibility for additional freestanding locations, RH Modern will have a retail footprint that grows by up to 100,000 square feet per year and ***will be a disruptive force in the highly fragmented modern market***.

126.   Friedman stated that Defendants would "also support the launch of RH Modern with a national advertising campaign in the top design and luxury publications such as Architectural Digest, Elle Decor, Town & Country, and Wallpaper, as well as key online marketing, and opening events in Los Angeles, and New York."  Friedman emphasized that RH Modern "can create a significant and new market, much larger than at any time in history."

127.   During the same video presentation and following Friedman's presentation, Boone assured investors that RH was investing in inventory of RH Modern.  Boone stated that "***[i]nventory at the end of the first quarter was up 24%, and we expect to end the year with inventory growth that is higher than our sales growth, given the inventory investments in RH Modern*** and other newness that we will introduce this fall."  Defendant Boone highlighted the inventory growth with a slide during the presentation:

128.    Also on June 11, 2015, following the video presentation, Defendants held an investor conference call.  The first question on the call was from analyst Adam Sindler at Deutsche Bank, who asked whether RH's manufacturers "have the capacity to handle" the RH Modern launch, and how the launch of RH Modern would affect the Company's "balance sheet through inventory."  Friedman responded with a reassurance regarding the availability of RH Modern products from the manufacturers, noting that for RH Modern "most of Modern is scaling on our current vendor base with some new vendors added in some categories."  Boone also responded to the analyst's question regarding inventory, stating that "*because we have a lot of the newness and investment that are coming in the back half*" of the year, "*we will grow inventory ahead of sales at the end of Q4*."  In response to a question from Neely Tamminga, an analyst from Piper Jaffray & Co., regarding "the elevation of inventory because of the newness," Boone stated that "[i]t will grow a little bit in Q2 . . . and then we'll make some additional investments in the Modern and other newness that we are having.  It will grow a little bit more in Q2 then it will dip, and then it will grow a little bit more in Q4."

129.    Also on the investor call, analyst Budd Bugatch from Raymond James inquired about the RH Modern "supply chain."  In response, Boone stated that "this

summer" the Company was opening 1.5 million square feet of distribution center space "planned partially for Modern" and "knowing that Modern was coming.  So, we should be very good on supply chain capacity for a while."  Boone also mentioned that in negotiating payment terms with manufacturers, "most importantly, again, is making sure we have the product to get to the customer."  Analyst Matt Nemer from Wells Fargo Securities asked about "speed to delivery" for RH Modern products, asking "[h]ow do you think you'll compete on speed?"  Friedman responded that "[on] the Modern side, and the lead times, the wait times are a real disadvantage for the people in the marketplace today" but that "[w]e are going to compete on speed just like we would our current business" and RH would have "a huge competitive advantage versus how the marketplace exists and operates today."

130.    Friedman stated that "we expect this to really open up the aperture of the brand to attract a lot of new customers and in many ways we expect RH Modern to create a new business in general," and characterized RH Modern as an "incremental layer of business," "a new market," and "an entirely new business" that would create "incremental revenues and profitability" for RH.  Friedman stated "could RH Modern, in and of itself, take $4 billion to $5 billion [of revenues] up? Yes, it could." He added, "I am more excited about this than any new thing we've ever done and I would say our organization is, too."

131.    Analysts took note of Defendants' statements about RH Modern and inventory growth.  A June 12, 2015 report by William Blair Equity Research highlighted that "[m]anagement said that it expects inventory growth to exceed sales growth in 2015, with the spread more pronounced by year-end due in part to the newly announced planned launch of the RH Modern collection and one yet-to-be-announced business."  A June 12, 2015 report by Barrington Research similarly noted that "management expects inventory levels to grow by year end as a higher level is needed to support growth and its new concept/categories."

132.    On June 15, 2015, RH announced its intention to offer up to $300 million in convertible notes "to provide . . . additional funding for expansion of its business and the

pursuit of additional growth opportunities." On July 2, 2015, RH completed the sale of the $300 million in debt in a private placement transaction.

133. On September 10, 2015, Defendants published a press release announcing the Company's financial results for the second fiscal quarter of 2015 and raising guidance for the Company's fiscal 2015 performance. Citing the Company's "execution capabilities" and "the significant investments we are making to develop the many new businesses we have in the pipeline," Friedman stated that "the launch of RH Modern and RH Teen late in the third quarter," among other factors, "puts us on a clear path to accelerate our growth in the fourth quarter and into fiscal 2016." Friedman also stated that the launch of RH Modern "gives us further confidence in our financial outlook for fiscal 2015," and Defendants raised fiscal 2015 guidance as follows: EPS increased to $3.06 to $3.16, adjusted net income increased to $129.6 to $133.7 million, net revenues increased to $2.158 to $2.178 billion, and adjusted operating margins increased to 10.5% to 10.7%.

134. Also on September 10, 2015, Defendants published on the Company website a "video presentation" for investors and analysts. During the video, Defendant Friedman continued to promote RH Modern, stating that "it is the most comprehensive launch of a new business and brand in the history of our industry." Defendant Boone stated that "[i]nventory at the end of the second quarter was up 29%" and highlighted how Defendants "expect to end the year with inventory growth that is higher than our sales growth given the inventory investments necessary for the launches of RH Modern and RH Teen." Defendant Boone emphasized inventory growth with a slide during the video:



135.    During an investor conference call later the same day, analyst Cristina Fernández from Telsey Advisory Group asked, regarding the Company's reported inventory growth of 29% in for Q2 2015, "how much of that is related to Modern?" Boone responded that for Modern, "*some of it's on the water,*" *i.e.*, products had been ordered and were in transit, and that "*we do expect inventory, as I mentioned on the video, to outpace revenue growth,* just because we do need to make those investments in Modern . . . inventory."

136.    During the call, analyst Matthew Fassler at Goldman Sachs asked about the Company's "operation and execution." Friedman responded that "I know it looks like we are going so much faster, and it's true and we are," but that at RH, "we test and prove and scale new businesses here on a regular basis every season and every year since we have been a public Company. We have hit our numbers every year and every quarter. We do what we tell you we are going to do."

137.    Friedman dismissed the notion that the RH Modern launch was risky, stating "Now you'd say like well gosh, is that really risky? Well, I don't know; I'd look at everything else we have done." Friedman emphasized that RH Modern "*is the most important new business we have launched in the history of this Company*" and "*the most important and significant new home furnishings business to be launched in the last 15*

*or 20 years*." He stated that RH could "go so fast" with the RH Modern launch because "we know this business," explaining: "It is every category that we're already in. It is every product line that we're already in. We know the percent of the business that should be living room, dining room, bedroom, bathroom. We know how sizes sell versus other sizes. We know how finishes sell versus other finishes. We know the lighting business. We know the window treatment business. We know the rug business. We know the bedroom and bathroom textiles business."

138. Friedman also emphasized that RH had tested some of the demand for RH Modern products by marketing them in RH's other product books, and RH was "extremely happy with the early reads. Extremely happy. And that's maybe why" the Company decided to make the RH Modern Source Book 540 pages long instead of 300 pages long, as previously planned. Friedman also stated that RH Modern "can be as big as RH is today or bigger than we are today. There is no reason to believe that RH Modern can't be a multi-billion dollar business in the U.S."

139. Analysts took note of Defendants' positive inventory statements. An October 1, 2015 analyst report by Cristina Fernández and others at Telsey Advisory Group cited RH's purported "better in-stock levels," noting that "[i]nventory for RH Modern and RH Teen are largely in transit." The analyst report further stated that "RH continues to expect inventory growth to outpace sales growth for the remainder of 2015, driven by the planned product launches." Analysts at Barrington Research also noted in a September 11, 2015 report that "[i]nventory increased 29% and management expects inventory growth to be above sales growth at year end. The higher inventory level is needed to support growth and the company's new concepts and categories." The *Wall Street Journal* published an article on September 10, 2015 titled "Restoration Hardware Raises Outlook," which noted Friedman's "prepared remarks" that "the launch of RH Modern," among other factors, "provide[d] further confidence in [the Company's] outlook for the current fiscal year."

140. The RH Modern launch took place on the Company's website in September 2015. On October 2, 2015, RH opened a retail store in Chicago, Illinois. According to the

Company's press release, the Chicago gallery featured the first in-store presentation of RH Modern products for sale.  RH Modern was presented in an 11,000-square-foot exhibition space located on the fourth level of the gallery.  Defendant Friedman attended the ribbon-cutting ceremony, as well as the launch party the previous night.

141.    On October 12, 2015, Defendants published a press release entitled "RH Introduces RH Modern."  The press release stated that "RH announced today the unveiling of RH Modern" with a 540-page Source Book and website.  The press release stated that RH Modern "debuts with a unique website and significant physical presence, including a dramatic, standalone RH Modern Gallery at the site of RH's former gallery on Beverly Boulevard in Los Angeles, the entire ground floor of the Flatiron Gallery in New York, plus entire floors in the Company's next generation Design Galleries in Chicago, Denver, Tampa and Austin."

142.    On October 15, 2015, Defendant Friedman gave a speech at RH's new retail store in Denver, Colorado.  According to the Company's press release, the Denver gallery featured a 15,000-square-foot exhibition space debuting RH Modern.  During the speech, Friedman stated that "the platform we built . . . [is] very much underappreciated and overlooked," and "gives us massive speed and leverage."  On November 6, 2015, RH opened its Modern Gallery on Beverly Boulevard in Los Angeles, which was a standalone RH Modern Gallery that offered RH Modern products for sale throughout the 21,000-square-feet indoor-outdoor space.  Defendant Friedman personally attended the ribbon-cutting ceremony.  A week later, Defendant Friedman attended the opening of RH's Tampa location, which also offered RH Modern products for sale.

143.    On November 16, 2015, the news publication Curbed published excerpts of an email interview with Defendant Friedman regarding RH Modern.  In the interview, Friedman stated that in developing RH Modern, RH had "carefully curated renowned global designers and artisans to collaborate on RH Modern" and that "[d]espite the size and scope of the launch, trust me when I say we are just warming up."

D.     **RH Revealed The Truth About RH Modern**
       **Through Partial Disclosures While Continuing**
       **To Misrepresent The Launch And Inventory Issues**

144.    On December 10, 2015, Defendants disclosed quarterly revenue at the lower end of guidance, which Defendants attributed to the late release of the RH Modern Source Book.  Defendants also disclosed that "the in-stock position is not great today" on RH Modern, and that "*it's not that we were in [stock] and then we were out [of stock], it's really just a build of getting some of those most initial products*" in the RH Modern line. Defendants also blamed their disappointing financial results on "various external macro factors outside our control, including deteriorating trends in regions impacted by currency and oil prices."

145.    In response to the partial disclosures, the price of RH stock dropped over 10% on high volume, erasing over $361 million in shareholder value, over the next two trading days.

146.    Defendants reassured investors, however, about the success of the RH Modern launch and the Company's financial position, omitting the true facts surrounding RH inventory.  During the quarterly video presentation that Defendants published on December 10, they omitted any mention of the severe RH Modern in-stock problems and overwhelming customer complaints, instead stating that "inventory at the end of the third quarter was up 25% year-over-year.  And we continue to expect to end the year with inventory growth higher than our sales growth *given the inventory investments in RH Modern* and RH Teen."  Defendant Boone also presented the following slide during the video presentation:

147.   Purporting to "update [investors] on [RH's] recent progress," Defendant Friedman stated during the video that "RH Modern was launched with a 540-page source book, its own dedicated website, a significant retail presence inside our Next Generation galleries, plus a free-standing gallery on Beverly Boulevard in Los Angeles." Highlighting the purported success of the RH Modern launch, Friedman stated that "the trends are very encouraging.  In the retail locations where RH Modern is now featured, we have early data that RH Modern is adding more than 40 points of incremental volume.  In Los Angeles where we opened our first free-standing location, RH Modern is trending to add over 60 points of incremental volume with a $25 million annual run rate, while our Melrose gallery continues to comp positive only a few blocks away."

148.   During the investor conference call later that day, Boone again reassured investors regarding inventory, stating that "we have been talking about the cadence of inventory for the year, and really, ***nothing's changed***.  We continue to expect to have year-over-year inventory growth ahead of sales growth in Q4, mostly because of the cadence of newness."  Boone further stated that "[t]he investments we have made in our supply chain and systems infrastructure will enable us to continue to improve our customer experience and support our long term growth."  In a Form 10-Q filed with the SEC on December 10,

2015, Defendants similarly stated that there had been "increases in inventory of $201.7 million related to the increase in 2015 Spring, RH Teen and RH Modern collections."

149. When, during the December 10, 2015, investor conference call, an analyst asked whether "out of stocks in Modern" would be "a gating factor to the early success of Modern," Friedman reassured investors that *"[w]e've got a lot of new product"* and "in stocks are going to improve every week." Friedman characterized the RH Modern issue as one of high demand for certain products while omitting material facts about the near-complete lack of inventory, stating that "the best sellers in a new business are always going to sell out, and you're going to always have to respond and catch up with those" and highlighting that "the demand is outstanding." Without mentioning the overwhelming customer complaints and cancellations, Friedman stated that "[t]he early data would tell us that [RH Modern is] opening up an entirely new market, it's bringing in new customers, and it's accretive to our current core customers." Friedman reassured investors yet again that the "headline" was that RH Modern was "performing ahead of our expectations."

150. On December 10, 2015, 40 days into the quarter, and two months since the launch of RH Modern, Defendants raised guidance for net revenues in the current (fourth) quarter ending January 31, 2016. With just seven weeks remaining in RH's fiscal year, Defendants also raised guidance for fiscal year 2015 net income, net revenues, and adjusted diluted EPS.

151. During the quarterly investor conference call held that day, analysts asked "what's given you the confidence in Q4 to increase your revenue guidance range, even despite all the factors you named, like the oil and the later Source Book?" Friedman responded that *"[a]s of today we are ahead of Q4. That's why."* In other words, Friedman represented that as of December 10, 2015, RH had revenue of more than $708 million in the fourth quarter of fiscal 2015. Friedman also stated during the call that "we have a lot of data that we're looking at" and "I feel more confident than ever before." When asked about how the purported adverse macro trends Defendants noted were playing out in the fourth quarter, Defendants indicated that such issues were accounted for in the Company's

guidance, stating that "[i]t's about basically the same as it dragged in the third quarter" and "[w]e have a good read so far how we're trending versus the third quarter, so far, four or five weeks in."

152.   Investors and analysts reacted to the news.  A December 11, 2015 analyst report by Cowen and Company highlighted that **RH management "expects inventory to continue to outpace sales growth for the remainder of [2015] to support the investment in Modern,** Teen, and new gallery openings." On December 10, 2015, analysts at KeyBanc Capital Markets noted that "[r]esults were hurt by a later launch of Modern." On December 11, 2015, analysts at William Blair Equity Research also reported that "[m]anagement indicated that the revenue shortfall reflected delayed mailing of sourcebooks containing the new RH Modern  . . . line[]."

153.   On December 15, 2015, Defendant Friedman appeared for an interview on the financial news program "Mad Money," hosted by Jim Cramer.  During the interview, Friedman stated, without disclosure of the ongoing customer cancellations and lack of RH Modern inventory, that "we're more confident than ever about the long-term strategy" of RH because, among other things, "we just launched what is the most exciting business I've been associated with in my career: RH Modern."

154.   In January 2016, however, Friedman distributed internally his frantic, all-caps memorandum – "NO ONE WAS FOCUSED ON THE PEOPLE IN THE BUILDING WHO WERE ON FIRE.  THEIR CLOTHES BURNING, AND MANY OF THEM DYING.  WE HAVE LET CUSTOMERS DIE." *See also* ¶¶99, 101-14 above.

155.   On February 24, 2016, Defendants published a press release containing a letter from Defendant Friedman disclosing preliminary fourth quarter and fiscal 2015 results.  The disastrous results for the fourth quarter ending January 31, 2016 included adjusted diluted EPS of $0.99 and adjusted net income of only $41.8 million – figures that were each nearly 30% below the lower end of the range that Defendants had set in December 2015, six weeks into the quarter.  The quarterly EPS and adjusted net income figures were also each below the Company's results for the fourth quarter of the prior year,

fiscal 2014.  Despite Friedman's representation in December 2015 that RH's then-revenue was already ahead of $708 million (¶151), the Company announced net revenues of $708 million for the entire fourth quarter, as well as results for the 2015 fiscal year that were substantially below the range in each major financial category: net revenues, adjusted net income, adjusted diluted EPS, and adjusted operating margins.

156.   In his February 24, 2016 letter, Defendant Friedman disclosed that "there is certainly a fair amount of bad news in the quarter" and a "key factor" having a "negative effect on our fourth quarter results" was that "[w]hile the initial response to RH Modern has been outstanding, we are experiencing shipping delays as certain vendors are struggling to ramp up production of this new product line."  Friedman further disclosed that "***the poor in-stocks . . . suppressed orders***" and "we do not plan to introduce any incremental new businesses in fiscal 2016, as we believe launching into a potential headwind creates asymmetrical risk to the downside."  He also stated that "***RH Modern revenues [are] being affected in the first half by the production issues mentioned earlier***" and "[o]ur energies in the first half [of 2016] will be focused on ramping production and improving in-stocks for RH Modern."  Friedman also blamed "macro economic challenges" for RH's performance, citing the purported impact of "energy, oil, or currency fluctuations" on certain markets for RH products and stating that "we are clearly operating in different market conditions than a year ago."  Defendants also blamed the stock market for RH's performance, stating that "increased volatility in the U.S. stock markets" hurt sales.

157.   Analysts and journalists reacted to the news, calling into question Defendants' credibility.  Analysts at the Buckingham Research Group stated in a February 25, 2016 report that the Company's results were "well below already low expectations" and that "***management's credibility has been damaged in light of the major 4Q miss and there are several 'red flags' we have identified*** . . . ."  The report also cited "[m]ajor execution errors around RH Modern implementation," which "call[] into question the company's operational, strategical and planning capabilities."  A February 25, 2016 article on the financial news website The Motley Fool stated that "management has plenty

of work ahead in regaining investor confidence" and a February 24, 2016 article on the financial news website iBankCoin similarly noted that Defendants had revealed "offensive execution" as "a supply chain is the heart of retail." "***Acceptable excuses: 0.***"

158.   A February 29, 2016 article on the financial news website Seeking Alpha similarly concluded that "***[i]nvestors should not buy management's unconvincing explanations.***"   The article explained that in his December 10, 2015 RH statements, Friedman "insisted on being ahead of Q4 plan so far at that point."   Given the true Q4 2015 results, however, the article noted that "management already lined out a couple of red flags on the Q3 conference call and still decided to take up Q4 guidance only to fail miserably just a few weeks later."

159.   Numerous additional analysts and journalists noted the shocking financial results and management's reduced credibility.  *USA Today* reported on February 24, 2016 that "investors were stunned" by the news as "Restoration Hardware is falling apart."  A *Fortune* article the same day noted that the Company's shares were falling heavily on the news as "[t]he company's charismatic CEO Gary Friedman blamed everything from the oil bust to the crazy stock market for the high end furniture retailer's shortfall."

160.   In reports dated February 24 and February 25, 2016, analysts at KeyBanc Capital Markets downgraded RH's stock and highlighted the "disruption in RH Modern inventory procurement," and analysts at Piper Jaffray explained how RH had "[c]it[ed] shipping delays in its RH Modern product" while reporting results that were "well below guidance and expectations."  A February 25, 2016 article in *Business Insider* stated that in reporting its financial results, RH was "break[ing] out every excuse in the book" and that Friedman was continuing to provide "encouragement to shareholders."  News articles on February 26 and February 29, 2016 noted the "disastrous preliminary earnings report."

161.   Defendants' statements about factors such as stock market volatility, and energy, oil, and currency fluctuations, such as those identified in paragraphs 144, 156, 197, and 199, were false and misleading.  RH's Manager of Financial Planning and Analysis throughout the Class Period, for instance, stated that Defendants' blaming the earnings

decrease on energy, oil, and currency fluctuations was "not true." He explained that "the truth of the matter is it was because of the Modern business and how it was poorly executed"; that the Company did not have enough inventory to ship out to meet all of the demand for Modern; and that because RH did not have inventory, the fourth quarter results suffered. "It is just amazing what you can tell the public," he said. RH's Buyer from 2014 to 2016 similarly stated that it was "absolutely" not true that the Company's weak earnings were due to energy, oil, and currency fluctuations. Rather, it was all about not being able to deliver product to customers on time. When RH Modern launched, customers were looking at delivery dates of April 2016, and "that's just ridiculous." He explained that RH put resources into its new brand and then was not able to reap the benefits; that is what caused the financial deficit, not oil prices. RH's Senior Vice President of Product Development and Design from October 2015 to June 2016 stated that the weak earnings were due to the supply and delivery of merchandise that specifically related to the Modern line and that affected sales. RH's Product Development Leader in Dining Furniture until September 2016 stated that the Company's earnings decrease was related to the launch of RH Modern. According to RH's Creative Associate in Design and Planning from 2013 to February 2016, RH's earnings suffered due to last-minute decision-making and then having to communicate those last minute decisions to factories in China.

162. Reports by RH analysts revealed how RH's partial disclosure on February 24, 2016 continued to mislead the market by giving the impression that the RH Modern difficulties were due to "vendor struggles" as opposed to the Company's failure to place timely orders for inventory. A February 24, 2016 report by analysts at Evercore ISI stated that RH's sales suffered from "poor in-stocks as *vendors struggled* to ramp up the new RH Modern line." In a report dated February 24, 2016, CRT Capital Group LLC similarly repeated that "[w]ritten orders were up 21% in 4Q on top of 26% [last year], however delivered revenue increased just 11% in the quarter versus 24% 4Q14. RH blamed this shortfall in delivered revenue on *shipping delays related to vendor production* of the new [] RH Modern line."

163.   In response to the partial disclosures, the price of RH stock declined.  On February 25, 2016, the share price fell over 25% to close at $38.49, erasing over $543 million in shareholder value on the highest trading volume ever recorded in a single day for RH stock.  As Bloomberg reported, this was the "biggest single-day drop [in Company share price] since the retailer held its initial public offering in 2012."

164.   On February 25, 2016, Bloomberg published an article titled "Delight the Customer or Lose Your Job: Restoration Hardware CEO Sends Scorching Memo."  The article published excerpts of the memo written by Defendant Friedman to RH employees in response to mounting customer complaints and high order-cancellation rates.  *See* ¶¶51-53, 103-14 above.  The next day, *Fortune* and *The Washington Post* picked up the story and noted that Friedman likely had reason to send the memo, as the Company had reported on February 24, 2016 – just a day before the *Bloomberg* article first reported on it – that "its fourth quarter sales and earnings were well below forecasts[.]"

165.   Unbeknownst to investors at the time, the "Delight the Customer or Lose Your Job" memo was over a month old at the time of publication, was the result of severe inventory shortages of RH Modern products, and Friedman followed up the memo with weekly conference calls and further memos as part of the costly "delight the customer" initiative.  *See* ¶¶103-14 above.

166.   On March 17, 2016, analysts at BB&T Capital Markets disclosed the results of a survey they conducted on the availability of RH Modern products.  The survey "*revealed [that] widespread supply chain issues continued into Q1'16 and are even worse than we feared*," putting "*the burden of proof on senior management to demonstrate the wheels have not completely fallen off*."  The survey analyzed the availability of "50 RH Modern products, including large furniture, home furnishings, and decorative items, in order to gauge how many are currently in or out of stock."  It found that "*58%* of the items are currently out of stock, with RH on average promising to contact customers to schedule a delivery—*not actually deliver the product*—in 63 days.  In one case RH currently does not promise to contact customers to schedule a delivery until *early December*."  BB&T

downgraded RH's stock and summarized its findings: "To be blunt, *we find it shocking over half of RH Modern products are currently not in stock and will take over two months on average before customers are even contacted about scheduling deliveries*." The analysts further concluded that they were "troubled" that RH management had not "ensure[d] its supply chain was adequately prepared *given its repeated bullish comments on the concept's potential*."

167.   Journalists at CNBC reiterated the "shocking" findings of product delays and noted that the findings "call[ed] into question just how severe an impact the retailer's chronic out-of-stock conditions" would have on the Company's financial performance despite Friedman's statements "assur[ing] investors that the majority of Restoration Hardware's written orders would translate into revenue during the first and second quarters, and that its vendors would be 'substantially caught up' by the end of the first half."  The Buckingham Research Group issued an analyst report on March 18, 2016, in which it downgraded the Company's stock to "underperform" and reported that "the worst of [RH's] supply chain issues may still be ahead of us."

168.   In response to the partial disclosures regarding RH Modern, the price of RH stock declined.  On March 17, 2016, the share price dropped 5.66% to close at $36.65 per share on high volume, erasing over $89 million in shareholder value.

169.   On March 29, 2016, RH Modern reported its final financial results for the fourth quarter of 2015 and fiscal 2015.  Defendants also released a video presentation for investors.  During the presentation, Defendants continued to characterize the RH Modern shipping delays as an issue of "certain vendors . . . are struggling to ramp up production." Defendants assured investors that RH Modern "can quickly become a billion-dollar-plus brand" and that RH was "ramping production and improving in-stocks for RH Modern." Defendants stated that "[r]evenue growth in the front half of fiscal 2016 will be driven by . . . RH Modern as the 2015 orders turn into delivered revenue; as well as stronger overall Modern demand as our in-stock levels improve."

170.   Also on March 29, 2016, Defendants stated that RH was "investing approximately $8 million to $10 million during the first quarter due to higher cancellation rates, shipping delays, and our overall initiative to elevate the customer experience." While RH characterized the costs euphemistically as an "investment," it amounted to an expense of "$0.12 to $0.15 per share" for the first quarter.  The Company stated that "customer accommodations due to RH Modern production delays" were expected to reduce the Company's adjusted diluted EPS in fiscal 2016 by $0.22.   Regarding RH Modern, Defendant Friedman stated that "we're on the back side of the mountain, if you will. . . .  I think we're past the peak.  The in stocks in Modern are going up."  Friedman stated that "we've now got our arms around it" and "we have our arms around what we think the costs will be."

171.   RH also held a quarterly investor conference call on March 29, 2016.  The first question during the call, from Matthew Fassler at Goldman Sachs, asked about the Company's first quarter guidance.  In response, Friedman stated that RH's guidance was "rightly conservative."   When Fassler inquired about the "cadence of the business as [Friedman] saw it play out through the quarter and perhaps into Q1," Friedman responded that on RH Modern, "[w]e're currently in the 70% range as far as our in-stocks today, and we expect that to build to the mid-80%s by the end of the quarter which is more at a normalized level."  Friedman also reiterated later in the call that "[t]he in-stocks in Modern are going up."

172.   Analysts and journalists responded to Defendants' statements.  A March 29, 2016 report by analysts at Morningstar Equity Research stated that RH's lack of RH Modern inventory was due to "the lack of insight RH had to the demand for Modern and the effectiveness of its supply chain."  The report further cited Defendants' statement that the Company expense in support of "the customer experience" would cost approximately "$0.12-$0.15 in EPS for the first quarter."   Numerous analyst reports also noted the Company's purported in-stock rates on RH Modern.  On March 30, 2016, a report by analysts at BB&T Capital Markets cited Defendant Friedman's statement about the level

of RH Modern in-stocks, stating that "[m]anagement noted only ~70% of RH Modern inventory is currently in stock." A March 30, 2016 report by Cowen and Company similarly noted RH's purported "~70%" in-stock position for RH Modern. A March 30, 2016 analyst report by Deutsche Bank similarly noted RH Modern in-stock levels in "the 70% range today and expected to build to the mid 80% range by the end of 1Q versus historical in-stock in the low 90% range." A March 30, 2016 analyst report by UBS similarly noted that RH Modern's "current in-stock rate is in the 70% range and should climb to mid-80% by the end of 2Q."

173.   On June 8, 2016, the Company made further disclosures regarding RH Modern and announced disappointing financial results for the first quarter of fiscal 2016. The Company disclosed that instead of spending $8 million to $10 million to "elevate the customer experience" in the quarter ending April 30, 2016 – a figure the Company had provided to investors two-thirds of the way through the quarter – RH had spent *$18 million* on such "customer accommodations and related expenses, largely as a result of RH Modern production delays." And while the Company had provided guidance of net income in the range of $1.6 million to $2.5 million and earnings between $0.04 and $0.06 per share for the quarter, the Company reported a net *loss* of $2.1 million and a *loss* of $0.05 per share. Based on the "RH Modern production delays," the Company also reduced its guidance for the full fiscal 2016 year.

174.   In a quarterly video presentation to investors published on June 8, 2016, Defendants blamed the poor performance on, among other things, "the launch of RH Modern," which "has suffered difficulties ramping production." Defendants also disclosed that they were taking a "more aggressive approach to rationalizing our SKU count and optimizing inventory," which would reduce the Company's financial performance substantially. The June 2016 statements about rationalizing the SKU count and optimizing inventory referred to liquidating unnecessary or excess inventory from RH's product lines other than RH Modern, as "there was a ton of product in the warehouse that wasn't selling or moving." *See* ¶64 above. Defendants revealed that the Company had "extra inventory"

that was "bloating [the] balance sheet," as well as "overstock" in the non-RH Modern categories "*across the board*." Defendants further disclosed that RH had decided to use "clearance events" and open more outlet stores "to support [thei]r more aggressive stance in rationalizing our SKU base and reducing our inventories."

175.    Analysts and journalists reacted to the news. On June 9, 2016, BB&T Capital Markets published a report stating that "*the last two quarters' debacles cast significant doubt on management's credibility*" and that "*we are still flabbergasted by how quickly the wheels appear to be falling off RH*." Also on June 9, 2016, analysts at Cowen and Company reported that RH's first quarter results "misse[d] expectations as *greater than expected modern in-stocks led to higher than anticipated customer accommodations*," and analysts at Oppenheimer similarly noted that "[i]nvestments to elevate the customer experience associated with the RH Modern rollout continue to weigh on profitability, detracting $0.34 from EPS." The Oppenheimer report noted that the Company's results were "much weaker than expected" as "EPS f[ell] meaningfully short of expectations" and "below management guidance." The next day, MarketWatch reported that "[a]nalysts didn't hold back in their assessments of the issues facing [RH], with concerns expressed about everything from transaction times to management's credibility" along with "concerns the wheels may be falling off." MarketWatch also noted how "BB&T Capital Markets analysts . . . believe the credibility of those running Restoration Hardware should be called into question."

176.    The price of RH's stock declined in response to Defendants' disclosures. On June 9, 2016, the share price plunged over 21% on the highest trading volume in the Company's history since its IPO. The share price dropped another 6.5% the next day, again on high trading volume. The two-day drop erased over $386 million in shareholder value.

177.    An article on the financial news website The Motley Fool following the close of the Class Period commented on some of Defendants' misstatements during the Class Period. The article noted that RH's "earnings reports have been filled with dubious excuses and self-inflicted errors" and that "*CEO Gary Friedman has stretched the limits of*

*credulity with many of his statements over the past year.*"  The article stated that despite Friedman's statements on February 24, 2016 that the Company's earnings were affected by "underperformance in markets affected by energy, oil, or currency fluctuations," an independent analysis "dispel[s] any notion that low oil or stock prices pressured RH's results," showing that "[t]he lesson for investors" was that "[*a*]*lmost all of Restoration Hardware's attempts to blame results on the macroeconomic environment have been proven false.*"  The article concluded: "One thing is clear.  Friedman's credibility has been severely damaged by this year's unforced errors and weak excuses."

## V.    DEFENDANTS' FALSE AND MISLEADING STATEMENTS AND OMISSIONS

178.    On March 26, 2015, Friedman, Boone and RH's Vice President of Investor Relations and Strategy, Cammeron McLaughlin, participated in the investor conference call that followed Defendants' press release and investor video.  After the announcement of the new product line, analyst Oliver Chen from Cowen and Company asked during the call Defendants about "the inventory needs over the next year," how the "supply chain . . . intersect[s] with the customer experience," and how investors should "think about the magnitude of cash outflows" for inventory purchases.  Defendant Boone represented that "the business does require a night-in-stock position . . . [s]o we will continue to make inventory investments to make sure that . . . [we] improve our in-stocks and make sure we're not having high back orders."  When Chen asked Defendant Friedman "[w]here are you with lead times roughly," Friedman responded that the Company was "making more meaningful investments, system investments on both sides, with our vendors and internally here," which "should help us with lead times, help us with inventory flow, the way we're systematically placing orders now."

179.    Defendants' statements in the investor conference call, identified above in ¶178, were false and misleading.  Defendants were not systematically placing orders for RH Modern product and were not "continuing" to make "required" inventory investments on RH Modern.  Defendants had not ordered the required inventory, or any substantial

amount of RH Modern inventory.  *See* ¶¶32-38; *see also* ¶¶39-50.  Defendants also omitted that, at the time, RH's vendors for RH Modern were already burdened from their production of RH's existing product lines.  *See* ¶¶36-38.

180.    On March 27, 2015, RH filed an annual report on Form 10-K with the SEC. In a section titled "Product Development," the 10-K promoted RH's "proprietary product development platform," by virtue of which the Company had "streamlined [its] product development organization and process to shorten product lead times[.]"   The statement continued, "Key aspects of our product development platform are . . . Organization . . . Process . . . [and] . . . Facility."   The 10-K stated that "[a]s a result of [this] proprietary [platform], [the Company's] typical product lead times are 3-9 months, which enhances [RH's] ability to introduce more new products with each collection."   RH reported merchandise inventories of approximately $559 million, up from $453 million at the end of fiscal 2014.

181.    Defendants' statements in the Form 10-K, identified above in ¶180, were misleading and omitted material facts.  Defendants' promotion of RH's purported "ability to introduce more new products" through a "streamlined product development organization" and references to lead times were misleading.  The Company failed to design and order necessary inventory for the RH Modern launch, and Defendants were ***not*** ordering RH Modern products in compliance with the product lead times.  Defendants' ability to introduce more new products was compromised by such delays, as Defendants had not ordered the required inventory, or any substantial amount of RH Modern inventory. *See* ¶¶32-38; *see also* ¶¶39-50.  Defendants also omitted that, at the time, (i) RH's reported inventories were due to excess accumulated inventory on RH's existing product lines (*see* ¶¶56-64); and (ii) RH's vendors for RH Modern were already burdened from their production of RH's existing product lines (*see* ¶¶36-38).

182.    On June 11, 2015, Defendants published on the Company website a "video presentation" for investors, in which the Individual Defendants participated and which, as described above, focused on the promotion of RH Modern.  During the video, Defendant

Boone stated that "[i]nventory at the end of the first quarter was up 24%, and we expect to end the year with inventory growth that is higher than our sales growth, given the inventory investments in RH Modern and other newness that we will introduce this fall."

183.    Defendants also held a quarterly investor conference call on June 11, 2015, in which Defendants Boone and Friedman, and RH's Vice President of Investor Relations, Cammeron McLaughlin, participated.  The first question on the call was from analyst Adam Sindler at Deutsche Bank, who asked whether RH's manufacturers "have the capacity to handle" the RH Modern launch, and how the launch of RH Modern would affect the Company's "balance sheet through inventory."  Boone responded that "because we have a lot of the newness and investment that are coming in the back half" of the year, "we will grow inventory ahead of sales at the end of Q4."  Friedman responded with a reassurance regarding the availability of RH Modern products from the manufacturers, noting that for RH Modern "most of Modern is scaling on our current vendor base with some new vendors added in some categories."

184.    In response to a question from Matt Nemer from Wells Fargo Securities regarding "speed to delivery" for RH Modern products, Friedman stated "[on] the Modern side, and the lead times, the wait times are a real disadvantage for the people in the marketplace today," but that at RH, "[w]e are going to compete on speed just like we would our current business."  He continued, "we're being relatively conservative on inventory, that's how and where we are buying" and that "we're going to oversell some stuff – overbuy, underbuy and so our lead times and our delivery won't be optimized in the 6 months or 12 months.  After that, I think, you think about it, it's going to be a huge competitive advantage versus how the marketplace exists and operates today."  In response to a question from Neely Tamminga, an analyst from Piper Jaffray & Co., regarding Defendants' stated "elevation of inventory because of the newness," Boone stated that "[i]t will grow a little bit in Q2 . . . and then we'll make some additional investments in the Modern and other newness that we are having.  It will grow a little bit more in Q2 then it will dip, and then it will grow a little bit more in Q4."

185. Defendants' statements in the video presentation and investor conference call, identified above in ¶¶182-84, were false and misleading. The video presentation was staged with RH Modern products that were not finished products from the RH Modern line. They were instead "one-offs" that had been hastily constructed by hand shortly before the investor video, and the designs for the products had not yet been provided to RH's vendors. *See* ¶¶74-76. Defendants highlighted "inventory growth that is higher than our sales growth, given the inventory investments in RH Modern," but Defendants had not ordered necessary inventory for RH Modern. *See* ¶¶32-38; *see also* ¶¶39-50. Defendants' references to "compet[ing] on speed," the possibility that RH could "overbuy" or "underbuy" on RH Modern, and to RH being "conservative" on "how and where" RH was buying, were misleading because they omitted material facts and gave the impression that RH was buying substantial quantities of RH Modern products and perhaps even "overbuy[ing]," and that the question was whether RH was buying the right variety of products, when, in fact, Defendants had not ordered necessary inventory or any substantial amount of RH Modern inventory. *See id.* Defendants also omitted that, at the time, (i) RH's reported inventories were due to excess accumulated inventory on RH's existing product lines (*see* ¶¶56-64); and (ii) RH's vendors for RH Modern were already burdened from their production of RH's existing product lines (*see* ¶¶36-38).

186. On September 10, 2015, Defendants published a press release regarding the Company's performance and filed it with the SEC on Form 8-K. In the press release, Defendant Friedman promoted the launch of RH Modern, citing "the significant investments we are making to develop the many new businesses we have in the pipeline and the infrastructure we are putting in place to scale them."

187. On September 10, 2015, Defendants also published on the Company website a "video presentation" for investors and analysts, in which the Individual Defendants participated. During the video, Defendant Boone stated that "[i]nventory at the end of the second quarter was up 29% and we expect to end the year with inventory growth that is higher than our sales growth given the inventory investments necessary for the launches of

RH Modern and RH Teen." Also on September 10, 2015, Defendants held a quarterly investor conference call, in which the Individual Defendants participated. During the call, analyst Cristina Fernández from Telsey Advisory Group asked, regarding the Company's reported inventory growth of 29% in for Q2 2015, "how much of that is related to Modern?" Boone responded that "some of it's on the water," it would "show up this quarter and into Q4," and "[s]o we do expect inventory, as I mentioned on the video, to outpace revenue growth, just because we do need to make those investments in Modern . . . inventory."

188. Defendants' statements on September 10, 2015, identified above in ¶¶186-87, omitted material facts and gave a reasonable investor the impression of a state of affairs that differed in a material way from the one that actually existed at RH. In truth, Defendants were not ordering necessary RH Modern inventory (*see* ¶¶32-38; *see also* ¶¶39-50), and instead of inventory growth outpacing sales growth and RH making the "necessary" investments in RH Modern, Defendants continued to make changes to RH Modern product designs, preventing the Company from having inventory at the time of the RH Modern launch. Defendants also omitted that, at the time, (i) RH's reported inventories were due to excess accumulated inventory on RH's existing product lines (*see* ¶¶56-64); and (ii) RH's vendors for RH Modern were already burdened from their production of RH's existing product lines (*see* ¶¶36-38).

189. On October 12, 2015, Defendants published a press release entitled "RH Introduces RH Modern." The press release stated that RH Modern "debuts with a unique website and significant physical presence, including a dramatic, standalone RH Modern Gallery at the site of RH's former gallery on Beverly Boulevard in Los Angeles, the entire ground floor of the Flatiron Gallery in New York, plus entire floors in the Company's next generation Design Galleries in Chicago, Denver, Tampa and Austin."

190. Defendants' statements above in ¶189 were misleading. Defendants omitted that (i) the Company website and Source Book displayed products created in Photoshop that were digitally manipulated and not fully designed (*see* ¶¶77-78); (ii) the store openings

1    used sample products due to a lack of inventory (*see* ¶¶44-47); and (iii) the Company had

2    failed to order inventory to fulfill customer orders (*see* ¶¶32-50).

3         191.    On December 10, 2015, Defendants published a press release regarding RH's

4    financial performance and filed the press release with the SEC on Form 8-K.  In the press

5    release, Defendant Friedman stated that Defendants were "extremely encouraged by the

6    early results we are seeing out of . . . RH Modern" and that "RH Modern is trending to add

7    significant incremental revenues."  With seven weeks remaining in the fiscal year, the press

8    release announced that Defendants were raising the financial guidance for RH for the fourth

9    quarter of fiscal 2015 and the 2015 fiscal year, including by raising the Company's

10   guidance for fiscal 2015 net revenues, adjusted net income, and adjusted diluted earnings

11   per share.

12        192.    On December 10, 2015, Defendants published on the Company website a

13   "video presentation" for investors and analysts, in which the Individual Defendants

14   participated.  Defendants continue to promote RH Modern while omitting material facts.

15   During the video, Defendant Boone stated that "inventory at the end of the third quarter

16   was up 25% year over year and we continue to expect to end the year with inventory growth

17   higher than our sales growth ***given the inventory investments in RH Modern*** and RH

18   Teen."  Purporting to "update [investors] on [RH's] recent progress," Defendant Friedman

19   stated that "RH Modern was launched with a 540-page source book, its own dedicated

20   website, a significant retail presence inside our Next Generation galleries, plus a free-

21   standing gallery on Beverly Boulevard in Los Angeles."  Friedman stated that "the trends

22   are very encouraging.  In the retail locations where RH Modern is now featured, we have

23   early data that RH Modern is adding more than 40 points of incremental volume.  In Los

24   Angeles where we opened our first free-standing location, RH Modern is trending to add

25   over 60 points of incremental volume with a $25 million annual run rate, while our Melrose

26   gallery continues to comp positive only a few blocks away."  Defendants also reiterated

27   their increased guidance for fiscal 2015.  *See* ¶191.

28

193.   On December 10, 2015, Defendants also held a quarterly investor conference call, in which the Individual Defendants and RH's Senior Vice President of Investor Relations and Strategy, Cammeron McLaughlin, participated.  During the call, Defendant Boone stated that "we have been talking about the cadence of inventory for the year, and really, ***nothing's changed***.  We continue to expect to have year-over-year inventory growth ahead of sales growth in Q4, mostly because of the cadence of newness."  Boone further stated that "[t]he investments we have made in our supply chain and systems infrastructure will enable us to continue to improve our customer experience and support our long term growth."  Defendants also stated that "various external macro factors outside our control, including deteriorating trends in regions impacted by currency and oil prices," negatively impacted RH's business.

194.   When, during the December 10, 2015 investor conference call, an analyst asked whether "out of stocks in Modern" would be "a gating factor to the early success of Modern," Friedman reassured investors that "[w]e've got a lot of new product" and "in-stocks are going to improve every week."  Friedman characterized the RH Modern situation as one of high demand for certain products, not a failure to timely order adequate inventory or a problem that will persist, stating that "the best sellers in a new business are always going to sell out, and you're going to always have to respond and catch up with those" and highlighting that "the demand is outstanding."  Friedman stated that a "headline" was that RH Modern was "performing ahead of our expectations."  During the call, analyst Jessica Mace from Nomura Securities challenged Defendants regarding the increased guidance that the Company had revealed the same day, asking "what's given you the confidence in Q4 to increase your revenue guidance range, even despite all the factors you named, like the oil and the later Source Book?"  Friedman responded that "[a]s of today we are ahead of Q4.  That's why."  Friedman also stated during the call that "we have a lot of data that we're looking at."  When asked by an analyst about how the purported adverse macro trends Defendants noted were playing out in the fourth quarter, Defendants indicated that such issues were accounted for in the Company's guidance, stating that

"[i]t's about basically the same as it dragged in the third quarter" and "we have a good read so far how we're trending versus the third quarter, so far, four or five weeks in."

195.   Also on December 10, 2015, RH filed with the SEC its quarterly report for the third quarter of fiscal 2015 on Form 10-Q.  The Form 10-Q reported in the third quarter there had been "increases in inventory of $201.7 million related to the increase in 2015 Spring, RH Teen and RH Modern collections."

196.   Defendants' statements on December 10, 2015, identified above in ¶¶191-95, were false and misleading, and omitted material facts.  Defendants' statements that "nothing's changed" regarding the inventory "cadence" and that inventories were growing "because of the cadence of newness," while highlighting the "improve[d] . . . customer experience," omitted material facts.  At the time, RH was experiencing overwhelming customer complaints, and extensive delays on RH Modern customer orders, because RH had launched RH Modern two months earlier with essentially no stock on hand to fulfill customer orders.  *See* ¶¶32-55.  Inventories were inadequate and were not growing in the fourth quarter, and RH accumulated excess inventory on non-RH Modern product lines. *See id.*; ¶¶56-64.  In response to a question about whether "out of stocks in Modern" would be "a gating factor to the early success of Modern," the response that "[w]e've got a lot of new product" and "in-stocks are going to improve every week" was misleading because RH was sorely out of stock, inventory was decreasing, and the rampant problems with back orders on RH Modern were impacting RH's business, including its financial results – that is, "out of stocks on Modern" were already "a gating factor to the early success of Modern." *See* ¶¶32-55.  Defendant Friedman's statement that RH Modern "demand is outstanding," RH Modern was "performing ahead of our expectations," and "the best sellers in a new business are always going to sell out," concealed the pervasive back orders and customer dissatisfaction, and misled investors regarding the extent of, and reasons for, the RH Modern out-of-stocks.  *See id.*  These facts were also omitted from Defendant Friedman's statements when he provided a purported "update" regarding RH Modern during the video presentation, citing RH Modern store openings and the distribution of the Source Book,

but omitting that the Source Book used Photoshopped products that did not yet exist, the stores used sample products due to a lack of inventory, high shipping costs were necessary due to RH Modern delays, and that there were pervasive back orders and customer dissatisfaction. *See* ¶¶44-47, 51-55, 77-78. In addition, Friedman's representation that as of December 10, 2015, RH was "ahead of Q4," *i.e.*, had revenue of more than $708 million already in the current fiscal quarter, were false and omitted the RH Modern launch back-log and order cancellations. Defendants' statements regarding "various external macro factors" omitted that the failed RH Modern launch was in truth driving the Company's disappointing financial results. *See* ¶¶32-55, 103-14, 161.

197.   On February 24, 2016, Defendants published a press release regarding the Company's financial performance and filed the press release with the SEC on Form 8-K. In the press release, Friedman blamed "macro economic challenges" for RH's poor performance, citing the purported impact of "energy, oil, or currency fluctuations" on certain markets for RH products and stating that "we are clearly operating in different market conditions than a year ago." Friedman also stated that "increased volatility in the U.S. stock markets" hurt sales. Friedman further stated that a "key factor" having a "negative effect on our fourth quarter results" was that "[w]hile the initial response to RH Modern has been outstanding, we are experiencing shipping delays as certain vendors are struggling to ramp up production of this new product line."

198.   Defendants' statements in the February 24, 2016 press release, identified above in ¶197, were false and misleading, and omitted material facts. Defendants' statements regarding the "volatility in the U.S. stock markets," "energy, oil, or currency fluctuations," and "macro economic challenges" omitted that the failed RH Modern launch was in truth driving the Company's disappointing financial results. *See* ¶¶32-55, 103-14, 161. Similarly, the statement that RH was "experiencing shipping delays as certain vendors are struggling to ramp up production" of RH Modern omitted the material facts that Defendants had failed to order inventory for the RH Modern launch, RH experienced high

back orders and customer complaints, and RH's reported inventory levels were due to excess accumulated inventory on RH's existing product lines.  *See* ¶¶32-64.

199.   On March 29, 2016, Defendants published on the Company website a "video presentation" for investors, in which the Individual Defendants participated.  During the video, Defendant Friedman stated that "certain vendors" were "struggling to ramp up production" on the RH Modern line.  Friedman also stated that "we continue to see underperformance in the markets affected by energy, oil, or currency fluctuations, specifically Texas, Miami, and Canada" and stated that "volatility in the U.S. stock markets . . . negatively impacted our performance."  Boone stated that RH was "investing approximately $8 million to $10 million during the first quarter due to higher cancellation rates, shipping delays, and our overall initiative to elevate the customer experience," which amounted to an "investment in the customer experience" of "$0.12 to $0.15 per share" for the first quarter.

200.   On March 29, 2016, Defendants published a press release regarding RH's financial performance and filed the press release with the SEC on Form 8-K.  The press release stated that "customer accommodations due to RH Modern production delays" would reduce the Company's adjusted diluted EPS in fiscal 2016 by $0.22.

201.   Defendants also held a quarterly investor conference call on March 29, 2016, in which Defendants Boone and Friedman, and RH's Senior Vice President of Investor Relations and Strategy, Cammeron McLaughlin, participated.  During the call, Defendant Friedman stated that on RH Modern, "[w]e're currently in the 70% range as far as our in-stocks today, and we expect that to build to the mid-80%s by the end of the quarter which is more at a normalized level."  Friedman also reiterated later in the call that "[t]he in-stocks in Modern are going up."

202.   Defendants' statements on March 29, 2016, identified above in ¶¶199-201, were false and misleading, and omitted material facts.  Defendants' statements that "we continue to see underperformance in the markets affected by energy, oil, or currency fluctuations, specifically Texas, Miami, and Canada" and that "volatility in the U.S. stock

markets . . . negatively impacted our performance," omitted that the failed RH Modern launch was in truth driving the Company's disappointing financial results. *See* ¶¶32-55, 103-14, 161. In truth, Defendants had failed to order inventory for the RH Modern launch, and back orders and customer complaints were overwhelming, and RH's reported inventory levels were due to excess accumulated inventory on RH's existing product lines. *See* ¶¶32-64, 103-14, 161. In addition, Defendants' statements regarding the costs for customer accommodations omitted that employees were authorized, *carte blanche*, to give customers unlimited amounts of accommodations without requiring authorization from management, leading to skyrocketing expenses. *See* ¶¶103-14. Defendant Friedman's statements regarding the in-stock levels on RH Modern mischaracterized the true in-stock levels at the time. *See* ¶¶166-68.

## VI.   ADDITIONAL ALLEGATIONS OF DEFENDANTS' SCIENTER

203.   Numerous facts in addition to those discussed above further support a strong inference that Defendants knew, or were deliberately reckless in disregarding, the omitted facts about the RH Modern launch, available RH Modern inventory, customer cancellations and expensive accommodations, and accumulation of inventory of products from the existing line when making the false and misleading statements identified above.

204.   *Defendant Friedman was intimately involved in the RH Modern launch.* Defendant Friedman was personally involved in the RH Modern launch, including designing the line, deciding timing of orders to vendors, staging photo and video shoots, and store openings. His personal approval was required for product development, and he repeatedly delayed product development through changes, including last-minute changes just weeks before release of the RH Modern Source Book. ¶¶66-73, 90-94. Defendant Friedman ultimately made the determination of what got ordered and how much was ordered. *Id.* He was also well aware of, and personally participated in, the Company's misleading publication of RH Modern products in a promotional video to investors, in the Source Book, and on the website. ¶¶74-78. Around the time of the launch, Friedman also

made personal appearances at store openings that featured RH Modern sample products. ¶¶44-47, 140-42.

205.   Friedman received weekly and even daily escalation reports that detailed the voluminous complaints about delayed delivery times, lack of inventory, and product quality.  ¶¶82, 92, 96-102.  He initiated the task force and the "delight the customer" initiative to combat the rampant cancellations and avoid customers reporting their complaints to the media. ¶¶98, 103-14.  He received the weekly reports of millions of dollars of customer accommodations as part of the initiative.  ¶¶95-102.  Defendant Friedman's personal involvement and control over the RH Modern launch and accommodations raise a strong inference that he knew, or was deliberately reckless in not knowing, about the design delays, lack of orders before the launch, available inventory, and the impact on the Company's customer relations and financial results.

206.   *Defendants received regular reports and current data regarding the lack of RH Modern inventory and the disastrous RH Modern launch*.  Defendant Friedman told investors that "we have a lot of data that we're looking at."  As explained above (*see* ¶¶79-89, 112), Defendants monitored current RH Modern inventory, sales, and back order data through specific Company databases, reports, and meetings.  Such data was available on the Merchandise Drill Down system, and RH's employees witnessed Friedman access the system.  Executives received weekly "in stock" reports.  RH used a system called CW, and analysts sent Friedman weekly reports drawn from CW showing the orders and back orders. Friedman also made notes on orders in CW.  Moreover, Friedman received weekly sales reports that showed orders as well as what inventory was available on RH Modern, on a SKU-by-SKU basis, and also showed the delayed delivery.  RH also had a system called GT Nexus that provided additional information regarding product delays by showing where items were in transit.  Defendant Friedman also personally monitored customer service and customer accommodations in the wake of the RH Modern launch, and was provided with up-to-date data regarding the extent and costs of the customer accommodations.  *See* ¶¶95-

102. Defendants' review of extensive reports and data with material facts that were omitted from their Class Period statements further raises a strong inference of scienter.

207. *"The law of materials and production" supports scienter.*  Given the necessary lead time to manufacture and ship RH Modern products, it was obvious to RH's executives that if RH Modern products were not ordered at least six months in advance of the October 2015 launch, those products would not be in stock or available for customers at the time of launch and would cause substantial delay for customers.  It was "kind of like physics; it's the law of materials and production."  *See* ¶33.

208. *The ease with which outsiders discovered RH's low inventory of RH Modern, back orders, and customer delays supports scienter because of the Individual Defendants' superior access to information and obligations as RH executives.*  RH's level of RH Modern inventory was easily observed by outsiders.  For example, on March 17, 2016, analysts at BB&T Capital Markets disclosed the results of a survey they conducted by asking RH about the availability of different RH Modern products.  The survey "revealed [that] widespread supply chain issues continued into Q1'16 and are even worse than we feared," putting "the burden of proof on senior management to demonstrate the wheels have not completely fallen off."  BB&T downgraded RH's stock and summarized its findings: "To be blunt, we find it shocking over half of RH Modern products are currently not in stock and will take over two months on average before customers are even contacted about scheduling deliveries."  The analysts further concluded that they were "troubled" that RH management had not "ensure[d] its supply chain was adequately prepared given its repeated bullish comments on the concept's potential."  ¶166.  Outsiders also easily discovered that Defendants' excuses regarding oil, currency, and stock market fluctuations were false and misleading.  *See* ¶177.

209. *The launch of RH Modern was critical to the Company's business.*  Defendants repeatedly emphasized the importance of the RH Modern launch to RH's business.  For instance, Friedman emphasized that RH Modern "is the most important new business we have launched in the history of this Company," "the most important and

significant new home furnishings business to be launched in the last 15 or 20 years," and "the most comprehensive launch of a new business and brand in the history of our industry." ¶¶134, 137.  He stated that RH Modern was "core to RH," would open up an "entirely new market[]" for the Company as it was "significantly incremental to what we're doing today," and that it was a "game-changer" that was "our finest work ever." ¶¶115, 130, 153.

210.  *Defendants took undisclosed steps that show their knowledge of the inadequate preparation for the launch, lack of inventory, customer complaints, and expensive accommodations.*  Leading up to the launch of RH Modern, Defendant Friedman personally participated in promoting the brand through photographs of jerry-rigged, one-off products and by placing photographs of Photoshopped, non-existent products in the RH Modern catalog and on the website.  *See* ¶¶74-78.  Given the lack of inventory, Defendants also spent large sums transporting one-off samples to RH's retail stores in order to have at least some products displayed to the public.  *See* ¶¶44-47.  Following the launch, Defendants initiated an undisclosed "delight the customer" program due to the overwhelming customer complaints and cancellations.  *See* ¶¶51-55, 103-14.

211.  *Friedman's efforts to furnish his homes with RH Modern show his knowledge of omitted facts about the RH Modern launch.*  Defendant Friedman was remodeling three homes at the same time that RH was developing the RH Modern line.  RH's Buyer from 2014 to 2016 explained that Defendant Friedman used RH's resources and employees – which could have been focused on getting RH Modern product to customers – towards remodeling his homes.  The buyer explained that he split his time working on Friedman's home project and on RH business, and that several additional employees worked on Friedman's homes as well.  RH's buyer further explained that employees were working on special projects to make Friedman's vision for his homes come to life, "and those hands were needed to work on product to sell to the customer."  During the delays with RH Modern, Friedman had vendors make special items for him when they needed that material and resources to make product for customer orders.  Friedman was taking RH Modern

inventory while customers were still waiting.  RH's buyer explained that this was ongoing in 2015.

212.    RH's Customer Service Lead Assist until April 2016 similarly recalled that after RH finally began to receive RH Modern products in stock, Friedman took RH Modern products for his personal homes, each of which was over 7,000 square feet, that were available to fill customer orders, and instead used them for his personal homes.  She stated that anyone at the Company could pull up Friedman's orders and look at them.  Friedman had six to eight orders that totaled $10 million in the classic RH line, but then he cancelled all of that and ordered the same amount of RH Modern in March or April 2016.  She recalled one instance in particular in March or April 2016 where RH switched the order for a sofa that was supposed to be delivered to a customer the next day to Friedman instead. She recalled that at the time RH was giving away $30,000 orders to customers for free due to the "delight the customer" initiative, yet Friedman was pulling popular items off orders to go into his homes.  She explained that even while the building was supposedly on fire and they were supposed to be delighting the customer, Friedman would take product from a customer's order for himself.

## VII.   <u>LOSS CAUSATION</u>

213.    Defendants' materially false and misleading statements and omissions artificially inflated the price of RH common stock and maintained inflation in the stock price.  A series of partial disclosures revealed the relevant truth and removed the artificial inflation from the stock price.

214.    On December 10, 2015, the Company disclosed that "the in-stock position is not great today" for RH Modern and that "it's not that we were in [stock] and then we were out [of stock], it's really just a build of getting some of those most initial products" in the RH Modern line.  Defendants further disclosed resulting quarterly revenue at the low end of prior guidance and a late release of the Source Book.

215.    The Company's partial disclosure caused RH's stock price to decline.  On December 11, 2015, the stock price declined by $3.78 per share, erasing over $153 million

in market value.  Investors continued to react to the news on the next trading day, December 14, 2015, and the stock price fell another $5.16 per share, erasing an additional $208 million in market capitalization.

216.   On February 24, 2016, Defendants disclosed "shipping delays" for RH Modern, that this "key factor" negatively affected the Company's financial results, that the "poor in-stocks . . . suppressed orders," and that the Company did not plan to introduce any new businesses in fiscal 2016 due to the "headwinds."  The Company disclosed resulting financial results below the Company's recent guidance for fiscal 2015 and the fourth quarter of fiscal 2015.

217.   The partial disclosures on February 24, 2016 caused RH's stock price to decline.  On February 25, 2016, the share price fell $13.43, erasing over $543 million in market capitalization on the highest trading volume in a single day for RH stock.  As Bloomberg reported, this was the "biggest single-day drop [in Company share price] since the retailer held its initial public offering in 2012."

218.   On March 17, 2016, BB&T Capital Markets disclosed "shocking[ly]" low levels of in-stocks for the RH Modern line, "reveal[ing] [that] widespread supply chain issues continued into Q1'16 and are even worse than we feared," and putting "the burden of proof on senior management to demonstrate the wheels have not completely fallen off." The disclosure continued: "To be blunt, we find it shocking over half of RH Modern products are currently not in stock and will take over two months on average before customers are even contacted about scheduling deliveries."

219.   The March 17, 2016 partial disclosures caused RH's stock price to decline. On March 17, 2016, the share price declined $2.20, erasing over $89 million in market capitalization.

220.   After the market closed on June 8, 2016, Defendants disclosed poor financial results "due to RH Modern production delays during the first half."  The Company further disclosed that instead of spending $8 million to $10 million to "elevate the customer experience" in the quarter ending April 30, 2016 – a figure the Company had provided to

investors two-thirds of the way through the quarter – RH had in truth spent $18 million on such "customer accommodations and related expenses, largely as a result of RH Modern production delays." And while the Company had provided guidance of net income in the range of $1.6 million to $2.5 million and earnings between $0.04 and $0.06 per share for the quarter, the Company reported a resulting net *loss* of $2.1 million and a *loss* of $0.05 per share. Defendants disclosed that they were taking an "aggressive approach to rationalizing our SKU count and optimizing inventory," eliminating excess inventory on the RH core product lines – the very excess inventory that had accumulated before and during the Class Period without disclosure. Defendants disclosed that the Company had "extra inventory" that was "bloating [the] balance sheet," as well as "overstock" in the non-RH Modern categories "across the board," and that RH had decided to use "clearance events" and open more outlet stores "to support [its] more aggressive stance in rationalizing [its] SKU base and reducing [its] inventories."

221. The price of RH's stock declined in response to Defendants' disclosures. On June 9, 2016, the share price dropped over 21% on the highest trading volume in the Company's history since its IPO. The share price dropped another 6.5% the next day, again on high trading volume. The drop erased over $386 million in shareholder value.

## VIII. PRESUMPTION OF RELIANCE

222. At all relevant times, the market for RH's common stock was efficient for the following reasons, among others:

(a)    RH's stock met the requirements for listing, and was listed and actively traded on the New York Stock Exchange, a highly efficient and automated market;

(b)    As a regulated issuer, RH filed periodic reports with the SEC and the New York Stock Exchange;

(c)    RH regularly communicated with public investors via established market communication mechanisms, including through regular disseminations of press releases on the national circuits of major newswire services and through other wide-ranging public disclosures, such as communications with the financial press and other similar reporting services; and

(d)     RH was followed by numerous securities analysts employed by major brokerage firms who wrote reports which were distributed to those brokerage firms' sales force and certain customers.  Each of these reports was publicly available and entered the public market place.

223.    As a result of the foregoing, the market for RH's common stock reasonably and promptly digested current information regarding RH from all publicly available sources and reflected such information in the price of RH's common stock.  All purchasers of RH's common stock during the Class Period suffered similar injury through their purchase of RH's common stock at artificially inflated prices, and a presumption of reliance applies.

224.    A Class-wide presumption of reliance is also appropriate in this action under the United States Supreme Court holding in *Affiliated Ute Citizens of Utah v. United States*, 406 U.S. 128 (1972), because the claims asserted herein against Defendants are predicated upon omissions of material fact for which there is a duty to disclose.

## IX.    INAPPLICABILITY OF THE STATUTORY SAFE HARBOR AND BESPEAKS CAUTION DOCTRINE

225.    The statutory safe harbor or bespeaks caution doctrine applicable to forward-looking statements under certain circumstances does not apply to any of the false and misleading statements pleaded in this Complaint.  None of the statements complained of herein was a forward-looking statement.   Rather, they were historical statements or statements of purportedly current facts and conditions at the time the statements were made.

226.    To the extent that any of the false and misleading statements alleged herein can be construed as forward-looking, those statements were not accompanied by meaningful cautionary language identifying important facts that could cause actual results to differ materially from those in the statements.   Then-existing facts contradicted Defendants' statements regarding the launch of RH Modern and the Company's inventory.  Given the then-existing facts contradicting Defendants' statements, any generalized risk

1    disclosures made by the Company were not sufficient to insulate Defendants from liability

2    for their materially false and misleading statements and omissions.

3        227.    To the extent that the statutory safe harbor does apply to any forward-looking

4    statements pleaded herein, Defendants are liable for those false forward-looking statements

5    because at the time each of those statements was made, the particular speaker knew that

6    the particular forward-looking statement was false, and the false forward-looking statement

7    was authorized and approved by an executive officer of RH who knew that the statement

8    was false when made.

9    **X.    CLASS ACTION ALLEGATIONS**

10       228.    Plaintiffs bring this action as a class action pursuant to Rule 23 of the Federal

11   Rules of Civil Procedure on behalf of all persons who purchased the common stock of RH

12   during the Class Period (the "Class").   Excluded from the Class are (i) Defendants; (ii)

13   members of the immediate family of each Individual Defendant; (iii) any person who was

14   an officer or director of RH; (iv) any firm or entity in which any Defendant has or had a

15   controlling interest; (v) any person who participated in the wrongdoing alleged; (vi)

16   Defendants' liability insurance carriers; (vii) any affiliates, parents, or subsidiaries of RH;

17   (viii) all RH plans that are covered by ERISA; and (ix) the legal representatives, agents,

18   affiliates, heirs, beneficiaries, successors-in-interest, or assigns of any excluded person or

19   entity, in their respective capacity as such.

20       229.    The members of the Class are so numerous that joinder of all members is

21   impracticable.   Throughout the Class Period, RH shares were actively traded on the New

22   York Stock Exchange.   As of December 2, 2016, there were approximately 41 million

23   shares of RH stock outstanding.   While the exact number of Class members is unknown to

24   Plaintiffs at this time and can only be ascertained through appropriate discovery, Plaintiffs

25   believe that there are at least hundreds of thousands of members of the proposed Class.

26   Class members who purchased RH common stock may be identified from records

27   maintained by RH or its transfer agent(s), and may be notified of this class action using a

28   form of notice similar to that customarily used in securities class actions.

230.   Plaintiffs' claims are typical of Class members' claims, as all members of the Class were similarly affected by Defendants' wrongful conduct in violation of federal laws as complained of herein.

231.   Plaintiffs will fairly and adequately protect Class members' interests and have retained competent counsel experienced in class actions and securities litigation.

232.   Common questions of law and fact exist as to all Class members and predominate over any questions solely affecting individual Class members.  Among the questions of fact and law common to the Class are:

        (a)    whether the federal securities laws were violated by Defendants' acts as alleged herein;

        (b)    whether Defendants made statements to the investing public during the Class Period that were false, misleading or omitted material facts;

        (c)    whether Defendants acted with scienter; and

        (d)    the proper way to measure damages.

233.   A class action is superior to all other available methods for the fair and efficient adjudication of this action because joinder of all Class members is impracticable. Additionally, the damage suffered by some individual Class members may be relatively small so that the burden and expense of individual litigation make it impossible for such members to individually redress the wrong done to them.  There will be no difficulty in the management of this action as a class action.

## XI.   CLAIMS FOR RELIEF

### COUNT I

**For Violations Of Section 10(b) Of the Exchange Act And
SEC Rule 10b-5 Promulgated Thereunder
(Against All Defendants)**

234.   Plaintiffs repeat and re-allege each and every allegation contained above as if fully set forth herein.

235.   This Count is asserted on behalf of all members of the Class against Defendants RH, Friedman, and Boone for violations of Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b) and Rule 10b-5 promulgated thereunder, 17 C.F.R. § 240.10b-5.

236.   During the Class Period, Defendants disseminated or approved the false statements specified above, which they knew were, or they deliberately disregarded as, misleading in that they contained misrepresentations and failed to disclose material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

237.   Defendants violated Section 10(b) of the Exchange Act and Rule 10b-5 in that they: (a) employed devices, schemes, and artifices to defraud; (b) made untrue statements of material facts or omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; and/or (c) engaged in acts, practices, and a course of business that operated as a fraud or deceit upon Plaintiffs and others similarly situated in connection with their purchases of RH common stock during the Class Period.

238.   Defendants, individually and in concert, directly and indirectly, by the use of means or instrumentalities of interstate commerce and/or of the mails, engaged and participated in a continuous course of conduct that operated as a fraud and deceit upon Plaintiffs and the Class; made various untrue and/or misleading statements of material facts and omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; made the above statements intentionally or with a deliberately reckless disregard for the truth; and employed devices and artifices to defraud in connection with the purchase and sale of RH common stock, which were intended to, and did: (a) deceive the investing public, including Plaintiffs and the Class, regarding, among other things, RH's preparedness for the launch of RH Modern; (b) artificially inflate and maintain the market price of RH common stock; and (c) cause Plaintiffs and other members of the Class to purchase RH common stock at artificially inflated prices and suffer losses when the true facts became known.

239.   Defendants RH, Friedman, and Boone are liable for all materially false and misleading statements made during the Class Period, as alleged above.

240.   As described above, Defendants acted with scienter throughout the Class Period, in that they acted either with intent to deceive, manipulate, or defraud, or with deliberate recklessness.  The misrepresentations and omissions of material facts set forth herein, which presented a danger of misleading buyers or sellers of RH stock, were either known to the Defendants or were so obvious that the Defendants should have been aware of them.

241.   Plaintiffs and the Class have suffered damages in that, in reliance on the integrity of the market, they paid artificially inflated prices for RH common stock, which inflation was removed from its price when the true facts became known.  Plaintiffs and the Class would not have purchased RH common stock at the prices they paid, or at all, if they had been aware that the market price had been artificially and falsely inflated by these Defendants' misleading statements.

242.   As a direct and proximate result of these Defendants' wrongful conduct, Plaintiffs and the other members of the Class suffered damages attributable to the material misstatements and omissions alleged herein in connection with their purchases of RH common stock during the Class Period.

## COUNT II

### For Violations Of Section 20(a) Of The Exchange Act
### (Against Defendants Friedman and Boone)

243.   Plaintiffs repeat and re-allege each and every allegation contained above as if fully set forth herein.

244.   This Count is asserted on behalf of all members of the Class against Defendants Friedman and Boone for violations of Section 20(a) of the Exchange Act, 15 U.S.C. § 78t(a).

245.   During their tenures as officers and/or directors of RH, each of these Defendants was a controlling person of the Company within the meaning of Section 20(a)

of the Exchange Act.  *See* ¶¶22-24.  By reason of their positions of control and authority as officers and/or directors of RH, these Defendants had the power and authority to direct the management and activities of the Company and its employees, and to cause the Company to engage in the wrongful conduct complained of herein.  These Defendants were able to and did control, directly and indirectly, the content of the public statements made by RH during the Class Period, including its materially misleading financial statements, thereby causing the dissemination of the false and misleading statements and omissions of material facts as alleged herein.

246.   In their capacities as senior corporate officers of the Company, and as more fully described above in ¶¶22-24, Defendants Friedman and Boone had direct involvement in the day-to-day operations of the Company, in reviewing and managing its regulatory and legal compliance, and in its reporting functions.  Defendants Friedman and Boone signed the Company's SEC filings during the Class Period, and were directly involved in providing false information and certifying and approving the false statements disseminated by RH during the Class Period.  As a result of the foregoing, Defendants Friedman and Boone, as a group and individually, were controlling persons of RH within the meaning of Section 20(a) of the Exchange Act.

247.   As set forth above, RH violated Section 10(b) of the Exchange Act by its acts and omissions as alleged in this Complaint.

248.   By virtue of their positions as controlling persons of RH and as a result of their own aforementioned conduct, Defendants Friedman and Boone are liable pursuant to Section 20(a) of the Exchange Act, jointly and severally with, and to the same extent as, the Company is liable under Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder, to Plaintiffs and the other members of the Class who purchased or otherwise acquired RH securities.  As detailed above, during the respective times these Defendants served as officers and/or directors of RH, each of these Defendants was culpable for the material misstatements and omissions made by RH.

249.   As a direct and proximate result of these Defendants' conduct, Plaintiffs and the other members of the Class suffered damages in connection with their purchase or acquisition of RH common stock.

## XII.   **PRAYER FOR RELIEF**

250.   WHEREFORE, Plaintiffs pray for relief and judgment as follows:

(a)   Declaring the action to be a proper class action pursuant to Rule 23(a) and (b)(3) of the Federal Rules of Civil Procedure on behalf of the Class defined herein;

(b)   Awarding all damages and other remedies available under the Exchange Act in favor of Plaintiffs and all members of the Class against Defendants in an amount to be proven at trial, including interest thereon;

(c)   Awarding Plaintiffs and the Class their reasonable costs and expenses incurred in this action, including attorneys' fees and expert fees; and

(d)   Such other and further relief as the Court may deem just and proper.

## XIII.   **JURY DEMAND**

251.   Plaintiffs demand a trial by jury.

Dated:  June 12, 2017                    Respectfully submitted,

BERNSTEIN LITOWITZ BERGER
& GROSSMANN LLP


*/s/ David R. Stickney*
DAVID R. STICKNEY

DAVID R. STICKNEY (Bar No. 188574)
davids@blbglaw.com
BRANDON MARSH (Bar No. 268316)
brandon.marsh@blbglaw.com
JENNY E. BARBOSA (Bar No. 292385)
jenny.barbosa@blbglaw.com
12481 High Bluff Drive, Suite 300
San Diego, CA 92130
Tel:   (858) 793-0070
Fax:   (858) 793-0323

*Attorneys for Lead Plaintiffs Public School Teachers' Pension & Retirement Fund of Chicago and Arkansas Teacher Retirement System and Lead Counsel for the Class*

CONSOLIDATED CLASS ACTION COMPLAINT
Case No. 4:17-00554-YGR

-90-

## CERTIFICATION PURSUANT TO
## THE FEDERAL SECURITIES LAWS

I, Charles A. Burbridge, on behalf of the Public School Teachers' Pension and Retirement Fund of Chicago ("Chicago Teachers"), hereby certify, as to the claims asserted under the federal securities laws, that:

1. I am the Executive Director of Chicago Teachers. I have reviewed a complaint filed in this matter. Chicago Teachers has authorized the filing of this motion for appointment as lead plaintiff.

2. Chicago Teachers did not purchase the securities that are the subject of this action at the direction of counsel or in order to participate in any action arising under the federal securities laws.

3. Chicago Teachers is willing to serve as a lead plaintiff and representative party on behalf of the Class, including providing testimony at deposition and trial, if necessary. Chicago Teachers fully understands the duties and responsibilities of the lead plaintiff under the Private Securities Litigation Reform Act, including the selection and retention of counsel and overseeing the prosecution of the action for the Class.

4. Chicago Teachers' transactions in the RH, Inc. securities that are the subject of this action are set forth in the chart attached hereto.

5. Chicago Teachers has sought to serve as a lead plaintiff and representative party on behalf of a class in the following actions under the federal securities laws filed during the three-year period preceding the date of this Certification, but either withdrew its motions for lead plaintiff or was not appointed lead plaintiff:

    *Gorrie v. GNC Holdings Inc.*, No. 15-cv-2037 (D. Or.)
    *Ong v. Chipotle Mexican Grill, Inc.*, No. 16-cv-141 (S.D.N.Y.)
    *In re Banco Bradesco S.A. Securities Litigation*, No. 16-cv-4155 (S.D.N.Y.)

6. Chicago Teachers is currently seeking to serve as a lead plaintiff and representative party on behalf of a class in the following action filed under the federal securities laws during the three years preceding the date of this Certification:

    *Galmi v. Teva Pharmaceutical Industries Limited*, No. 16-cv-8259 (C.D. Cal.)

7. Chicago Teachers will not accept any payment for serving as a representative party on behalf of the Class beyond Chicago Teachers' pro rata share of any recovery, except such reasonable costs and expenses (including lost wages) directly relating to the representation of the Class, as ordered or approved by the Court.

I declare under penalty of perjury that the foregoing is true and correct. Executed this _3_ day of _April_ 2017 .

Charles A. Burbridge
Executive Director
*Public School Teachers' Pension and*
*Retirement Fund of Chicago*

**Chicago Teachers'**
**Transactions in RH, Inc.**

| Transaction | Date | Shares | Price |
|-------------|------|--------|-------|
| Purchase | 6/15/2015 | 3,235 | 95.3779 |
| Purchase | 6/16/2015 | 12,130 | 95.2016 |
| Purchase | 6/17/2015 | 4,090 | 94.5594 |
| Purchase | 6/18/2015 | 3,515 | 95.0936 |
| Purchase | 6/19/2015 | 2,066 | 96.1000 |
| Purchase | 6/22/2015 | 500 | 96.1680 |
| Purchase | 7/6/2015 | 557 | 98.5356 |
| Purchase | 9/11/2015 | 1,733 | 98.9408 |
| Purchase | 9/14/2015 | 6,657 | 98.5011 |
| Sale | 3/31/2016 | (33,983) | 42.0551 |

## CERTIFICATION PURSUANT TO
## THE FEDERAL SECURITIES LAWS

I, George Hopkins, on behalf of Arkansas Teacher Retirement System ("Arkansas Teacher"), hereby certify, as to the claims asserted under the federal securities laws, that:

1. I am the Executive Director of Arkansas Teacher. I have reviewed a complaint filed in this matter. Arkansas Teacher has authorized the filing of this motion for appointment as lead plaintiff.

2. Arkansas Teacher did not purchase the securities that are the subject of this action at the direction of counsel or in order to participate in any action arising under the federal securities laws.

3. Arkansas Teacher is willing to serve as a lead plaintiff and representative party on behalf of the Class, including providing testimony at deposition and trial, if necessary. Arkansas Teacher fully understands the duties and responsibilities of the lead plaintiff under the Private Securities Litigation Reform Act, including the selection and retention of counsel and overseeing the prosecution of the action for the Class.

4. Arkansas Teacher's transactions in the RH, Inc. securities that are the subject of this action are set forth in the chart attached hereto.

5. Arkansas Teacher has sought to serve and was appointed as a lead plaintiff and representative party on behalf of a class in the following actions under the federal securities laws filed during the three-year period preceding the date of this Certification:

*State-Boston Retirement System v. Infoblox, Inc.*, No. 14-cv-2500 (N.D. Cal.)
*In re The Bancorp, Inc. Securities Litigation*, No. 14-cv-952 (D. Del.)
*In re CommVault Systems, Inc. Securities Litigation*, No. 14-cv-5628 (D.N.J.)
*Haan v. Five Below, Inc.*, No. 15-cv-94 (E.D. Pa.)
*In re Virtus Investment Partners, Inc., Securities Litigation*, No. 15-cv-1249 (S.D.N.Y.)
*In re Vipshop Holdings Ltd. Securities Litigation*, No. 15-cv-3870 (S.D.N.Y.)
*Arkansas Teacher Retirement System v. Insulet Corporation*, No. 15-cv-12345 (D. Mass.)
*Kasper v. AAC Holdings, Inc.*, No. 15-cv-923 (M.D. Tenn.)
*In re Extreme Networks, Inc. Securities Litigation*, No. 15-cv-4883 (N.D. Cal.)
*In re Nimble Storage, Inc. Securities Litigation*, No. 15-cv-5803 (N.D. Cal.)
*St. Lucie County Fire District Firefighters' Pension Trust Fund v. Stericycle, Inc.*,
No. 16-cv-7145 (N.D. Ill.)

6. Arkansas Teacher has sought to serve as a lead plaintiff and representative party on behalf of a class in the following actions under the federal securities laws filed during the three-year period preceding the date of this Certification, but either withdrew its motions for lead plaintiff or was not appointed lead plaintiff:

> *Jahm v. Bankrate, Inc.,* No. 14-cv-81323 (S.D. Fla.)
> *Ong v. Chipotle Mexican Grill, Inc.,* No. 16-cv-141 (S.D.N.Y.)
> *Friedman v. Endo International plc,* No. 16-cv-3912 (S.D.N.Y.)
> *Knurr v. Orbital ATK, Inc.,* No. 16-cv-1031 (E.D. Va.)

7. Arkansas Teacher is currently seeking to serve as a lead plaintiff and representative party on behalf of a class in the following action filed under the federal securities laws during the three years preceding the date of this Certification:

> *Oklahoma Law Enforcement Retirement System v. Adeptus Health Inc.,*
> No. 16-cv-1243 (E.D. Tex.)

8. Arkansas Teacher has served as a representative party on behalf of a class in the following action under the federal securities laws filed during the three-year period preceding the date of this Certification:

> *Horowitz v. SunEdison, Inc.,* No. 15-cv-1769 (E.D. Mo.)

9. Arkansas Teacher will not accept any payment for serving as a representative party on behalf of the Class beyond Arkansas Teacher's pro rata share of any recovery, except such reasonable costs and expenses (including lost wages) directly relating to the representation of the Class, as ordered or approved by the Court.

I declare under penalty of perjury that the foregoing is true and correct. Executed this 30 day of March, 2017.

George Hopkins
Executive Director
*Arkansas Teacher Retirement System*

**Arkansas Teacher Retirement System**
**Transactions in RH, Inc. (RH)**

| Transaction | Date | Shares | Price |
|---|---|---|---|
| Purchase | 6/18/2015 | 1,700 | 95.3944 |
| Purchase | 6/19/2015 | 1,000 | 96.1328 |
| Purchase | 6/19/2015 | 700 | 96.0000 |
| Purchase | 6/22/2015 | 1,200 | 96.5751 |
| Purchase | 6/23/2015 | 1,200 | 95.6591 |
| Purchase | 6/25/2015 | 1,100 | 96.1680 |
| Purchase | 6/29/2015 | 1,000 | 96.0718 |
| Purchase | 6/29/2015 | 1,200 | 97.9050 |
| Purchase | 7/10/2015 | 1,200 | 97.2541 |
| Purchase | 7/15/2015 | 900 | 99.4367 |
| Purchase | 7/20/2015 | 1,300 | 103.2011 |
| Purchase | 7/21/2015 | 2,050 | 102.8617 |
| Purchase | 8/6/2015 | 775 | 100.9102 |
| Purchase | 8/19/2015 | 800 | 99.3665 |
| Purchase | 8/20/2015 | 1,025 | 96.9735 |
| Purchase | 8/24/2015 | 500 | 92.0502 |
| Purchase | 8/28/2015 | 1,100 | 91.7157 |
| Purchase | 9/3/2015 | 575 | 92.9681 |
| Purchase | 9/9/2015 | 1,000 | 94.8604 |
| Purchase | 10/1/2015 | 199 | 92.0600 |
| Purchase | 10/2/2015 | 550 | 92.9462 |
| Purchase | 10/2/2015 | 826 | 91.2684 |
| Purchase | 10/5/2015 | 300 | 94.2009 |
| Purchase | 10/23/2015 | 825 | 99.7556 |
| Purchase | 12/1/2015 | 625 | 88.6550 |
| Purchase | 12/11/2015 | 2,575 | 86.8393 |
| Purchase | 12/14/2015 | 1,175 | 79.9450 |
| Purchase | 12/15/2015 | 800 | 80.2215 |
| Purchase | 12/16/2015 | 525 | 79.9500 |
| Purchase | 12/16/2015 | 525 | 79.5223 |
| Purchase | 12/18/2015 | 525 | 82.9300 |
| Purchase | 12/22/2015 | 500 | 79.2425 |
| Purchase | 12/29/2015 | 500 | 80.5890 |
| Purchase | 1/4/2016 | 500 | 77.9856 |
| Purchase | 1/8/2016 | 1,025 | 73.5530 |
| Purchase | 1/14/2016 | 500 | 63.2183 |
| Purchase | 1/20/2016 | 800 | 61.1944 |
| Purchase | 2/8/2016 | 1,050 | 51.0700 |
| Sale | 1/7/2016 | (1,050) | 72.9085 |
| Sale | 3/14/2016 | (1,050) | 39.5922 |
| Sale | 3/18/2016 | (2,625) | 37.3939 |
| Sale | 3/18/2016 | (2,625) | 35.5956 |
| Sale | 4/5/2016 | (1,050) | 43.5818 |
| Sale | 4/18/2016 | (2,100) | 44.2142 |

**Arkansas Teacher Retirement System**
**Transactions in RH, Inc. (RH)**

| Transaction | Date | Shares | Price |
|---|---|---|---|
| Sale | 4/21/2016 | (525) | 44.3668 |
| Sale | 4/26/2016 | (2,625) | 45.4230 |
| Sale | 4/27/2016 | (2,100) | 46.0341 |
| Sale | 4/29/2016 | (900) | 43.3400 |
| Sale | 4/29/2016 | (1,725) | 43.3052 |
| Sale | 5/3/2016 | (2,600) | 40.6975 |
| Sale | 5/4/2016 | (1,100) | 39.2356 |
| Sale | 5/5/2016 | (1,050) | 38.5100 |
| Sale | 5/6/2016 | (2,625) | 37.7578 |
| Sale | 5/9/2016 | (2,060) | 37.8621 |
| Sale | 5/9/2016 | (1,046) | 37.7890 |
| Sale | 5/9/2016 | (1,161) | 38.0000 |
| Sale | 5/10/2016 | (42) | 37.8100 |
| Sale | 5/10/2016 | (2,290) | 36.7598 |
| Sale | 5/10/2016 | (1,255) | 37.6005 |
| Sale | 5/11/2016 | (1,046) | 34.6545 |