UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

**CITY OF MIAMI GENERAL EMPLOYEES' & SANITATION EMPLOYEES' RETIREMENT TRUST, ET AL.,**

Plaintiffs,

v.

**RH, INC., ET AL.**

Defendants.

Case No. 17-cv-00554-YGR

**ORDER DENYING MOTION TO DISMISS**

Dkt. Nos. 50, 51, 57

Plaintiffs City of Miami General Employees' & Sanitation Employees' Retirement Trust, *et al.*, bring this securities class action litigation alleging fraudulent and misleading statements and omissions between March 26, 2015, and June 8, 2016, (the "Class Period"), against RH, Inc. ("RH"), and two individual defendants, namely Gary Friedman (CEO) and Karen Boone (CFO). Specifically, plaintiffs raise the following causes of action: (i) violation of section 10(b) of the Exchange Act and Rule 10b-5 against all defendants; and (ii) control person liability under section 20(a) of the Exchange Act against Friedman and Boone.

Defendants challenge plaintiffs' section 10(b) claim on three grounds. First, plaintiffs fail to identify any statements which were false or misleading when made. Second, plaintiffs cannot establish a strong inference of scienter. Third, the complaint does not allege loss causation. With regard to plaintiffs' 20(b) claim against Friedman and Boone defendants argue that plaintiffs cannot show an underlying predicate violation under section 10(b).

Having carefully considered the papers submitted and the pleadings in this action, the hearing held on October 31, 2017, and for the reasons set forth below, the Court hereby **DENIES** the motion to dismiss and finds that plaintiffs have pled sufficient facts of material falsity, scienter, and loss causation.

## I.   BACKGROUND

The facts at issue in this case, as pleaded in plaintiffs' 100-page Consolidated Class Action Complaint ("CCAC"), (Dkt. No. 45), are well-known to the parties.  Relevant allegations from the CCAC are set forth below. [1]

---

[1] In connection with defendants' motion to dismiss, defendants also have also filed an amended request for judicial notice of 25 documents, and a supplemental request for judicial notice of five additional documents, namely Securities and Exchange Commission ("SEC") filings, earnings call transcripts and press releases, earnings video presentations, market analyst reports, and documents referenced in plaintiffs' complaint.  (*See* Dkt. Nos. 51 ("RJN") and 59 ("SRJN").) Judicial notice may be taken of any adjudicative fact that "can be accurately and readily determined from sources whose accuracy cannot reasonably be questioned." Fed. R. Evid. 201(b)(2). The Court may properly take judicial notice of public SEC filings, earnings call transcripts, and press releases under Federal Rule of Evidence 201(b)(2). *See Metzler Inv. GMBH v. Corinthian Colleges, Inc.*, 540 F. 3d 1049, 1064 fn. 7 (9th Cir. 2008); *see also Primo v. Pac. Biosciences of Cal., Inc.*, 2013 WL 1615847, at *8 fn.1 (N.D. Cal. 2013) (taking judicial notice of earnings call transcripts because they are "capable of immediate determination by resort to accurate sources and not subject to reasonable dispute"); *In re Bare Escentuals, Inc. Sec. Litig.*, 745 F. Supp. 2d 1052, 1067 (N.D. Cal. 2010) ("The court is also permitted to take judicial notice of the content of relevant public disclosure documents required to be filed with the SEC, as well as of press releases and conference call transcripts cited in the complaint."). Plaintiffs concede that juridical notice of  Exhibits 1, 3, 6-7, 9-20, and 22-25 is appropriate, (*See* Dkt. No. 54), and the Court so finds.  Defendants' request for judicial notice is therefore **GRANTED** as to these documents**.** To the extent plaintiffs take issue with the statements in these documents and defendants' arguments based thereon, such argument belongs in plaintiffs' opposition to defendants' motion to dismiss and thus does not persuade on the question of whether judicial notice is proper.

Plaintiffs object to judicial notice of Exhibit 2 on the grounds that it is an "amalgamation" of transcripts from two separate events, namely (i) a pre-recorded video presentation for investors posted on RH's website posted on March 26, 2016; and (ii) a live investor conference call held on the same day. Plaintiffs do not persuade in light of the fact that the Court may take judicial notice of both presentations for investors and investor conference calls. *See Metzler*, 540 F. 3d 1049 at 1064 n.7; *see also Primo*, 2013 WL 1615847, at *8 n.1.  The fact that transcripts from these two related events were combined in a single exhibit does not render judicial notice inappropriate. Defendants' request for judicial notice is therefore **GRANTED** as to Exhibit 2**.**

Finally, plaintiffs contend that judicial notice of Exhibits 4, 5, 8 and 21 is inappropriate because these documents are incomplete.  Specifically, plaintiffs argue that these documents omit the Sarbanes-Oxley certifications which contain Boone's and Friedman's representations that the reports "do[] not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading." (Dkt. No. 54 at 3.) Courts frequently decline to take judicial notice of filings which are incomplete or truncated.  *See Cal. Sportfishing Prot. All. v. All Star Auto Wrecking, Inc.*, 860 F. Supp. 2d 1144, 1149 (E.D. Cal. 2012); *Newman v. San Joaquin Delta Cmty. Coll. Dist.*, 814 F. Supp. 2d 967, 972 n.2 (E.D. Cal. 2011); *see also Harris v. R.J. Reynolds*

## A. RH's Business and Procurement Structure

RH is a Delaware corporation headquartered in Corte Madera, California, with approximately 41 million outstanding shares. (*Id.* at ¶ 21.) Its fiscal year ("FY") concludes on January 31 of each year. RH is a retailer of luxury home furnishings such as couches, chairs, tables, lamps, and rugs. (*Id.* ¶ 25.) It sells products through its website; retail and outlet stores; and "Source Books" which are voluminous, glossy product catalogs distributed to potential customers. (*Id.*) As of April 29, 2017, the RH operated 85 retail stores and 28 outlets. (*Id.*)

During the Class Period, RH did not manufacture any of the products it sold. (*Id.* ¶ 28.) Instead, RH contracted with third-party manufacturers. (*Id.*) Most of RH's manufacturers (frequently referred to as "vendors") were located overseas: RH sourced approximately 69% of its inventory from vendors in Asia in FY2013 and 82% in FY2015. Plaintiffs aver that sourcing inventory from foreign manufacturers involves "significant lead times," typically upwards of six and as many as nine months. (*Id.* ¶ 29.)

## B. Alleged Facts Relevant to this Action

According to plaintiffs, RH experienced significant revenue growth in the years leading up to the Class Period. (*Id.* ¶ 2.) "By the start of the Class Period, however, revenue growth . . . from RH's existing product lines had slowed substantially." (*Id.*) RH sought to restore its sales growth by expanding its product offerings through the introduction of new brands, notably "RH Modern." (*Id.* ¶¶ 2 and 30.) Defendants promoted the launch of RH Modern to investors, describing the product line as "the most important and significant new home furnishings business to be launched in the last 15 or 20 years." (*Id.* ¶ 3.) Plaintiffs further allege that a successful launch required adequate in-stock merchandise of RH Modern. (*Id.* ¶ 4.) "Without adequate inventory, customers

*Vapor Co.*, 2016 WL 6246415, at *3 (N.D. Cal. Sept. 30, 2016) (declining to judicially notice a document "missing key disclaimer language").

Here, defendants do not contest that Friedman and Boone signed the Sarbanes-Oxley certifications at issue and have provided replacement Exhibits 4, 5, 8, and 21 which contained the omitted certifications. Therefore, plaintiffs' objection is moot and defendants' request for judicial notice is **Granted** as to the revised Exhibits 4, 5, 8, and 21.

who placed orders for RH Modern products would face long delays to receive their products, leading to cancelled orders and costly accommodations." (*Id*. ¶¶ 4, 103, and 173.)

On the first day of the Class Period, March 26, 2015, Friedman announced the launch of RH Modern and reported that RH was "systematically placing orders now," which "should help us with lead times [and] help us with inventory flow." (*Id.* ¶¶ 5 and 117; Dkt. No. 52, Declaration of Erik J. Olson in Support of Motion to Dismiss ("Olson Decl."), Ex. 1 at 14.) Plaintiffs aver that during the Class Period defendants "repeatedly assured investors" that RH was "prepared for the launch." (CCAC ¶ 3.) Specifically, during an investor call on June 6, 2015, Friedman stated that RH was growing its inventory levels, making the "necessary" inventory investments, and would "compete on speed" of delivery for RH Modern. (Olson Decl., Ex. 7 at 19.) Boone also reassured investors that RH was making inventory investments to prevent "high back orders" and claimed that RH would "grow inventory ahead of sales at the end of Q4." (*Id.* at 6.) Plaintiffs contend that defendants "emphasized RH's preparedness for the launch throughout 2015" by indicating that RH Modern was "going to compete on speed." (CCAC at ¶ 5.) According to plaintiffs, however, the "preparation and launch of RH Modern were debacles from the outset due to a near-complete lack of inventory." (*Id*. ¶ 7.) "RH needed to order RH Modern products far in advance of the launch date in order to have RH Modern inventory available to fulfill customer orders at the time of the RH Modern launch" but failed to do so. (*Id*. ¶¶ 32-37.)

On June 11, 2015, defendants allegedly marketed RH Modern "before designs were finalized and without placing orders with manufacturers." (*Id*. ¶ 7.) On that date, defendants published a "video presentation" for investors which appeared to display a range of RH Modern items. (*Id*. ¶ 124.) Plaintiffs allege that "certain of these were not actual products from the line but unfinished 'one-offs' that had been hastily constructed by hand shortly before the investor video." (*Id*.) During the video presentation, Boone stated that 1Q15 inventory "was up 24%" and that "we expect to end the year with inventory growth that is higher than our sales growth, *given*

*the inventory investments in RH Modern* and other newness that we will introduce this fall."[2]

(Olson Decl., Ex. 6 at 5 (emphasis supplied).) Plaintiffs allege that Boone's statement referencing RH Modern "inventory investments" was (i) false because RH had not actually made such inventory investments when the statement was made, and (ii) misleading because it concealed the fact that 1Q inventory growth was due to "surplus inventory of existing product" and "60-80% of RH's inventory" was "product that had been returned to RH from customers and/or was damaged." (CCAC at ¶ 57.)

Plaintiffs assert that when defendants launched the RH Modern website and published the 540-page RH Modern Source Book in September 2015, "there was essentially no RH Modern furniture in stock." (*Id.* ¶¶ 7 and 40.) Plaintiffs claim that Friedman knew that the Source Book "featured Photoshopped images of products that did not exist, and the videos through which he promoted RH Modern also showcased unavailable, unfinished products." (*Id.* ¶ 8.) Customers therefore faced lengthy delays and many became upset and cancelled their orders. (*Id.* ¶¶ 8, 51-55, 106.)

On September 10, 2015, RH issued a press release which indicated that "the launch of RH Modern and RH Teen late in the third quarter," among other factors, "puts us on a clear path to accelerate our growth in the fourth quarter and into fiscal 2016."[3] (Olson Decl., Ex. 11 at 2.) On December 10, 2015, Friedman expressed a similar sentiment during an investor call when he touted as a "headline" that RH Modern was "performing ahead of our expectations." (*Id.*, Ex. 13 at 14.) That same day, RH issued a press release which indicated that defendants were "extremely encouraged by the early results we are seeing out of . . . RH Modern" and that "RH Modern is trending to add significant incremental revenues." (*Id.*, Ex. 15 at 2.) Plaintiffs allege that these

---

[2] Defendants made similar statements with regard to inventory growth during the Class Period. (*See* CCAC ¶¶ 128, 134, 135, 142, 148, 183, 184, 192, and 193.)

[3] Also on September 10, 2015, during an investor conference call, Friedman was asked "how much of [RH's 29% inventory growth in 2Q15] is related to Modern?" (*Id.* ¶ 135.) In response, Friedman stated that "some of it's on the water," (*i.e.,* in transit from overseas vendors), and that RH expected inventory to outpace revenue growth "because we do need to make those investments in Modern." (*Id.*)

1   representations were false and misleading because they concealed (i) pervasive RH Modern

2   inventory shortages as well as (ii) customer complaints and (iii) canceled orders arising from such

3   inventory shortages dating back to 1Q15.  (CCAC at ¶ 193.)

4       In a statement issued by RH on December 10, 2015, RH disclosed that RH Modern was

5   suffering from an "in-stock position [which is] not great today."  (*Id.* ¶¶ 10 and 144.)  The

6   following day RH shares declined by more than 10%.  (*Id.*)  Nonetheless, Boone continued to

7   reassure investors that "we continue to expect to end the year with inventory growth higher than

8   our sales growth given the inventory investments in RH Modern and RH Teen."  (Olson Decl., Ex.

9   14 at 6.)

10      The extent of RH Modern's inventory shortage was reflected in an internal memo sent by

11  Friedman to all RH employees on January 30, 2016, which stated that RH's customers were "on

12  fire" and that RH had "let customers die."  (CCAC ¶ 106.)  Friedman's email initiated a "delight

13  the customer initiative" wherein RH issued millions of dollars in "customer accommodations"

14  including $10,000 gift cards, free orders, and complimentary expedited air shipping to pacify

15  customers upset by the inventory shortage.  (*Id.* ¶¶ 8 and 108.)

16      On February 24, 2016, defendants disclosed RH's poor financial performance as well as

17  "shipping delays," "poor in-stocks . . . [and] suppressed orders" for RH Modern.  (Olson Decl.,

18  Ex. 17 at 2.)  This disclosure also attributed the poor financial performance to "macro economic

19  challenges" including "energy, oil, or currency fluctuations" in certain markets. (*Id.* ¶ 156.)  The

20  following day RH shares fell by more than 25%.  (CCAC at ¶ 163.)

21      Finally, on June 8, 2016, defendants disclosed "RH Modern production delays" and

22  revealed that RH had issued $18 million in customer accommodations.  (*Id.* ¶ 173; *see also* Olson

23  Decl., Ex. 22 at 5.)  RH also stated that other product lines were suffering from "extra inventory"

24  which was "bloating [the] balance sheet" and leading to "clearance events." (*Id.* ¶¶ 11 and 156.)

25  The next day, RH's "share price plunged over 21% on the highest trading volume in history since

26  its IPO." (*Id.*)

27  //

28  //

## II. LEGAL STANDARD

A motion to dismiss under Rule 12(b)(6) tests the legal sufficiency of the claims alleged in the complaint. *Ileto v. Glock, Inc.*, 349 F.3d 1191, 1199–1200 (9th Cir. 2003). "Dismissal can be based on the lack of a cognizable legal theory or the absence of sufficient facts alleged under a cognizable legal theory." *Balistreri v. Pacifica Police Dep't*, 901 F.2d 696, 699 (9th Cir. 1990). All allegations of material fact are taken as true and construed in the light most favorable to the plaintiff. *Johnson v. Lucent Techs., Inc.*, 653 F.3d 1000, 1010 (9th Cir. 2011). To survive a motion to dismiss, "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.' " *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 557 (2007)). That requirement is met "when the plaintiff pleads factual content that allows the court to draw the reasonable inferences that the defendant is liable for the misconduct alleged." *Id.*

Furthermore, claims for fraud must meet the particularity requirements of Federal Rule of Civil Procedure 9(b), which requires that "[i]n alleging fraud or mistake, a party must state with particularity the circumstances constituting fraud or mistake." Fed. R. Civ. P. 9(b). Rule 9(b) "requires ... an account of the time, place, and specific content of the false representations as well as the identities of the parties to the misrepresentations." *Swartz v. KPMG LLP*, 476 F.3d 756, 764 (9th Cir. 2007) (internal quotation marks omitted). Further, plaintiffs are required to state with particularity the facts giving rise to a strong inference of defendants' scienter. *See* 15 U.S.C. § 78u–4(b)(2). "[T]he inference of scienter must be more than merely 'reasonable' or 'permissible'—it must be cogent and compelling, thus strong in light of other explanations" and a court "'must consider plausible nonculpable explanations for the defendant's conduct." *See Tellabs*, 551 U.S. at 324.

## III. COUNT 1: SECTION 10(B) OF THE EXCHANGE ACT AND RULE 10B-5

### A. LEGAL FRAMEWORK

Section 10(b) of the Securities and Exchange Act, 15 U.S.C. § 78j(b), makes it unlawful for any person to "use or employ, in connection with the purchase or sale of any security . . . any manipulative or deceptive device or contrivance in contravention of such rules and regulations as

7

the Commission may prescribe as necessary or appropriate in the public interest or for the protection of investors." 15 U.S.C. § 78j(b). SEC Rule 10b–5 implements this provision by making it unlawful to "make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading." 17 C.F.R. § 240.10b–5(b). Similarly, under the Exchange Act, any person who "directly or indirectly, controls any person liable under any provision of [the Exchange Act] or of any rule or regulation thereunder shall also be liable jointly and severally with and to the same extent as such controlled person to any person to whom such controlled person is liable. 15 U.S.C. § 78t(a).

In 1995, Congress enacted the Private Securities Litigation Reform Act ("PSLRA"), which includes "exacting pleading requirements," as a check against abusive litigation by private parties.[4] *Tellabs, Inc.*, 551 U.S. at 313. Heightened pleading is one of the control measures Congress included to advance "the PSLRA's twin goals: to curb frivolous, lawyer-driven litigation, while preserving investors' ability to recover on meritorious claims." *Id.* at 322.

To state a claim under Section 10b, a plaintiff must "show that the defendant made a statement which was '*misleading* as to a *material* fact.'" *Matrixx Initiatives, Inc. v. Siracusano*, 563 U.S. 27, 38 (2011) (quoting *Basic Inc. v. Levinson*, 485 U.S. 224, 238 (1988)) (emphasis in original). Under the PSLRA's heightened pleading requirement, to state a Section 10(b) claim, plaintiffs must allege facts sufficient to establish: (i) that the defendant made a material misrepresentation or omission of fact; (ii) that the misrepresentation was made with scienter; (iii) a connection between the misrepresentation or omission and the purchase or sale of a security; (iv) reliance on the misrepresentation or omission; (v) loss causation; and (vi) economic loss. *Metzler Inv. GMBH v. Corinthian Colleges, Inc.*, 540 F.3d 1049, 1061 (9th Cir. 2008). Under Rule 9(b),

---

[4] Members of the House and Senate "observed that plaintiffs routinely were filing lawsuits 'against issuers of securities and others whenever there [was] a significant change in an issuer's stock price, without regard to any underlying culpability of the issuer, and with only faint hope that the discovery process might lead eventually to some plausible cause of action[.]'" *In re Silicon Graphics Inc. Sec. Litig.*, 183 F.3d 970, 978 (9th Cir. 1999) (alterations in original) (citation omitted).

claims alleging fraud are subject to a heightened pleading requirement, which requires that a party

"state with particularity the circumstances constituting fraud or mistake." Fed. R. Civ. P. 9(b).

With respect to the scienter requirement, the Court must view the allegations as a whole and

determine whether plaintiff have raised an inference of scienter that is "cogent and compelling,

thus strong in light of other explanations," to satisfy the PSLRA standard. *S. Ferry LP, No. 2 v.

Killinger*, 542 F.3d 776, 784 (9th Cir. 2008) (citing *Tellabs*, 551 U.S. at 326). When assessing the

allegations holistically, the Court views circumstances that are probative of scienter with a

practical and common-sense perspective. *Id*.

**B.    DISCUSSION**

As an overview, defendants assert that the complaint should be dismissed because it fails

to include three categories of allegations to state a claim, namely with respect to the first, second,

and fifth elements. Thus: plaintiffs first fail to identify any statements which were false or

misleading when made and, in any event, many of the challenged statements are protected by the

PSLRA's safe harbor. [5] Second, plaintiffs fail to plead a strong inference of scienter with

sufficient particularity. Third, the complaint fails to allege loss causation. With respect to

plaintiffs' section 20(a) claim against Friedman and Boone, defendants' assert that plaintiffs

cannot show an underlying predicate violation under section 10(b). Defendants do not contest that

Friedman and Boone are control persons for the purposes of section 20(a). The Court addresses

each.

**1.    First Element: Material Misrepresentation or Omission**

**a.    Legal Standard**

"Materially misleading statements or omissions by a defendant constitute the primary

---

[5] The PLSRA creates a safe harbor for untrue statements of material fact with respect to any forward looking statement where any of the following conditions are met: (i) the forward looking statement is identified as such and is accompanied by meaningful cautionary statements; (ii) the forward looking statement is immaterial; (iii) the plaintiff fails to prove that the declarant made the statement with actual knowledge that the statement was false or misleading; or (iv) if made by an entity, the plaintiff fails to show that it was made by an officer with actual knowledge of falsity. 15 U.S.C. § 78u-5(c)(1).

element of a section 10(b) and rule 10b-5 cause of action." *In re Immune Response Sec. Litig.*, 375 F.Supp.2d 983, 1017 (S.D. Cal. 2005) (quoting *Marksman Partners, L.P. v. Chantal Pharm. Corp.*, 927 F.Supp. 1297, 1305 (C.D. Cal. 1996)). To plead falsity, a complaint must "specify each statement alleged to have been misleading, [and] the reason or reasons why the statement is misleading." 15 U.S.C. § 78u–4(b)(1)(B). Plaintiff, "in addition to alleging the 'time, place[,] and nature of the alleged fraudulent activities,' must 'plead evidentiary facts' sufficient to establish any allegedly false statement 'was untrue or misleading when made.'" *Wozniak v. Align Tech., Inc.*, 850 F.Supp.2d 1029, 1034 (N.D. Cal. 2012) (quoting *Fecht v. Price Co.*, 70 F.3d 1078, 1082 (9th Cir. 1995)).

"Central to a 10b–5 claim is the requirement that a misrepresentation or omission of fact must be material." *In re Cutera Sec. Litig.*, 610 F.3d 1103, 1108 (9th Cir. 2010). A statement is material when there is "a substantial likelihood that the disclosure of the omitted fact would have been viewed by the reasonable investor as having significantly altered the 'total mix' of information made available." *Basic*, 485 U.S. at 231–32 (quoting *TSC Indus., Inc. v. Northway, Inc.*, 426 U.S. 438, 449 (1976)). Put another way, a "statement or omission is misleading in the securities fraud context 'if it would give a reasonable investor the impression of a state of affairs that differs in a material way from the one that actually exists.'" *Reese v. BP Exploration (Alaska) Inc.*, 643 F.3d 681, 691 (9th Cir. 2011) (quoting *Berson v. App. Signal Tech., Inc.*, 527 F.3d 982, 985 (9th Cir. 2008)). To plead materiality, the allegations must "suffice to raise a reasonable expectation that discovery will reveal evidence satisfying the materiality requirement, and to allow the court to draw the reasonable inference that the defendant is liable." *Matrixx*, 563 U.S. at 43. (quoting *Twombly*, 550 U.S. at 556; *Iqbal*, 556 U.S. at 678) (internal citations and quotation marks omitted). "Although determining materiality in securities fraud cases should ordinarily be left to the trier of fact, conclusory allegations of law and unwarranted inferences are insufficient to defeat a motion to dismiss for failure to state a claim." *In re Cutera*, 610 F.3d at 1108 (internal citations and quotation marks omitted).

     **b.**   **Material Misrepresentations or Omissions Requirement Met**

Plaintiffs' securities fraud claim centers on three categories of statements. First, plaintiffs allege that statements regarding RH Modern inventory were false and misleading. Second, plaintiffs challenge statements which allegedly misrepresented RH Modern's market performance. Finally, plaintiffs aver that RH's partial disclosures were themselves misleading because such disclosures attributed poor financial performance in part to macroeconomic conditions.

### i. Inventory

With respect to statements concerning RH inventory, the Court finds the relevant allegations to be as follows. During a 2Q15 video presentation for investors held on June 11, 2015, Boone indicated that RH inventory "at the end of the first quarter was up 24%." (Olson Decl., Ex. 6 at 5.) Boone explained that RH expected "to end the year with inventory growth that is higher than our sales growth, *given the inventory investments in RH Modern*." (*Id.* (Emphasis supplied).) Plaintiffs allege that this statement was misleading for two reasons: First, it led the market to believe that RH's inventory growth was driven by the launch of RH Modern and inventory investments regarding the same. As noted above, plaintiffs proffer evidence that RH's inventory growth was actually the result of non-Modern product returns stemming from persistent quality issues. (CCAC ¶¶ 58 and 59.) Second, plaintiffs assert that this statement led the market to believe that RH had made meaningful "inventory investments in RH Modern" despite the fact that RH had failed to order necessary inventory for the RH Modern launch in a timely manner.[6] (*Id.* ¶ 181.)

---

[6] Defendants attempt to characterize as forward-looking Boone's statement that RH "expect[s] to end the year with inventory growth that is higher than our sales growth, given the inventory investments in RH Modern." However, defendants overlook the fact that Boone's statement gave the impression that RH had *at present* made "inventory investments in RH Modern." When a statement contains mixed forward-looking and present-tense components the Ninth Circuit treats the "non-forward-looking portions of mixed statements [as] not eligible for the safe harbor provisions of the PSLRA." *In re Quality Sys., Inc. Sec. Litig.,* 865 F.3d 1130, 1150 (9th Cir. 2017). Therefore, the portion of Boone's statement which refers to present-tense inventory investments in RH Modern line is not forward-looking and thus not eligible for the safe harbor provisions of the PSLRA. *Id.*

Next, on December 10, 2015, RH touted "increases in inventory of $201.7 million related to the increase in 2015 Spring, RH Teen and RH Modern collections" in its SEC filing for the fiscal quarter ending October 31, 2015 ("3Q15"). (Olson Decl., Ex. 16 at 28.) According to plaintiffs, it was misleading for RH to connect the $201.7 million inventory increase to RH Modern when RH Modern inventories were negligible and the company did not order or receive significant RH Modern inventory in 3Q15.

In support of plaintiffs' allegations regarding material falsity, plaintiffs rely on several confidential witnesses ("CWs") as attesting that (i) defendants had not made inventory investments in RH Modern prior to the launch in 2Q15, and (ii) RH inventory growth in 3Q15 reflected an accumulation of excess non-Modern inventory rather than RH Modern inventory growth leading up to and immediately following the launch. With regard to RH Modern inventory investments in 2Q15, CW2, a Buyer employed at RH who worked at corporate headquarters from 2014 through 2016 and is knowledgeable about product selection, inventory levels, and purchasing of hard goods and furniture for RH Modern, stated that when RH Modern was launched in September 2015 no inventory existed because RH Modern product designs had not even been finalized. (*Id.* ¶ 77.) CW 19, a former Vice President of Merchandising for Upholstered Furniture, stated that the Modern Source Book depicted samples that RH had not yet attempted to manufacture. (*Id.* ¶ 73.) RH's Customer Service Lead Assist until April 2016 (CW4) explained that when RH issued its Modern Source Book in September 2015 not a single piece of RH Modern furniture was in stock. (*Id.* ¶ 40.) CW4 further explained that prior to the Modern launch employees were informed that RH Modern inventory was not in stock. (*Id.* ¶ 48.) CW8, a Manager of Financial Planning and Analysis throughout the Class Period, corroborates the testimony of the other CWs in indicating that when the RH Modern Source Book was issued RH Modern product was not available for purchase. (*Id.* ¶ 41 n.8.) RH's Product Development Leader for Dining Furniture from 2014 through September 2016 (CW9) similarly stated that no RH Modern product was in stock on the launch date. (*Id.* ¶ 41; *see also* ¶ 42 (Associate Store Leader from May 2013 through April 2016 (CW10) (same)).)

12

Concerning the inventory of non-Modern products in 2Q15 and 3Q15, RH's Store Operations and Communications Analyst through June 2016 (CW18) noted that surplus inventory for non-Modern product lines increased significantly year-over-year from 2014 to 2015. (*Id.* ¶ 57.) CW11, a Manager in Operations throughout the Class Period, similarly indicated that RH was experiencing problems regarding "tons of excess inventory" totaling over $200 million in 2015. (*Id.* ¶ 61.) CW11 further noted that Friedman "would get involved" in conversations about excess inventory and "yell." (*Id.* ¶ 63.)

Based on the foregoing outline of the allegations, the Court finds that plaintiffs have sufficiently alleged falsity, particularly with respect to present-tense statements of fact[7] regarding (i) the inventory investments RH had made in RH Modern inventory as of 2Q15, and (ii) specific attribution of 3Q15 inventory growth to RH Modern on December 10, 2015.[8]

### ii. Market Performance

The Court further highlights three statements made by Friedman with regard to RH Modern's performance in the market. First, on September 10, 2015, Friedman stated in a press release that the launch of RH Modern in 3Q15 "puts us on a clear path to accelerate our growth in the fourth quarter and into fiscal 2016." (Olson Decl., Ex. 11 at 2.) Second, in a December 10,

---

[7] Although plaintiffs allege further statements in support of the instant claim, the statements the Court finds most central to resolution of the instant motion are those that are statements of past or existing fact that plaintiffs allege differed materially from the state of affairs at the time the statements were made. Given that the Court finds these statements sufficient to state a claim, the Court need not and does not consider plaintiffs' additional statements, which defendants argue generally are inactionable as forward-looking statements and/or puffery. (*See id.* ¶¶ 118, 121, 128, 134, 135, 148, 178, 180, 183, 184, 189, and 194.)

[8] Defendants rely on *Santa Fe Industries v. Green*, 430 U.S. 462, 479-80 (1977), in arguing that the CCAC recites mere "allegations of mismanagement [which] do not give rise to a Section 10(b) claim." (Motion at 9, 18.) There, the Supreme Court held that "Congress by [enacting] § 10(b) of the Securities Exchange Act of 1934, 15 U.S.C.S. § 78j, did not seek to regulate [conduct] which constitute[s] no more than internal corporate mismanagement." *Santa Fe Indus.*, 430 U.S. at 479-80; *see also Gaines v. Haughton*, 645 F.2d 761, 779 n.33 (9th Cir. 1981) (federal securities laws do not provide a cause of action for corporate mismanagement).

Defendants do not persuade, as they ignore the allegations in the CCAC which state that defendants made affirmative statements regarding the inventory growth of RH Modern. Such allegations support plaintiffs' theory that defendants made misleading statements and omissions in reporting strong inventory growth for RH Modern when in reality inventory growth was weak. (CCAC ¶¶ 178–192.)

2015, press release, Friedman wrote that RH was "extremely encouraged by the early results we are seeing out of . . . RH Modern" and that "RH Modern is trending to add significant incremental revenues." (*Id.*, Ex. 15 at 2) Third, during an investor call held that same day, Friedman stated that a "headline" was that RH Modern was "performing ahead of our expectations." (*Id.*, Ex. 13 at 14.)

The Court finds that plaintiffs have sufficiently alleged material falsity with regard to the challenged market performance statements because Friedman's rosy representations concealed that RH Modern was suffering from a severe lack inventory and defendants were receiving customer complaints and canceled orders regarding the same. As noted, less than eight weeks after Friedman stated that defendants were "extremely encouraged" by the RH Modern results and represented that RH Modern was "performing ahead of [] expectations[,]" Friedman wrote a memo to all RH employees which specifically referenced RH Modern and stated that RH's customers were "on fire" and that RH had "let customers die." (CCAC ¶ 106.)

Three categories of allegations support this conclusion: first, allegations regarding RH Modern inventories as of September 10, 2015; second, allegations concerning the home furnishings industry production cycle and lead times; and third, the content of Friedman's internal memo sent to all RH employees eight weeks after he made the December 10, 2015, statements.

As to the first category, plaintiffs reference several CWs as attesting to the fact that by September 10, 2017, defendants' "total absence of [RH Modern] inventory" was well known internally and openly "communicated at staff meetings." (*Id.* ¶ 49 (CW4).) As discussed above, plaintiffs proffer CWs who indicate that RH Modern product had not been ordered by the time defendants launched the RH Modern product line and issued the Source Book in September 2015. (*Id.* ¶¶ 41, 161 (CW8); *see also* ¶¶ 33, 37 (CW1); ¶ 40 (CW4); ¶ 41 (CW9 and CW10); and ¶ 73 (CW19).)

With regard to the second category, multiple CWs state that product lead times in the home furnishings industry are at least six months. (*Id.* ¶¶ 33 (CQ1); 34 (CW2 and CW2); 35 (CW4); and ¶ 38 (CW6).) Pursuant to this timeline, Friedman's September 10, 2015, representation that the launch of RH Modern put RH "on a clear path to accelerate our growth in the fourth quarter

[of fiscal 2015] and into fiscal 2016" was misleading because RH would not even have received RH Modern inventory until several months *after* the close of FY2015, much less converted that inventory into incremental revenue.

Third, the Court finds significant the temporal proximity between Friedman's December 10, 2015, statements that RH Modern was experiencing "encouraging" results and "performing ahead of [] expectations," and his January 30, 2016, memo alerting employees to customer complaints stemming from orders "not being in stock, and having orders pushed out multiple times" which specifically referenced RH Modern. (*Id*. at ¶ 112.) The Court does not find plausible the possibly that such pervasive customer complaints arose only after December 10, 2015, and subsequently escalated with such intensity over the next eight weeks so as to drive Friedman to decry that RH had let its customers "die." Thus, it was misleading for Friedman to represent to that market that RH Modern was experiencing "encouraging" market performance when RH Modern was suffering from inventory shortages and customer dissatisfaction.

Accordingly, the Court finds that plaintiffs have alleged facts sufficient to support their contention that at the time Friedman's statements were made the statements conveyed to investors that RH Modern was performing well in the market despite inventory shortages, customer complaints, and canceled orders which were well documented internally. Such statements therefore created an "impression of a state of affairs that differ[ed] in a material way from the one that actually exist[ed]." *Berson v*, 527 F.3d at 985 (quoting *Brody v. Transitional Hospitals Corp.*, 280 F.3d 997, 1006 (9th Cir. 2002)).

Defendants attempt to characterize Friedman's market performance statements as referring only to customer demand rather than to RH Modern's performance as a whole. However, this characterization fails to take into account the import of context, as discussed at length above. For example, the December 10, 2015, press release specifically mentions incremental revenue and does not appear to be limited to customer demand.

For these reasons, plaintiffs have adequately alleged falsity.[9]

---

[9] Because the Court finds that plaintiffs have alleged sufficiently the falsity of present-

## 2. Second Element: Scienter

### a. Legal Standard

Scienter is defined as "a mental state embracing intent to deceive, manipulate, or defraud." *Ernst & Ernst v. Hochfelder*, 425 U.S. 185, 193 n. 12 (1976). To plead scienter adequately, the complaint must "state with particularity facts giving rise to *a strong inference* that the defendant acted with the required state of mind." 15 U.S.C. § 78u–4(b)(2)(A) (emphasis supplied). "The inference that the defendant acted with scienter need not be irrefutable, *i.e.*, of the 'smoking gun' genre, or even the 'most plausible of competing inferences.'" *Tellabs*, 551 U.S. at 324 (citation omitted). Rather, a complaint survives if, "[w]hen the allegations are accepted as true and taken collectively . . . a reasonable person [would] deem the inference of scienter at least as strong as any opposing inference." *Id.* at 326. In determining whether this requirement is met, the Court must view the allegations as a whole and determine whether plaintiffs have raised an inference of scienter that is "cogent and compelling, thus strong in light of other explanations," to satisfy the PSLRA standard. *S. Ferry LP*, 542 F.3d at 784 (citing *Tellabs*, 551 U.S. at 326). When assessing allegations holistically, the Court views circumstances that are probative of scienter with a practical and common-sense perspective. *Id.*

Nonetheless, the PSLRA demands "particular allegations which strongly imply Defendants' *contemporaneous* knowledge that the statement was false when made." *Berson*, 527 F.3d at 989 (emphasis in original). A strong inference of scienter "must be more than merely plausible or reasonable — it must be cogent and at least as compelling as any opposing inference of non-fraudulent intent." *Tellabs*, 551 U.S. at 314. The inference must be that "the defendant[ ] made false or misleading statements either *intentionally* or with *deliberate recklessness.*" *Zucco*, 552 F.3d at 991 (emphasis supplied) (internal quotation marks omitted). Deliberate recklessness means that the reckless conduct "reflects some degree of intentional or conscious misconduct."

tense statements for purposes of the instant motion, the Court need not and does not consider independently the sufficiency of plaintiffs' claims concerning later part of the class period regarding statements made by Friedman in February and March of 2016 which attribute some of RH's poor financial performance to macroeconomic trends. (*See id.* ¶¶ 169, 197, 199, and 201.)

*S. Ferry*, 542 F.3d at 782. "[A]n actor is [deliberately] reckless if he had reasonable grounds to believe material facts existed that were misstated or omitted, but nonetheless failed to obtain and disclose such facts although he could have done so without extraordinary effort." *In re Oracle Corp. Sec. Litig.*, 627 F.3d 376, 390 (9th Cir. 2010) (quoting *Howard v. Everex Sys., Inc.*, 228 F.3d 1057, 1064 (9th Cir. 2000)).

"[F]acts showing mere recklessness or a motive to commit fraud and opportunity to do so [may] provide some reasonable inference of intent," but are not independently sufficient. *In re Silicon Graphics Inc. Sec. Litig.*, 183 F.3d at 974, *abrogated on other grounds by S. Ferry LP*, 542 F.3d at 784. It may also be reasonable to conclude that high-ranking corporate officers have knowledge of the critical core operation of their companies. *S. Ferry LP*, 542 F.3d at 785–86.

### b. Scienter Requirement Met

The Court finds that plaintiffs have adequately alleged scienter for three reasons: First, Friedman was highly involved in the RH Modern launch. Second, plaintiffs proffer testimony of CWs who indicate that Friedman and Boone had access to and reviewed reports which described the RH Modern inventory shortage and customer complaints. Third, the record reflects CW testimony alleging that RH was struggling with an accumulation of non-Modern "excess inventory" totaling over $200 million and that Friedman took an active role in conversations regarding this issue. (*Id.* ¶¶ 61 and 63.) Finally, the Court highlights the importance of the RH Modern launch to defendants' business and growth strategy. In so finding, the Court views the CCAC as a whole and takes note of the context in which the statements above were made.

In support of their contention that defendants possessed scienter when the above-referenced statements were made, plaintiffs refer to multiple CWs. Plaintiffs' reliance on the CW statements must pass two hurdles. First, a CW must be described with sufficient particularity to establish his or her reliability and personal knowledge. *Zucco Partners LLC v. Digimarc Corp.*, 552 F.3d 981, 995 (9th Cir. 2009). Second, the statements supplied by CWs "with sufficient reliability and personal knowledge must themselves be indicative of scienter." *Id.* Here, the Court finds the standard met. The CWs are described with sufficient specificity to establish reliability — their dates of employment and professional roles are provided, and that information provides a

sufficiently reliable basis for the Court to determine that statements attributed to them are indicative of scienter.

First, Friedman was highly involved in the Modern launch, and made last-minute changes to RH Modern designs which caused delays.  (*Id.* ¶ 67.)  According to CW2, these changes slowed down production and caused inventory shortages.  (*Id.* ¶¶ 68 and 69.)  Further, CW2 indicated that both Boone and Friedman received "weekly inventory reports" which showed that RH Modern inventory was out of stock.  (*Id.* ¶ 82.)  Similarly, CW1, RH's Director of Product development employed from April 2009 through May 2015, explained that Friedman "had the final word on how much of the RH Modern would be ordered." (*Id.* ¶ 67; *see also* ¶ 49 (Customer Service Lead Assist (CW4) statement that Friedman's management style was "hands on everything").)

Second, CW11, RH's Manager in Operations throughout the class period who worked with vendors to source RH inventory, indicated that she observed Friedman "regularly" inspect RH's Merchandise Drill Down ("MDD") system which pulled information on inventory levels for all products including for RH Modern.  CW11 further stated that "in mid to late 2015, there were meetings where Friedman checked MDD . . . asking questions about inventory."  (*Id.* ¶ 80.)  According to CW11, Friedman and Boone received weekly inventory reports which showed that RH Modern was out of stock.  (*Id.* ¶ 82.)  CW8, a Manager of Financial Planning and Analysis throughout the class period, worked closely with Boone and provided Boone with a weekly "CFO Package" which contained information on sales, demand, and how the RH was converting demand to net sales for products including RH Modern.  (*Id.* ¶ 41 n.8.)

Third, CW20, a studio manager in charge of catalogue photo operations from 2012 to 2016, stated that Friedman staged RH Modern video and photoshoots for investors by using samples and prototypes instead of actual product because RH had not "decided what it was going to make."  (*Id.* ¶ 75.)  Employees would "have to rig the products to make them work, and [] this process was happening the night before the video was released" to investors."  (*Id.*)  CW2 similarly stated that "items were photographed and digitally manipulated, and catalogs launched long before finishes were approved on the product."  (*Id.* ¶ 77.)  Further, "some products shown in the RH Modern Source Book were Photoshopped and did not actually exist."  (*Id.*)

Fourth, CW11 stated that RH was struggling with an accumulation of non-Modern "excess inventory" totaling over $200 million in 2015.  (*Id.* ¶ 61.)  Accordingly to CW11, Friedman "would get involved" in conversations about excess inventory and "yell." (*Id.* ¶ 63.)

Finally, in addition to these CW statements, the CCAC notes that Friedman touted RH Modern as "the most innovative and new concept in the world of home design" that "represented our finest work to date."  (*Id.* ¶ 3.)  He also described RH Modern as "the most important and significant new home furnishings business to be launched in the last 15 or 20 years."  (*Id.*) Although circumstantial and certainly not dispositive, such statements, paired with the CW statements regarding Friedman's "hands on" management style, support a compelling inference that Friedman knew about the inventory shortages and customer complaints which followed.

The confluence of these specific allegations supports this Court's finding that the PSLRA's high standard for alleging scienter has been met here.  That RH Modern was allegedly such a critical product for RH's financial success, that defendants had been highly involved when the RH Modern launch was delayed, that they had received or reviewed the substance of MDD, CFO, and weekly sales reports wherein the inventory shortage continued to be quantified and analyzed, and the production timeline for the Modern furniture, together support a strong inference that they knew of the (i) shortage in RH Modern inventory, (ii) effects of this shortage on RH Modern's market performance and customer satisfaction, and (iii) fact that inventory growth in 3Q2015 was attributable to excess non-Modern inventory and not the RH Modern launch.

The Court does not reach this conclusion lightly.  In so holding, the Court has considered possible non-culpable explanations for why defendants might have stated that they had sufficient RH Modern inventory to support the launch and that Modern was exceeding market expectations when it was later exposed as not having been.  For example, perhaps Friedman and Boone simply assumed that customers would not mind waiting several months for their RH Modern orders to arrive, or maybe the delays were not foreseeable to defendants when the challenge statements were made.  However, allegations in the CCAC render such possibilities relatively less persuasive than the inference that defendants met the scienter requirement of the PSLRA.  The CCAC, read as a whole, and in particular those allegations concerning Friedman's and Boone's own roles in

monitoring inventory and the confidential witnesses' statements, [10] undermines the notion that

defendants were not privy to the sort of information that would have informed them about the

problems surrounding RH Modern inventory and customer dissatisfaction.

### 3. Fifth Element: Loss Causation

#### a. Legal Standard

To establish loss causation, plaintiffs must show that the statements at issue "caused the

loss for which the plaintiff seeks to recover damages." 15 U.S.C. § 78u-4(b)(4). Plaintiffs must

establish "some causal connection between the fraud and the securities transaction in question." *In

re Daou Sys., Inc.,* 411 F.3d 1006, 1025 (9th Cir. 2005); *In re Gilead Scis. Sec. Litig.*, 536 F.3d

1049, 1055–56 (9th Cir. 2008). However, plaintiffs are not "required to show 'that a

misrepresentation was the sole reason for the investment's decline in value' in order to establish

loss causation." *Id*. at 1025. Put another way, "plaintiff can satisfy loss causation by showing that

'the defendant misrepresented or omitted the *very facts* that were a substantial factor in causing the

plaintiff's economic loss.'" *Nuveen Mun. High Income Opportunity Fund v. City of Alameda*, 730

F.3d 1111, 1120 (9th Cir. 2008) (emphasis in original). Further, a "corrective disclosure need not

be a 'mirror image' disclosure—a direct admission that a previous statement is untrue; it must

simply 'relate to the same subject matter as the alleged misrepresentation.'" *In re Harman Int'l

Indus., Inc. Sec. Litig.*, 791 F.3d 90, 109 (D.C. Cir. 2015), (quoting *Mass. Ret. Sys. v. CVS

Caremark Corp.*, 716 F.3d 229, 240 (1st Cir. 2013)).

#### b. Loss Causation Requirement Met

On December 10, 2015, RH disclosed to investors that "the in-stock position is not great

today" for RH Modern. This disclosure corrected defendants' earlier statements that RH (i) had

made investments in RH Modern inventory, and (ii) RH Modern inventories were growing. The

following day, RH's stock price declined by $3.78 per share, erasing over $153 million in market

value. (CCAC ¶¶ 144 and 215.)

---

[10] Defendants' generic characterization of the CW statements as "hearsay allegations" does
not persuade. First, many of the CWs had firsthand knowledge of the events and company
procedures which form the basis for their statements.

United States District Court
Northern District of California

On February 24, 2016, RH disclosed the existence of "shipping delays" for RH Modern. Friedman further revealed that RH Modern was experiencing "suppressed orders" and that RH did not "plan to introduce any incremental new businesses in fiscal 2016." (*Id.* ¶ 156.) This disclosure corrected defendants' earlier statements that RH Modern was displaying encouraging early results and exceeding expectations. On February 25, 2016, RH stock fell $13.43, erasing over $543 million in market capitalization. (*Id.* ¶ 217.)

Finally, RH disclosed on June 8, 2016, that it had experienced poor financial results partly "due to RH Modern production delays during the first half" of the fiscal year. (*Id.* ¶ 173.) This disclosure corrected defendants' earlier statements that RH Modern was displaying encouraging early results and exceeding expectations. The next day, RH shares dropped over 21%. (*Id.* ¶ 176.)

The Court finds plaintiffs' allegations regarding loss causation sufficient to establish a "causal connection between the fraud and the securities transaction in question." *Daou,* 411 F.3d at 1025; *Gilead,* 536 F.3d at 1055–56. Specifically, these disclosures "relate[] to the same subject matter as the alleged misrepresentations[s]," namely that (i) defendants had made inventory investments in RH Modern in 2Q15 sufficient to support a successful launch, (ii) RH Modern was performing well in the market as of 3Q2015, and (iii) inventory growth in 3Q2015 was driven by RH Modern rather than the accumulation of non-Modern inventory which customers had returned due to quality issues. *See Harman*, 791 F.3d at 109. Further, the three disclosures and corresponding declines in stock price discussed above indicate that the misrepresented or omitted facts "were a substantial factor in causing the plaintiff's economic loss." *Nuveen*, 730 F.3d at 1120.

Defendants' argument that the respective stock declines were due to other macroeconomic factors does not persuade. "Whether the stock drop was due to other factors is a factual inquiry better suited for determination on summary judgment or trial, rather than at the pleading stage." *Robb v. Fitbit, Inc.*, 216 F.Supp. 3d 1017 at 1033 (N.D Cal. 2016) (citing M*cCabe v. Ernst & Young, LLP,* 494 F.3d 418, 427 n.4 (3d Cir. 2007); *Emergent Capital Inv. Mgmt.*, LLC v. Stonepath Group, Inc., 343 F.3d 189, 197 (2d Cir. 2003)). Thus, defendants' final argument on the sufficiency of the claims fails and the motion on that ground is **DENIED.**

In light of the Court's holding with regard to plaintiffs' section 10(b) claim, defendants'

motion to dismiss plaintiffs' section 20(a) claims against Friedman and Boone is **DENIED** because defendants' challenge to plaintiffs' section 20(a) claims is based solely on the argument that plaintiffs failed to plead a predicate violation of section 10(b).

**IV.     CONCLUSION**

For the reasons stated above, the Court finds that plaintiffs have alleged sufficiently a violation of Section 10(b) of the Securities Exchange Act and Rule 10b-5 promulgated thereunder. Accordingly, the motion to dismiss is **DENIED**.  By this Order, the Court takes no position regarding the appropriate length of the class period, given the lack of briefing on the issue of whether the class period should be of plaintiffs' desired length.

This terminates Docket Nos. 50, 51, 57.

**IT IS SO ORDERED.**

Dated: February 26, 2018

_____
**YVONNE GONZALEZ ROGERS**
**UNITED STATES DISTRICT COURT JUDGE**

United States District Court
Northern District of California