# EXHIBIT F

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA
OAKLAND DIVISION

| | |
|---|---|
| IN RE RH, INC. SECURITIES LITIGATION, | Case No. 4:17-00554-YGR |

REBUTTAL REPORT OF

PROFESSOR STEVEN P. FEINSTEIN, PH.D., CFA

September 11, 2018

### TABLE OF CONTENTS

I.      SCOPE OF PROJECT AND REPORT ............................................................1

II.     CONCLUSIONS...........................................................................................1

III.    MY REPORT DESCRIBED THE OUT-OF-POCKET METHODOLOGY FOR
        CALCULATING DAMAGES ON A CLASSWIDE BASIS .............................3

        A.    The Out-of-Pocket Damages Methodology Is Fully Specified And
              Articulated.............................................................................................3

        B.    The Out-of-Pocket Damages Methodology Is Consistent With Plaintiffs'
              Theory Of Liability ..............................................................................5

IV.     DR. ZUREK SPECULATES THAT CERTAIN VALUATION ISSUES MAY
        ARISE.  THE OUT-OF-POCKET METHODOLOGY, HOWEVER,
        ACCOMMODATES THE ISSUES. ..............................................................7

        A.    The Two Potential Issues Of Concern To Dr. Zurek ..............................7

              1.    Time-Varying Inflation................................................................8

              2.    Confounding News ......................................................................9

        B.    Time-Varying Inflation And Confounding News Are Handily
              Accommodated In The Inflation Ribbon Construction .........................10

V.      THERE ARE NUMEROUS TOOLS AVAILABLE TO VALUE RH STOCK
        USING THE OUT-OF-POCKET METHODOLOGY .....................................12

VI.     ERROR RATE COMMENSURATE WITH VALUATIONS IN ANALYST
        COVERAGE...........................................................................................16

VII.    LIMITING FACTORS AND OTHER ASSUMPTIONS..................................16

## I.   SCOPE OF PROJECT AND REPORT

1.   On 22 June 2018, I submitted a report in this matter ("Feinstein Report" or "June Report").

2.   After I submitted the Feinstein Report, Lead Counsel asked me to consider and evaluate the arguments and conclusions in the Declaration of Paul Zurek, Ph.D., dated 14 August 2018 (the "Zurek Declaration"), submitted by the Defendants in this matter. I also reviewed the transcript of the Deposition of Paul Zurek, Ph.D., dated 4 September 2018 (the "Zurek Deposition").

3.   This report presents my analysis and conclusions relating to the Zurek Declaration and the Zurek Deposition.

4.   The documents I reviewed and relied upon in preparing this report, in addition to those already cited in the Feinstein Report, are listed in Exhibit-1. My credentials and compensation are presented in the Feinstein Report, as is a list of the testimony I provided during the four-year period preceding that report. Testimony that I have provided since the Feinstein Report is identified in Exhibit-2.

5.   I reserve the right to amend, refine, or modify my opinion and report, including in the event any new or additional information or analysis becomes available.

## II.   CONCLUSIONS

6.   The Zurek Declaration provides no valid reason to revise my conclusion that damages in this matter can be computed for all Class Members using a common methodology that is consistent with the Plaintiffs' theory of liability and allegations.

7.   Dr. Zurek does not dispute that the "out-of-pocket" damages methodology I identified is appropriate in this case. Nor does he contest that the methodology is applicable in a common manner for all Class members.

8.   Instead of challenging the applicability of the "out-of-pocket" methodology, Dr. Zurek raises questions about the precise manner in which certain loss causation issues will be resolved, and the damages calculations that application of the out-of-pocket methodology will ultimately provide. In other words, Dr. Zurek does not challenge the out-of-pocket

damages methodology at all. Rather, he contends that there may be some valuation issues encountered in the implementation of the methodology, and he argues that I have not explained precisely how I might address these potential issues. It is noteworthy that he conducted no formal analysis to confirm that the potential issues actually exist in this case. As such, his critique is speculative.

9.      The two potential valuation issues that Dr. Zurek surmises may or may not present challenges in calculating damages are: (1) time-varying inflation and (2) confounding news on disclosure dates. Essentially, Dr. Zurek contends that the valuation analysis in the implementation of the "out-of-pocket" methodology could potentially be undertaken incorrectly in the presence of these potential valuation issues, if, when the out-of-pocket method is ultimately applied to the facts of the case, appropriate valuation tools are not used. He does not argue that the valuation exercise would certainly be executed incorrectly, or that the potential valuation issues actually exist, or even that they would be insurmountable if they do exist. His argument is limited to the opinion that I have not explained with specificity how these and every potential valuation issue would be overcome, should such issues be encountered in the implementation of the damages methodology at trial.

10.     All of the potential valuation issues Dr. Zurek raises are the same typical classwide issues that occur in nearly every Section 10(b) securities fraud class action, which can and will be addressed in a damages report at trial, if they are actually encountered in this case. I have not conducted a loss causation analysis at this time and reserve the right to address such issues at the appropriate stage should I be asked to do so. None of the particular valuation issues Dr. Zurek addresses will be insurmountable and, indeed, Dr. Zurek does not contend that they are insurmountable. He does not dispute that, as I explained in my June Report, the out-of-pocket method's use of an event study in combination with valuation tools can properly account for such issues.

11.     Dr. Zurek asserts that an event study *by itself* is not enough to account for the potential issues of time-varying inflation and confounding news, should they be encountered. However, I never stated that event study analysis alone and in isolation would resolve all potential valuation issues. I stated that event study analysis in combination with standard valuation tools would resolve all potential issues, as valuation tools have been developed

for precisely the sorts of issues Dr. Zurek brings up. Dr. Zurek does not dispute what I stated in my opening report: that there are valuation tools, derived from financial principles and the literature, that are designed and frequently used in conjunction with an event study to account for the common issues of time-varying inflation and information disaggregation.

12.   Many of Dr. Zurek's assertions regarding the particular valuation tools discussed in my report are also incorrect, as further discussed below.

## III.   MY REPORT DESCRIBED THE OUT-OF-POCKET METHODOLOGY FOR CALCULATING DAMAGES ON A CLASSWIDE BASIS

### A.   The Out-of-Pocket Damages Methodology Is Fully Specified And Articulated

13.   In the Feinstein Report, I described the methodology for calculating damages that I would use in this case – the out-of-pocket damages methodology.[1] This method is the appropriate damage computation methodology in virtually all federal class action securities cases alleging misrepresentations and omissions, and fits the facts, circumstances, and liability theory of the instant case. I explained that the calculation of each Class member's damages would be a mechanical arithmetical exercise, conducted the same way for all Class members, applying the results of the Classwide analyses described in my June Report (and again below) to each Class member's trading data.[2]

14.   The Feinstein Report fully articulated the three steps of the out-of-pocket methodology, as follows:

> "First, valuation tools, which would include event study analysis such as that described herein, and potentially other empirical analyses if necessary, would be used to establish that the disclosure(s), correcting the alleged misrepresentations and omissions, caused the price of RH stock to fall. This analysis, after controlling for potentially non-fraud-related information, would establish that the alleged misrepresentations and omissions had caused the stock price to be artificially inflated, and that the corrective

---

[1] Feinstein Report, ¶186(i)-(iii).

[2] *Id.*

disclosure(s) caused the inflation to dissipate, in turn causing investor losses. This analysis would apply on a Classwide basis."
**Feinstein Report, ¶186(i).**


"Second, an inflation ribbon would be constructed, using generally accepted empirical analysis and valuation tools, indicating how much artificial inflation caused by the alleged misrepresentations and omissions was in the price of RH stock on each day during the Class Period. An inflation ribbon is a time series of the difference between a stock's actual price observed in the marketplace, and the estimated price that the stock would have traded at each day had there been full disclosure from the outset of the Class Period. Construction of the inflation ribbon generally employs event study analysis, combined with widely used and generally accepted valuation tools and models. The inflation ribbon is often constructed by working chronologically backwards from the final corrective disclosure to the start of the Class Period, accounting for alleged fraud-related residual price declines as they occurred. Inflation prior to a corrective disclosure that dissipated inflation is greater than the inflation afterward by the amount of inflation that dissipated. Should it be determined that a disclosure(s) is not corrective, the methodology described herein can accommodate such a change and calculate the but-for stock prices. This analysis would also apply on a Classwide basis."
**Feinstein Report, ¶186(ii).**


"Third, the measure of per share damages generally applied in 10b-5 cases is the reduction in the inflation ribbon over an investor's holding period (the economic/inflation loss) that was caused by corrective disclosures. That is, for each Class member, per share damages would be calculated as the difference between the inflation on the date the shares were purchased and the inflation on the date those same shares were subsequently sold, excluding any inflation dissipation caused by factors other than corrective disclosure. Per share damages are also limited, however, to be no greater than the decline in share price over the holding period, which is the investment loss actually sustained. Pursuant to the Private Securities Litigation Reform Act of 1995 (the "PSLRA") (15 U.S.C. § 78u-4(e)), for any shares sold during the 90-day period after the end of the Class Period, per share damages would be calculated as the lesser of the reduction in the dollar inflation over the investor's holding period (the economic/inflation loss), or the decline in the stock price (the investment loss), where the terminal stock price is deemed to be the average price from the final corrective disclosure date to the sale date. Also, pursuant to the PSLRA, for any shares held 90 days or more beyond the final corrective disclosure, damages would equal the lesser of the reduction in the dollar inflation over the investor's holding period (the economic/inflation loss) or the decline in the stock price (the investment loss), where the terminal stock price is

deemed to be the average price over the 90 days following the final corrective disclosure. The calculation of each Class member's damages would be a mechanical arithmetical exercise, conducted the same way for all Class members, applying the results of the Classwide analyses described above to each Class member's trading data."
**Feinstein Report, ¶186(iii).**

15.     As is evident in his declaration and deposition testimony, Dr. Zurek acknowledges the existence of the "out-of-pocket" damages methodology,[3] and exhibited enough understanding of it to indicate that the methodology is fully articulated. He further acknowledged that the "out-of-pocket" methodology is commonly used in securities cases:

"[Question]: And based on your experience, would you agree that the out-of-pocket damage method is usually applied in securities class actions?

[Dr. Zurek]: I haven't done the analysis to know what's usual in all cases. I've certainly seen the out-of-pocket method applied in many of the securities matters that I've been involved with or know about. Not exclusively, but I've certainly seen it applied."
**Zurek Deposition, at 24:12-20.**

   **B.     The Out-of-Pocket Damages Methodology Is Consistent With Plaintiffs' Theory Of Liability**

16.     In Paragraph 36 of his declaration, Dr. Zurek questioned whether the model is consistent with Plaintiffs' theory of "harm."[4] The "out-of-pocket" methodology is fully consistent with Plaintiffs' theory of liability (and harm) in the instant matter, as it measures what compensation would place investors in a position commensurate to the economic condition they would have been in had there been no alleged fraud.

17.     In the instant case, Plaintiffs allege that misrepresentations and omissions artificially inflated the price of RH stock, and corrective disclosures later dissipated this artificial inflation, causing investor losses. The "out-of-pocket" methodology measures the loss caused by the introduction and subsequent dissipation of artificial inflation, and it does so

---

[3] Zurek Declaration, ¶14.

[4] *Id.,* ¶36.

commonly for all investors. The methodology therefore measures the compensation that would put Class members in the economic position they would have been in had they not suffered losses stemming from the alleged fraud.

18.     Dr. Zurek does not dispute that the "out-of-pocket" damages methodology is appropriate in the RH case. His concern is whether the implementation would be executed correctly.[5] He submits, and I agree, that the inflation ribbon must be carefully and correctly constructed to compute "out-of-pocket" damages. For example, Dr. Zurek stated the following in his deposition:

> "[Question]: Have you ever authored any articles discussing how to calculate damages in a securities class action?
>
> [Dr. Zurek]: I have not. Those -- I'm a financial economist, and that's a -- that's a legal issue how damages should be calculated. So I have not.
>
> [Question]: What do you mean, that's a legal issue as to how damages should be calculated?
>
> [Dr. Zurek]: My understanding is that there are certain legal standards, such as out-of-pocket damages, that apply in securities class actions and have certain definitions, and that those are dictated by relevant case law or rulings. And the role of a financial economist is to assist the court in ultimately calculating damages, but not deciding what the standard is."
> **Zurek Deposition, at 19:2-18.**
>
> "[Question]: [W]hy do you think it's appropriate to use an inflation ribbon when inflation varies over time?
>
> [Dr. Zurek]: … [M]y understanding of an inflation ribbon is just the amount of inflation at different points in time. So this is really part of the definition of out-of-pocket damages subject to any loss causation requirements and PSLRA adjustments. It's inflation at time of purchase less inflation at the time of sale is the definition of damages. And so knowing inflation at different points in time is an input to a damages calculation. It's a definition."
> **Zurek Deposition, at 30:1-16.**

---

[5] Zurek Declaration, ¶¶14-15.

19.     Dr. Zurek challenges *damages calculations* that have not yet been conducted, on the basis
        of potential issues, the existence of which have not yet been confirmed. Accordingly, Dr.
        Zurek testified that "what [Dr. Zurek's] report talks about" is "a loss causation analysis in
        a damages calculation."[6]

20.     If asked by the Plaintiffs, I will implement the out-of-pocket damages methodology and
        submit a loss causation and damages report after the conclusion of fact discovery, by the
        Court-ordered date.


## IV.     DR. ZUREK SPECULATES THAT CERTAIN VALUATION ISSUES MAY ARISE.  THE OUT-OF-POCKET METHODOLOGY, HOWEVER, ACCOMMODATES THE ISSUES.

### A.     The Two Potential Issues Of Concern To Dr. Zurek

21.     Dr. Zurek speculates that two potential valuation issues may exist that, if present, could
        complicate the construction of the inflation ribbon. The two potential issues he raises are
        time-varying inflation and confounding news.[7]

22.     Dr. Zurek has conducted no formal and replicable analysis to determine if these problems
        even exist in this case.

> "[Question]: You've not performed any analysis consistent with the standards in your industry to determine whether or not in fact the artificial inflation in RH's share price changed on any date during the class period; correct?
>
> [Dr. Zurek]: What I have not done, and I don't think is required at this stage, and Dr. Feinstein hasn't done either, is to determine whether on any individual day, inflation has changed."
> **Zurek Deposition, at 223:21-224:5.**

---

[6] Zurek Deposition, at 25:18-20.

[7] Zurek Declaration, ¶¶14-15.

"[Question]: What did you mean when you just said you haven't conducted an analysis to determine whether there was time-varying inflation on each day? You acknowledged that that is a loss causation analysis; correct?

[Dr. Zurek]: Well, that's a -- I think that's a causation analysis generally -- … to determine what fraction of a price movement is attributed to any piece of news on a given day, which is different than recognizing that inflation is highly likely to vary over the class period, and then being informed by that intuition by that recognition in constructing a damages model."
**Zurek Deposition, at 228:22-229:11.**

"[Question]: You haven't conducted any analysis to determine whether or not in fact there was any change in artificial inflation in RH's share price during the class period, Right?

[Dr. Zurek]: … What I haven't done is to conduct a loss causation analysis or a causation analysis on a particular day to disentangle the effect of various pieces of information on any given day."
**Zurek Deposition, at 227:13-228:13.**

"[Question]: Is it your opinion that performing a price-to-earnings multiple analysis to determine inflation in this case would be improper? ... Did you ever try?

[Dr. Zurek]: As I've stated, I have not tried to do an independent valuation or an independent assessment of inflation other than the analysis that I described in my report."
**Zurek Deposition, at 186:6-187:17.**

### 1.    Time-Varying Inflation

23.    Time-varying inflation means that artificial inflation in RH stock changes to some extent over the course of the Class Period.

24.    The amount of artificial inflation may change for a number of reasons. Additional misrepresentations or omissions may maintain or add to inflation, while corrective disclosures generally cause inflation to dissipate. These effects are common, and, as I explained in my June Report, commonly dealt with using valuation tools to measure what the subject security would have been worth at each point in time under the but-for scenario of adequate disclosure.  Issues of time-varying inflation are common in securities class actions, and Dr. Zurek does not dispute this point.  For example, he testified as follows.

> "[Question]: And you would also agree with me, sir, that the presence of time-varying inflation is not particular to the RH matter but exists in many securities litigations; correct?
>
> [Dr. Zurek]: … I don't have a specific empirical basis. It is true that facts and circumstances around a company change over time. Those may or may not affect the level of inflation. It depends on the information that's withheld from the market. … [I]n isolation, I think this case is challenging.  How it compares to other cases, I don't know."
> **Zurek Deposition, at 114:12-115:11.**

25.   In his declaration, Dr. Zurek posits that inflation may have varied over time because the disclosures RH could have made early in the Class Period might not be the same disclosures they ultimately made at the end of the Class Period.[8] I agree, and this is precisely one of the reasons that execution of the damages computation prior to the completion of discovery and the full development of the record is premature. I disagree with Dr. Zurek if his contention is that the valuation of RH stock in the but-for scenario of full disclosure appears unusual or exceptionally complex at this time. Such security valuation under alternative scenarios and different as-of dates is conducted by valuation analysts every day for virtually all publicly traded securities. It is also a regular part of applying the out-of-pocket damages methodology in securities fraud class actions.

### 2.   Confounding News

26.   Confounding news or information is non-fraud-related information that affects the security price, sometimes at the same time that fraud-related corrective disclosures affect the security price. If, for example, material negative non-fraud-related information is revealed to the market at the same time that material fraud-related disclosures are made to the market, an observed decline in the security price may combine the effects of the fraud-related information and the non-fraud-related information.  The confounding news should be accounted for when quantifying the impact of the fraud-related corrective disclosures.

---

[8] Zurek Declaration, ¶22.

27. Issues of confounding news are common in securities class actions, and Dr. Zurek does not dispute this point.  For example, he testified as follows.

> "[Question]: You would agree with me, sir, that the presence of confounding news is something that occurs in many securities litigations; correct?
>
> [Dr. Zurek]: That statement is probably true, although I don't have a strict empirical basis to agree one way or another.  For example, one might have significant market movements on a particular day, and that would be confounding news. It wouldn't surprise me if that's a factor in many different securities cases."
>
> **Zurek Deposition, at 113:7-114:10.**

**B.    Time-Varying Inflation And Confounding News Are Handily Accommodated In The Inflation Ribbon Construction**

28. The application of the out-of-pocket methodology will solve any issues of time-varying inflation and confounding news using standard valuation tools. Indeed, the very evidence of such potential valuation issues would directly inform the tools and techniques necessary to accommodate them.

29. For example, any empirical evidence showing that investors measurably scaled up the importance they attributed to RH Modern over the course of the Class Period, as a percentage of the Company's value, could then be applied as the basis for appropriately scaling the artificial inflation attributable to RH Modern misrepresentations and omissions.

30. If confounding information is present, valuation techniques can be applied to separate the effects of non-fraud-related information from fraud-related information in the RH stock price decline on corrective disclosure dates. For example, suppose a company announces disappointing financial results with earnings guidance falling below consensus by $1.00. Suppose further that $0.50 of the decline is attributable to allegation-related corrective disclosures while the other $0.50 is attributable to non-allegation-related news. Here, should it be determined that reputation effects do not apply, 50% of the stock price decline on that day may reasonably be attributed to the disclosure of the allegation-related information. Such attribution derives explicitly from the price-earnings multiple valuation technique. Should it be determined that the fraud-related disclosure engendered

reputation effects, which can be ascertained by commentary from analysts or from a comparison of the character of the fraud-related disclosures with disclosures addressed in the finance literature on reputation effects, the proportion of the stock price decline attributable to the fraud should be scaled upward, consistent with weights presented in that literature, which were determined from empirical research.[9] It is important to note that this and all such attribution analysis would apply on a classwide basis for all investors.

31. Dr. Zurek apparently contends that I must describe in granular detail at this stage precisely which valuation tools I will use when constructing the inflation ribbon later in the case, after full discovery.  I am unaware of any expert report submitted at the class certification stage in a case alleging violations of the securities laws that describes specifically which valuation tools and techniques will be used in the construction of the inflation ribbon to the degree of detail that Dr. Zurek requires. There is good reason for this, because the detailed analysis and computations that are involved in the ***application*** of the out-of-pocket method to the facts of the case depend on the development of the factual record through discovery. It is my understanding that in this case, for example, document discovery is ongoing, and no depositions of any RH employees have occurred yet. Development of the record will inform the forensic analyst of the nature of the but-for full disclosure scenario — a necessary prerequisite to conducting the valuation component of the out-of-pocket methodology. Moreover, pursuant to the out-of-pocket methodology, all valuation exercises of time-varying inflation and disaggregation would be classwide issues that are modeled uniformly for each Class member.

---

[9] *See*, *e.g.* "The Cost to Firms of Cooking the Books," by Jonathan M. Karpoff, *et al.*, *Journal of Financial and Quantitative Analysis*, Vol. 43, No. 3, Sept. 2008, pp. 581-612.

## V.   THERE ARE NUMEROUS TOOLS AVAILABLE TO VALUE RH STOCK USING THE OUT-OF-POCKET METHODOLOGY

32.   In the Feinstein Report, I explained that the standard tools of valuation analysis can be applied to measure time-varying inflation and disaggregation, *i.e.*, "measure inflation and damages caused by the alleged misrepresentations and omissions according to Plaintiffs' theory of liability."[10] I also provided examples of valuation tools and techniques that could be applied should specific issues or challenges complicate the quantification of inflation in this case.[11] Those tools include, but are not limited to:

> "Valuation multiple models, such as those based on earnings, EBITDA, revenue, book value, and cash flow; discounted cash flow models (DCF); return attribution analysis; and the literature regarding valuation effects of factors such as reputation and quality of accounting."
> **Feinstein Report, ¶185.**

33.   Dr. Zurek agrees that there are valuation tools and techniques that exist to value RH stock on each day of the Class Period.[12]  In his declaration, however, he focuses exclusively on the DCF technique, incorrectly contending that the DCF model must be used, and that its input arguments must therefore be estimated for every day in the Class Period.[13]  While it is incorrect to suggest that the DCF approach is the only applicable valuation tool, dismissing others, it is noteworthy that Dr. Zurek concedes in his declaration that at least this tool exists and applies on a classwide basis.

---

[10] Feinstein Report, ¶185.

[11] *Id.*

[12] Zurek Declaration, ¶18.

[13] *Id.*

34.    While in his declaration he dismisses the applicability of all other valuation tools besides DCF (insisting that the but-for valuation would require estimating alternative probability-weighted cash flows), in his deposition Dr. Zurek did acknowledge that there are other valuation tools that can be used and actually were used by equity analysts valuing RH stock during the Class Period.[14]

> "[Question]: What tools exist to value RH today?
>
> [Dr. Zurek]: To -- to value the whole company, as RH, I think, you know, different people would use different tools."
> **Zurek Deposition, at 185:8-12.**

> "[Question]: Are you aware that analysts, equity analysts, performed price-to-earnings multiple analyses to value RH during the class period?
>
> [Dr. Zurek]: So I've reviewed a number of reports. I don't remember a specific report, but I would not be at all surprised if that were the case…."
> **Zurek Deposition, at 189:11-16.**

> "[Question]: Are you aware that analysts during the class period performed price-to-sale analyses to value RH?
>
> [Dr. Zurek]: So I would give the same answer. I can't name a specific report, but I wouldn't be surprised."
> **Zurek Deposition, at 189:20-25.**

> "[Question]: In determining what tools market participants used to value RH during the class period, would you look at their communications with RH?
>
> [Dr. Zurek]: … Ultimately, what's relevant for an out-of-pocket measure of damages is inflation, which is an amalgamation of different market participants' buy and sell positions presumably guided by some sort of valuation methodology or trading approach that represents the market consensus view."
> **Zurek Deposition, at 192:1-193:1.**

---

[14] Dr. Zurek's assertion in ¶35 of the Zurek Declaration that the other valuation tools are not applicable is wrong – such tools are applicable for valuing RH stock under alternative scenarios throughout the Class Period, as analysts did use them to value RH stock under different information scenarios on different dates throughout the Class Period.

35.    Not only did Dr. Zurek acknowledge an array of tools that can value RH stock in the present, given actual market conditions and information, but he also acknowledged that these tools are often applied to value securities on earlier "as of" dates, under alternative "but-for" scenarios. This type of valuation analysis is exactly what would be applied in the construction of an inflation ribbon in this case, estimating what RH stock would have been worth during the Class Period in the but-for scenario of full disclosure.

> "[Question]: Have you ever valued companies where the "as of" date was not today? … Do you know what I mean by 'as of' date?
>
> [Dr. Zurek]: So let me -- so it's an exercise that assigns value as of a particular time … And that is, in the litigation context, at least, that's common. ...
>
> "[Question]: Have you ever, though, valued a company as of a date that's not today?
>
> [Dr. Zurek]: Yes."
> **Zurek Deposition, at 173:8–174:1.**

36.    Additional valuation techniques that can be used to measure out-of-pocket damages include P/E, P/Sales, P/EBITDA, and EV/EBITDA.[15] Each of these tools can be used to adjust inflation in this case for any potential valuation issues. Numerous analysts following RH stock employed these valuation multiple techniques, which have no probability-weighted cash flow inputs, and so would require – contrary to Dr. Zurek's assertions – no estimation of alternative probabilities and cash flow expectations to construct the inflation ribbon.[16]

> "Our price target is based on a 25x multiple to our FY16 EPS estimate."
> **"Bull/Bear Debate Rages On," by Adam Sindler and Mike Baker, *Deutsche Bank*, analyst report, 27 March 2015, p. 1.**

---

[15] *See, e.g.*, "Bull/Bear Debate Rages On," by Adam Sindler and Mike Baker, *Deutsche Bank*, analyst report, 27 March 2015, p. 1; "Reports 24% Comparable Brand Revenue Growth in FQ4; Offers Outlook for 2015," by Neely Tamminga and Kayla Berg, *Piper Jaffray*, analyst report, 26 March 2015, p. 1; and "2015 a 'Bridge' Year; LT Growth Trajectory on Track; Buy," by Lee Giordano, et al., *CRT Capital*, analyst report, 27 March 2015, p. 1.

[16] Zurek Declaration, ¶18.

"Our price target remains moves to $88 from $91 based on 15x (unchanged)
FY16E EV/EBITDA"
**"Reports 24% Comparable Brand Revenue Growth in FQ4; Offers Outlook for
2015," by Neely Tamminga and Kayla Berg, *Piper Jaffray*, analyst report, 26 March
2015, p. 1.**

"Our $100 one-year price target is based on 33x our 2015 EPS estimate of
$3.06, a premium to the peer group average P/E multiple of 17x, given
strong long-term growth potential in the 25%+ range."
**"2015 a 'Bridge' Year; LT Growth Trajectory on Track; Buy," by Lee Giordano, *et
al.*, CRT Capital, analyst report, 27 March 2015, p. 1.**

37.     In fact, unlike in his declaration, at deposition Dr. Zurek acknowledged that some of
these tools may be appropriate and applicable in this case.

"[Question]: What tools exist to value RH today?

[Dr. Zurek]: To -- to value the whole company, as RH, I think, you know,
different people would use different tools."
**Zurek Deposition, at 185:8-12.**

"[Question]: Are you aware that analysts, equity analysts, performed price-
to-earnings multiple analyses to value RH during the class period?

[**Dr.** Zurek]: So I've reviewed a number of reports. I don't remember a
specific report, but I would not be at all surprised if that were the case...."
**Zurek Deposition, at 189:11-16.**

"[Question]: Are you aware that analysts during the class period performed
price-to-sale analyses to value RH?

[Dr. Zurek]: So I would give the same answer. I can't name a specific report,
but I wouldn't be surprised."
**Zurek Deposition, at 189:20-25.**

## VI.     ERROR RATE COMMENSURATE WITH VALUATIONS IN ANALYST COVERAGE

38.     Dr. Zurek comments that I have not computed any potential "error rate" corresponding to my implementation of the fully articulated damages methodology in this matter.[17] The assertion is irrelevant. Using the same valuation tools and techniques applied by equity analysts following RH stock would result in an acceptable error rate commensurate with the generally acceptable error rate in published analyst reports. In addition, any eventual error rate regards the merits of the damages model – not whether damages can be calculated on a classwide basis pursuant to a common methodology for the Class.

## VII.     LIMITING FACTORS AND OTHER ASSUMPTIONS

39.     This report is furnished solely for the purpose of court proceedings in the above-referenced matter and may not be used or referred to for any other purpose. The analysis and opinions contained in this report are based on information available as of the date of this report. I reserve the right to supplement or amend this report, including in the event additional information becomes available.


Steven P. Feinstein, Ph.D., CFA

---

[17] Zurek Declaration, ¶38.

**Exhibit-1**

**Documents and Other Information Considered**
**In Addition to Those Listed in the Feinstein Report**

**CASE DOCUMENTS**

- Declaration of Paul Zurek, Ph.D., dated 14 August 2018.
- Deposition of Paul Zurek, Ph.D., dated 4 September 2018.

**ACADEMIC AND PROFESSIONAL LITERATURE**

- Karpoff, Jonathan, D. Scott Lee, and Gerald S. Martin, "The Cost to Firms of Cooking the Books," *Journal of Financial and Quantitative Analysis*, Vol. 43, No. 3, Sept. 2008.

**OTHER**

- Any other documents and data cited in the report.

**Exhibit-2**
**Steven P. Feinstein, Ph.D., CFA**
**Testimony Provided Since my Feinstein Report**


In Re Community Health Systems Securities Litigation
Case No. 11-cv-0433
United States District Court
Middle District of Tennessee
Deposition Testimony
June 2018

In Re Orbital ATK, Inc. Securities Litigation
Case No. 1:16-cv-01031-TSE-MSN
United States District Court
Eastern District of Virginia
Deposition Testimony
July 2018

In Re Correction Corporation of America Securities Litigation
Case No. 3:16-cv-02267
United States District Court
Middle District of Tennessee
Deposition Testimony
July 2018

In Re Blackberry Limited Securities Litigation
Case No. 1:13-cv-7060-TPG
United States District Court
Southern District of New York
Deposition Testimony
July 2018

In Re SunEdison, Inc. Securities Litigation
Case No. 16-md-2742-PKC
United States District Court
Southern District of New York
Deposition Testimony
July 2018