1   BERNSTEIN LITOWITZ BERGER
        & GROSSMANN LLP
2   JONATHAN D. USLANER (Bar No. 256898)
    jonathanu@blbglaw.com
3   2121 Avenue of the Stars, Suite 2575
    Los Angeles, CA 90067
4   Tel:    (310) 819-3472

5   *Counsel for Lead Plaintiffs Public School*
6   *Teachers' Pension & Retirement Fund of*
    *Chicago and Arkansas Teacher Retirement*
7   *System and Lead Counsel for the Class*

8   [Additional counsel appear on signature page]

9

10

11                 UNITED STATES DISTRICT COURT
                   NORTHERN DISTRICT OF CALIFORNIA
12                        OAKLAND DIVISION

13

14   IN RE RH, INC. SECURITIES              Case No. 4:17-00554-YGR
     LITIGATION
15                                          ECF CASE

16                                          **LEAD PLAINTIFFS' MOTION**
17                                          **FOR FINAL APPROVAL OF**
                                            **SETTLEMENT AND PLAN OF**
18                                          **ALLOCATION, AND**
                                            **MEMORANDUM OF POINTS AND**
19                                          **AUTHORITIES IN SUPPORT**
                                            **THEREOF**
20
                                            Judge:       Hon. Yvonne Gonzalez Rogers
21                                          Courtroom:   1
                                            Date:        October 22, 2019
22                                          Time:        2:00 p.m.

23

24

25

26

27

28

---

LEAD PLAINTIFFS' MOTION FOR FINAL APPROVAL          Case No. 4:17-cv-00554-YGR
OF SETTLEMENT AND PLAN OF ALLOCATION

# TABLE OF CONTENTS

Page

TABLE OF AUTHORITIES ................................................................................................... ii

NOTICE OF MOTION ........................................................................................................... 1

STATEMENT OF ISSUES TO BE DECIDED ...................................................................... 1

MEMORANDUM OF POINTS AND AUTHORITIES ......................................................... 2

PRELIMINARY STATEMENT ............................................................................................. 2

ARGUMENT ........................................................................................................................... 4

I.      The Settlement Warrants Final Approval ..................................................................... 4

        A.      Lead Plaintiffs and Lead Counsel Have Adequately Represented the Class ...................... 5

        B.      The Settlement Was Reached After Substantial Discovery, Arm's-Length
                Negotiations Between Experienced Counsel, and Mediation with an Experienced
                Mediator ........................................................................................................................ 6

        C.      The Relief that the Settlement Provides for the Class Is Adequate, Taking into
                Account the Costs and Risks of Further Litigation and All Other Relevant Factors ........... 8

                1.      The Amount Offered in Settlement ................................................................. 8

                2.      The Strength of Lead Plaintiffs' Case and the Significant Risks of
                        Continued Litigation ................................................................................... 10

                3.      The Duration and Costs of Continued Litigation .................................... 13

                4.      All Other Factors Set Forth in Rule 23(e)(2)(C) Support Approval of the
                        Settlement ................................................................................................... 14

        D.      The Settlement Treats Class Members Equitably Relative To Each Other ...................... 16

        E.      Additional Factors Considered by the Ninth Circuit Support Approval of the
                Settlement ................................................................................................................... 16

II.     The Plan of Allocation Is Fair and Reasonable ........................................................ 17

III.    Notice to the Class Satisfied the Requirements of Rule 23 and Due Process ........... 19

CONCLUSION ..................................................................................................................... 21

# <u>TABLE OF AUTHORITIES</u>

**Page(s)**

CASES

*In re Amgen Inc. Sec. Litig.*,
   2016 WL 10571773 (C.D. Cal. Oct. 25, 2016)...................................................................11, 13, 17

*In re Anthem, Inc. Data Breach Litig.*,
   327 F.R.D. 299 (N.D. Cal. 2018) ...................................................................................................7

*In re AOL Time Warner, Inc. Sec. & "ERISA" Litig.*,
   2006 WL 903236 (S.D.N.Y. Apr. 6, 2006).................................................................................13

*In re Biolase, Inc. Sec. Litig.*,
   2015 WL 12720318 (C.D. Cal. Oct. 13, 2015)..............................................................................9

*In re Bluetooth Headset Prods. Liab. Litig.*,
   654 F.3d 935 (9th Cir. 2011) .....................................................................................................7, 8

*In re Celera Corp. Sec. Litig.*,
   U.S. Dist. LEXIS 157408 (N.D. Cal. Nov. 20, 2015)................................................................13

*Churchill Village L.L.C. v. General Electric*,
   361 F.3d 566 (9th Cir. 2004) ..........................................................................................5, 16, 20

*Class Plaintiffs v. City of Seattle*,
   955 F.2d 1268 (9th Cir. 1992) ................................................................................................5, 17

*Destefano v. Zynga, Inc.*,
   2016 WL 537946 (N.D. Cal. Feb. 11, 2016) ...........................................................8, 9, 13, 20

*Eisen v. Carlisle & Jacquelin*,
   417 U.S. 156 (1974)....................................................................................................................20

*Garner v. State Farm Mut. Auto. Ins. Co.*,
   2010 WL 1687832 (N.D. Cal. Apr. 22, 2010) .............................................................................4

*In re Global Crossing Sec. & ERISA Litig.*,
   225 F.R.D. 436 (S.D.N.Y. 2004) ...............................................................................................13

*Hanlon v. Chrysler Corp.*,
   150 F.3d 1011 (9th Cir. 1998) ............................................................................................5, 6, 8

*Hartless v. Clorox Co.*,
   273 F.R.D. 630 (S.D. Cal. 2011), *aff'd in relevant part*,
   473 F. App'x 716 (9th Cir. 2012) ..............................................................................................14

*Hayes v. MagnaChip Semiconductor Corp.*,
   2016 WL 6902856 (N.D. Cal. Nov. 21, 2016) ..........................................................................20

*Hefler v. Wells Fargo & Co.*,
2018 WL 6619983 (N.D. Cal. Dec. 18, 2018) ...................................................................16

*In re Heritage Bond Litig.*,
2005 WL 1594403 (C.D. Cal. June 10, 2005) .............................................................13, 18

*IBEW v. Int'l Game Tech.*,
2012 WL 5199742 (D. Nev. Oct. 19, 2012) ......................................................................10

*In re Immune Response Sec. Litig.*,
497 F. Supp. 2d 1166 (S.D. Cal. 2007)...............................................................................11

*Kirkorian v. Borelli*,
695 F. Supp. 446 (N.D. Cal. 1988) .....................................................................................16

*Knapp v. Art.com, Inc.*,
283 F. Supp. 3d 823 (N.D. Cal. 2017) ................................................................................10

*Lane v. Facebook, Inc.*,
696 F.3d 811 (9th Cir. 2012) ................................................................................................5

*In re Lendingclub Sec. Litig.*,
282 F. Supp. 3d 1171 (N.D. Cal. 2017) ................................................................................5

*Lerwill v. Inflight Motion Pictures, Inc.*,
582 F.2d 507 (9th Cir. 1978) ................................................................................................6

*In re LinkedIn User Privacy Litig.*,
309 F.R.D. 573 (N.D. Cal. 2015).........................................................................................13

*Linney v. Cellular Alaska P'ship*,
1997 WL 450064 (N.D. Cal. July 18, 1997), *aff'd*, 151 F.3d 1234 (9th Cir. 1998) .............7

*Luna v. Marvell Tech. Grp.*,
2018 WL 1900150 (N.D. Cal. Apr. 20, 2018) ....................................................................20

*McPhail v. First Command Fin. Planning, Inc.*,
2009 WL 839841 (S.D. Cal. Mar. 30, 2009) ......................................................................10

*In re Mego Fin. Corp. Sec. Litig.*,
213 F.3d 454 (9th Cir. 2000) ................................................................................................8

*Nat'l Rural Telecommc'ns Coop. v. DIRECTTV*,
221 F.R.D. 523 (C.D. Cal. 2004) ........................................................................................16

*In re Netflix Privacy Litig.*,
2013 WL 1120801 (N.D. Cal. Mar. 18, 2013).......................................................................7

*Officers for Justice v. Civil Serv. Comm'n*,
688 F.2d 615 (9th Cir. 1982) ............................................................................................5, 9

*In re Omnivision Techs., Inc.*,
 559 F. Supp. 2d 1036 (N.D. Cal. 2008) ...................................................................4, 9, 17

*In re Online DVD-Rental Antitrust Litig.*,
 779 F.3d 934 (9th Cir. 2015) .................................................................................16

*In re Oracle Sec. Litig.*,
 1994 WL 502054 (N.D. Cal. June 18, 1994) ...........................................................18

*In re Polaroid ERISA Litig.*,
 240 F.R.D. 65 (S.D.N.Y. 2006) ................................................................................6

*Shapiro v. JPMorgan Chase & Co.*,
 2014 WL 1224666 (S.D.N.Y. Mar. 24, 2014) ...........................................................9

*Spann v. J.C. Penney Corp.*,
 314 F.R.D. 312 (C.D. Cal. 2016) ..........................................................................20

*In re Syncor ERISA Litig.*,
 516 F.3d 1095 (9th Cir. 2008) .................................................................................4

*Thomas v. MagnaChip Semiconductor Corp.*,
 2017 WL 4750628 (N.D. Cal. Oct. 20, 2017) .........................................................16

*Torrisi v. Tucson Elec. Power Co.*,
 8 F.3d 1370 (9th Cir. 1993) ...........................................................................10, 13

*Trabakoolas v. Watts Water Techs., Inc.*,
 2014 WL 12641599 (N.D. Cal. Aug. 5, 2014) ..........................................................7

*Velazquez v. Int'l Marine & Indus. Applicators, LLC*,
 2018 WL 828199 (S.D. Cal. Feb. 9, 2018) ..............................................................14

*In re Volkswagen "Clean Diesel" Mktg., Sales Practices, & Prods. Liab. Litig.*,
 2019 WL 2077847 (N.D. Cal. May 10, 2019) ...........................................................5

**STATUTES & RULES**

Private Securities Litigation Reform Act of 1995,
 15 U.S.C. § 78u-4(a)(7) .........................................................................................21

Fed. R. Civ. P. 23 ...........................................................................................2, 17, 20

Fed. R. Civ. P. 23(b)(3) .........................................................................................20

Fed. R. Civ. P. 23(c)(2)(B) .................................................................................20, 21

Fed. R. Civ. P. 23(e) ........................................................................................................ *passim*

Fed. R. Civ. P. 23(f) ................................................................................................................3

**OTHER AUTHORITIES**

Cornerstone Research, *Securities Class Action Settlements: 2018 Review and Analysis*
   (2019) ...................................................................................................................................9

1
2

## NOTICE OF MOTION FOR FINAL APPROVAL
## OF SETTLEMENT AND PLAN OF ALLOCATION

3

**TO ALL PARTIES AND THEIR ATTORNEYS OF RECORD:**

4

5

6

7

8

9

10

11

12

13

PLEASE TAKE NOTICE that, pursuant to Rule 23(e)(2) of the Federal Rules of Civil Procedure and the Court's Order Preliminarily Approving Settlement and Providing for Notice (ECF No. 142) ("Preliminary Approval Order"), Lead Plaintiffs Public School Teachers' Pension & Retirement Fund of Chicago ("Chicago Teachers") and Arkansas Teacher Retirement System ("ATRS") (collectively, "Lead Plaintiffs") will and hereby do move the Court, before the Honorable Yvonne Gonzalez Rogers, on October 22, 2019, at 2:00 p.m. in Courtroom 1 of the United States District Court for the Northern District of California, 1301 Clay Street, Oakland, CA 94612, or at such other location and time as set by the Court, for (1) entry of a judgment granting final approval of the proposed settlement of this Action (the "Settlement") and (2) entry of an order granting approval of the proposed plan of allocation of the net proceeds of the Settlement (the "Plan of Allocation").

14

15

16

17

18

19

20

This Motion is based on the following Memorandum of Points and Authorities, the accompanying Declaration of Jonathan D. Uslaner in Support of (I) Lead Plaintiffs' Motion for Final Approval of Settlement and Plan of Allocation, and (II) Lead Counsel's Motion for Attorneys' Fees and Litigation Expenses ("Uslaner Declaration" or "Uslaner Decl.") and its exhibits, all other prior pleadings and papers in this Action, arguments of counsel, and any additional information or argument that may be required by the Court.  The proposed Judgment and a proposed Order approving the Plan of Allocation will be submitted with Lead Plaintiffs' reply submission.

21

## STATEMENT OF ISSUES TO BE DECIDED

22

23

1.       Whether the Court should approve the proposed Settlement of this securities class action as fair, reasonable, and adequate under Rule 23(e)(2); and

24

2.       Whether the Court should approve the Plan of Allocation as fair and reasonable.

25

26

27

28

## MEMORANDUM OF POINTS AND AUTHORITIES

Lead Plaintiffs, on behalf of themselves and the Class, respectfully submit this memorandum in support of their motion for final approval of the proposed Settlement and the plan of allocation of the settlement proceeds.[1]

## PRELIMINARY STATEMENT

Subject to Court approval, Lead Plaintiffs have agreed to settle the claims in this action in exchange for a cash payment for the benefit of the Class of $50,000,000.00, which has been deposited into an escrow account in accordance with the Settlement Agreement. Lead Plaintiffs respectfully submit that the proposed Settlement is an excellent result for the Class and satisfies the standards for final approval under Rule 23 of the Federal Rules of Civil Procedure. As detailed in the accompanying Uslaner Declaration and summarized in this memorandum, the proposed Settlement provides a substantial, certain, and immediate recovery for the Class while avoiding the significant risks of continued litigation, including the risk that the Class could recover nothing or less than the Settlement Amount after years of additional litigation and delay.

The Settlement was reached after months of arm's-length negotiations between the Parties, which included two separate mediation sessions with former United States District Judge Layn R. Phillips, an experienced and highly respected mediator of complex class actions, and was based on a mediator's recommendation made by Judge Phillips.

Lead Plaintiffs and Lead Counsel were well informed of the strengths and weaknesses of the claims in the Action at the time the Settlement was reached, based on their extensive prosecution of the claims asserted in the Action. By the time of the Settlement, Lead Counsel had, among other things, (i) conducted an extensive investigation into the alleged fraud; (ii) drafted the initial complaint in the Action and a detailed consolidated complaint based on the investigation; (iii) successfully opposed Defendants' motion to dismiss through briefing and argument; (iv) engaged in substantial fact discovery, including obtaining and reviewing more than 10 million pages of documents produced by Defendants

---

[1] Unless otherwise defined in this memorandum, all capitalized terms have the meanings defined in the Stipulation and Agreement of Settlement, dated May 6, 2019 (ECF No. 135-1) (the "Stipulation") or the Uslaner Declaration. Citations to "¶__" herein refer to paragraphs in the Uslaner Declaration and citations to "Ex. __" refer to exhibits to the Uslaner Declaration.

and third parties; (v) conducted 15 depositions, including of fact and expert witnesses; (vi) successfully moved for certification of the Class; (vii) successfully opposed Defendants' Rule 23(f) petition to appeal the certification of the Class; (viii) consulted with experts in retail home-furnishings industry and class-wide damages; and (ix) exchanged two sets of mediation statements and participated in two full-day mediations overseen by Judge Phillips.

The Settlement is particularly favorable in light of the risks of litigation. As discussed below and in the Uslaner Declaration, Lead Plaintiffs faced meaningful risks in establishing each element of their claims at trial, including that (a) Defendants' challenged statements about the launch of RH Modern and RH's inventory were false or misleading when made; (b) the challenged statements were made with intent to mislead or severe recklessness; and (c) the correction of prior false statements, rather than other factors, caused the declines in the price of RH's stock price. Neither the SEC nor any other governmental entity has brought a related investigation or asserted a parallel enforcement action against RH, and the Company was never required by its auditor to restate any of its financial statements. In addition, the price of RH's stock has fully rebounded since the Class Period, and the RH Modern brand has proven to be extremely successful. Although Lead Plaintiffs believes in the merits of their claims, it recognized the risks associated with continued litigation, including at the summary judgment stage, at trial, and on any appeals.

The Settlement has the full support of the Court-appointed Lead Plaintiffs, which are both institutional investors that took an active role in supervising the litigation and participated directly in settlement negotiations. Further, although the deadline to object to the Settlement has not yet passed, no Class Members have objected to-date to the Settlement.[2]

In light of these considerations and the other factors discussed below, Lead Plaintiffs respectfully submit that the Settlement is fair, reasonable, and adequate and warrants final approval by the Court. Additionally, Lead Plaintiffs request that the Court approve the Plan of Allocation, which was set forth in the Notice mailed to potential Class Members. The Plan of Allocation, which was developed by Lead Counsel in consultation with Lead Plaintiffs' damages expert, provides a reasonable method for

---

[2] The deadline for submission of objections is October 1, 2019. Should any objections be received, Lead Counsel will address them in its reply papers.

allocating the Net Settlement Fund among Class Members who submit valid claims based on damages they suffered on purchases of RH common stock that were attributable to the alleged fraud.

## ARGUMENT

### I.    The Settlement Warrants Final Approval

Federal Rule of Civil Procedure 23(e) requires judicial approval for any compromise or settlement of class-action claims.  *See* Fed. R. Civ. P. 23(e).  A class-action settlement should be approved if the court finds it "fair, reasonable, and adequate." Fed. R. Civ. P. 23(e)(2).

The Ninth Circuit recognizes "a strong judicial policy that favors settlements, particularly where complex class action litigation is concerned."  *In re Syncor ERISA Litig.*, 516 F.3d 1095, 1101 (9th Cir. 2008); *see also In re Omnivision Techs., Inc.*, 559 F. Supp. 2d 1036, 1041 (N.D. Cal. 2008) ("the court must also be mindful of the Ninth Circuit's policy favoring settlement, particularly in class action law suits"). Class actions readily lend themselves to compromise because of the difficulties of proof, the uncertainties of the outcome, and the typical length of the litigation.  Settlements of complex cases such as this one greatly contribute to the efficient utilization of scarce judicial resources and achieve the speedy resolution of claims.  *See, e.g., Garner v. State Farm Mut. Auto. Ins. Co.*, 2010 WL 1687832, at *10 (N.D. Cal. Apr. 22, 2010) ("Settlement avoids the complexity, delay, risk and expense of continuing with the litigation and will produce a prompt, certain, and substantial recovery for the Plaintiff class.").

In determining whether a proposed settlement is "fair, reasonable, and adequate," the Court should consider whether:

(A)    the class representatives and class counsel have adequately represented the class;

(B)    the proposal was negotiated at arm's length;

(C)    the relief provided for the class is adequate, taking into account, [among other things,] the costs, risks, and delay of trial and appeal . . .; and

(D)    the proposal treats class members equitably relative to each other.

Fed. R. Civ. P. 23(e)(2).

In addition, the Ninth Circuit has held that district courts should consider the following factors in evaluating the fairness of a class action settlement:

> (1) the strength of the plaintiffs' case; (2) the risk, expense, complexity, and likely duration of further litigation; (3) the risk of maintaining class action status throughout the trial; (4) the amount offered in settlement; (5) the extent of discovery completed and the stage of the proceedings; (6) the experience and views of counsel; (7) the presence of a governmental participant; and (8) the reaction of the class members to the proposed settlement.

*Churchill Village L.L.C. v. Gen. Elec.*, 361 F.3d 566, 575 (9th Cir. 2004); *accord Lane v. Facebook, Inc.*, 696 F.3d 811, 819 (9th Cir. 2012); *Hanlon v. Chrysler Corp.*, 150 F.3d 1011, 1026 (9th Cir. 1998); *see also In re Volkswagen "Clean Diesel" Mktg., Sales Practices, & Prods. Liab. Litig.*, 2019 WL 2077847, at *1 (N.D. Cal. May 10, 2019) (approving settlement after considering both the "Rule 23(e)(2) factors, which became effective on December 1, 2018, and the factors identified in" Ninth Circuit case law).

The Ninth Circuit has cautioned that courts' review of settlements should be "limited to the extent necessary to reach a reasoned judgment that the agreement is not the product of fraud or overreaching by, or collusion between, the negotiating parties, and that the settlement, taken as a whole, is fair, reasonable and adequate to all concerned." *Hanlon*, 150 F.3d at 1027. In other words, a settlement hearing should "not to be turned into a trial or rehearsal for trial on the merits," *Officers for Justice v. Civil Serv. Comm'n,* 688 F.2d 615, 625 (9th Cir. 1982), and a court "need not 'reach any ultimate conclusions on the contested issues of fact and law which underlie the merits of the dispute, for it is the very uncertainty of outcome in litigation and avoidance of wasteful and expensive litigation that induce consensual settlements.'" *Class Plaintiffs v. City of Seattle*, 955 F.2d 1268, 1291 (9th Cir. 1992).

### A. Lead Plaintiffs and Lead Counsel Have Adequately Represented the Class

In determining whether to approve a class action settlement, the Court should consider whether "the class representatives and class counsel have adequately represented the class." Fed. R. Civ. P. 23(e)(2)(A); *see In re Lendingclub Sec. Litig.*, 282 F. Supp. 3d 1171, 1182 (N.D. Cal. 2017) (to determine adequacy, "courts consider two questions: (1) do the named plaintiffs and their counsel have any conflicts of interest with other class members, and (2) will the named plaintiffs and their counsel prosecute the action vigorously on behalf of the class?").

In granting class certification, the Court found that Lead Plaintiffs were adequate to serve as Class Representatives, and Lead Counsel was fit to serve as Class Counsel.  *See* ECF No. 111, at 6-7.  Lead Plaintiffs' claims are typical of and coextensive with those of the Class, and Lead Plaintiffs do not have any interests that are antagonistic to the interest of other members of the Class.  *See Lerwill v. Inflight Motion Pictures, Inc.*, 582 F.2d 507, 512 (9th Cir. 1978); *Hanlon*, 150 F.3d at 1020.  Lead Plaintiffs—like all other Class Members—have an interest in obtaining the largest possible recovery from Defendants.  *See In re Polaroid ERISA Litig.*, 240 F.R.D. 65, 77 (S.D.N.Y. 2006) ("Where plaintiffs and class members share the common goal of maximizing recovery, there is no conflict of interest between the class representatives and other class members.").

Lead Plaintiffs and Lead Counsel have adequately represented the Class in both their vigorous prosecution of the Action during the past two-and-a-half years and in the negotiation and achievement of the Settlement.  The institutional investor Lead Plaintiffs played an active role in supervising and participating in the litigation, attended both mediation sessions, and retained counsel who are highly experienced in securities litigation and have successfully prosecuted many complex class actions throughout the United States.  S*ee* Ex. 7 (Lead Counsel's firm resume).  Lead Counsel vigorously prosecuted the Class's claims, including by conducting a thorough investigation, overcoming Defendants' motion to dismiss, obtaining certification of the Class, and engaging in extensive discovery.

Accordingly, as the Court previously found in certifying the Class and in appointing Lead Plaintiffs as Class Representatives and Lead Counsel as Class Counsel, Lead Plaintiffs and Lead Counsel have adequately represented the Class.

> **B.** **The Settlement Was Reached After Substantial Discovery, Arm's-Length Negotiations Between Experienced Counsel, and Mediation with an Experienced Mediator**

In weighing approval of a class action settlement, courts consider whether the settlement "was negotiated at arm's length."  Fed. R. Civ. P. 23(e)(2)(B).  This includes consideration of related circumstances bearing on the procedural fairness of the settlement, including (i) counsel's understanding of the strengths and weakness of the case based on factors such as "the extent of discovery completed and the stage of the proceedings," *Hanlon*, 150 F.3d at 1026; (ii) the presence or absence of any indicia of

collusion, *see In re Bluetooth Headset Prods. Liab. Litig.*, 654 F.3d 935, 947 (9th Cir. 2011); and (iii) the involvement of a mediator.

Here, the Settlement was reached only after several months of arm's-length negotiations between the Parties, which included two separate mediation sessions with Judge Phillips, a former federal judge with more than 25 years of experience in mediating complex civil litigation.  ¶¶ 48-53.  The parties prepared and exchanged detailed mediation statements before participating in the mediation sessions and exchanged their views on the merits of the case.  ¶¶ 49-52.

As courts in this District have explained, the fact that the Parties reached a settlement after arm's-length negotiations between experienced counsel creates a presumption of its fairness.  *See In re Netflix Privacy Litig.*, 2013 WL 1120801, at *4 (N.D. Cal. Mar. 18, 2013) ("Courts have afforded a presumption of fairness and reasonableness of a settlement agreement where that agreement was the product of non-collusive, arms' length negotiations conducted by capable and experienced counsel"); *Linney v. Cellular Alaska P'ship*, 1997 WL 450064, at *5 (N.D. Cal. July 18, 1997) ("The involvement of experienced class action counsel and the fact that the settlement agreement was reached in arm's length negotiations, after relevant discovery had taken place create a presumption that the agreement is fair."), *aff'd*, 151 F.3d 1234 (9th Cir. 1998). Indeed, the involvement of an experienced mediator in the settlement process, like Judge Phillips, "confirms that the settlement is non-collusive."  *In re Anthem, Inc. Data Breach Litig.*, 327 F.R.D. 299, 327 (N.D. Cal. 2018); *see also Trabakoolas v. Watts Water Techs., Inc.*, 2014 WL 12641599, at *2 (N.D. Cal. Aug. 5, 2014) (finding that settlement "resulted from extensive, good-faith, arm's-length negotiations between experienced counsel" where Judge Phillips "presided during two in-person mediation sessions and follow-up negotiations between the parties over several months, which ultimately resulted in the settlement before the Court").

In addition, as noted above, the Parties and their counsel were knowledgeable about the strengths and weaknesses of the case before reaching the agreement to settle it.  As described in the Uslaner Declaration, Lead Counsel conducted a detailed, substantive investigation into the alleged fraud by, among other things, reviewing SEC filings, analyst research reports, investor conference calls, press releases, media reports, and RH promotional materials, and conducting dozens of interviews of former RH employees.  ¶¶ 12-14.  Lead Counsel also performed extensive legal research in preparing the

1   complaints and briefing the opposition to Defendants' motions to dismiss.  ¶¶ 15-20.  After the motion

2   to dismiss was decided, Lead Counsel engaged in substantial fact discovery, including obtaining over 10

3   million pages of documents produced by Defendants and third-parties and taking numerous depositions,

4   including of high-level RH employees.  ¶¶ 24-39.  Lead Counsel also consulted with experts regarding

5   loss causation, damages, and the retail home furnishings industry.  ¶¶ 46-47.  Finally, the Parties

6   engaged in extensive settlement negotiations assisted by an experienced private mediator, which further

7   informed the Parties of the strength of each side's arguments.  ¶¶ 50-51.

8          Further, the Settlement has none of the indicia of possible collusion identified by the Ninth

9   Circuit, such as a "clear-sailing" fee agreement or a provision that would allow settlement proceeds to

10  revert to Defendants.  *See Bluetooth Headset*, 654 F.3d at 947.  In short, the Settlement here was reached

11  after arm's-length negotiations by capable counsel after substantial discovery and was not a product of

12  fraud, overreaching, or collusion among the Parties.

13            **C.      The Relief that the Settlement Provides for the Class Is**
              **Adequate, Taking into Account the Costs and Risks of**
14            **Further Litigation and All Other Relevant Factors**

15         In determining whether a class-action settlement is "fair, reasonable, and adequate," the Court

16  must also consider whether "the relief provided for the class is adequate, taking into account . . . the

17  costs, risks, and delay of trial and appeal," as well as other relevant factors.  Fed. R. Civ. P. 23(e)(2)(C).

18  This factor under Rule 23(e)(2)(C) essentially encompasses four of the seven factors of the traditional

19  *Hanlon* analysis: (1) the strength of plaintiffs' case; (2) the risk, expense, complexity, and likely

20  duration of further litigation; (3) the risk of maintaining class-action status throughout the trial; and

21  (4) the amount offered in settlement.  *See Hanlon*, 150 F.3d at 1026.  As demonstrated below, each of

22  these factors supports approval of the Settlement under Rule 23(e)(2)(C).

23                   **1.      The Amount Offered in Settlement**

24         The amount of a settlement "is generally considered the most important [factor], because the

25  critical component of any settlement is the amount of relief obtained by the class." *Destefano v. Zynga,*

26  *Inc.*, 2016 WL 537946, at *11 (N.D. Cal. Feb. 11, 2016).  However, "[i]t is well-settled law that a cash

27  settlement amounting to only a fraction of the potential recovery does not per se render the settlement

28  inadequate or unfair."  *In re Mego Fin. Corp. Sec. Litig.*, 213 F.3d 454, 459 (9th Cir. 2000).  In

assessing the recovery, a fundamental question is how the value of the settlement compares to the amount the class potentially could recover at trial, discounted for risk, delay, and expense. "Naturally, the agreement reached normally embodies a compromise; in exchange for the saving of cost and elimination of risk, the parties each give up something they might have won had they proceeded with litigation." *Officers for Justice*, 688 F. 2d at 624; *see also Shapiro v. JPMorgan Chase & Co.*, 2014 WL 1224666, at *11 (S.D.N.Y. Mar. 24, 2014) (holding that settlement amount must be judged "not in comparison with the possible recovery in the best of all possible worlds, but rather in light of the strengths and weaknesses of plaintiffs' case").

Here, the Settlement amount—$50 million in cash, plus interest—represents a significant recovery for the Class. The Settlement amount is approximately six times the size of the median securities class-action settlement in the Ninth Circuit between 2009 and 2018 ($8.3 million). *See* Cornerstone Research, *Securities Class Action Settlements: 2018 Review and Analysis* (2019) (Ex. 9), at 19. Moreover, the recovery under the proposed Settlement provides a substantial financial benefit to the Class in comparison to overall potential damages and eliminates the significant risk that the Class could recover less, or even nothing at all, if the Action continued through summary judgment, trial, and appeals. Lead Counsel estimates that the maximum damages for the Class that could be realistically established at trial, assuming Plaintiffs prevailed on all liability issues of falsity and scienter, would be $117.1 million to $306.5 million, depending on the resolution of certain disputed loss causation issues. ¶ 69. Thus, the $50 million Settlement represents approximately 43% to 16% of the maximum realistic damages that could be recovered for the Class if Lead Plaintiffs prevailed at trial on all liability issues of falsity and scienter. *Id*.

Courts have routinely approved and lauded settlements with substantially lower percentage recoveries than obtained here as fair and reasonable. *See, e.g.*, *Zynga*, 2016 WL 537946, at *11 ("Settlement Amount represent[ing] approximately 14 percent of likely recoverable aggregate damages at trial" was "well within the range of percentages approved in other securities-fraud related actions"); *In re Biolase, Inc. Sec. Litig.*, 2015 WL 12720318, at *4 (C.D. Cal. Oct. 13, 2015) (finding that settlement recovery of 8% of estimated damages "equals or surpasses the recovery in many other securities class actions"); *Omnivision*, 559 F. Supp. 2d at 1042 (finding that settlement yielding 9% of

potential damages was "higher than the median percentage of investor losses recovered in recent shareholder class action settlements"); *McPhail v. First Command Fin. Planning, Inc*., 2009 WL 839841, at *5 (S.D. Cal. Mar. 30, 2009) (finding that securities-class-action settlement recovery of 7% of estimated damages "weigh[s] in favor of final approval"); *IBEW v. Int'l Game Tech.*, 2012 WL 5199742, at *3 (D. Nev. Oct. 19, 2012) (approving settlement representing "about 3.5% of the maximum damages that Plaintiffs believe[d] could be recovered at trial" and finding it "within the median recovery in securities class actions settled in the last few years").

### 2.    The Strength of Lead Plaintiffs' Case and the Significant Risks of Continued Litigation

Courts evaluating proposed class action settlements consider the strength of the plaintiffs' case and the risks of further litigation.  *See Torrisi v. Tucson Elec. Power Co.*, 8 F.3d 1370, 1376 (9th Cir. 1993).  To determine whether the proposed Settlement is fair, reasonable, and adequate, the Court "must balance the risks of continued litigation, including the strengths and weaknesses of plaintiff's case, against the benefits afforded to class members, including the immediacy and certainty of a recovery."  *Knapp v. Art.com, Inc.*, 283 F. Supp. 3d 823, 831 (N.D. Cal. 2017).

In considering whether to enter into the Settlement, Lead Plaintiffs, represented by counsel experienced in securities litigation, weighed the risks inherent in establishing the elements of their claims, including risks at trial of proving to a jury the elements of falsity, scienter, loss causation, and full damages, as well as the likely duration of the Action.  Lead Plaintiffs and Lead Counsel believed in the merits of the claims they asserted, but also recognized that there were meaningful risks.  Lead Plaintiffs and Lead Counsel were aware that, in order to prevail at trial, they would have to prove not only that Defendants' statements were false or misleading, but also that Defendants knew or were deliberately reckless in not knowing that their statements were false when made; and that those statements were corrected and caused recoverable damages for the Class.  Each of these elements is addressed below:

**Falsity.**  Lead Plaintiffs and Lead Counsel recognize that they faced challenges in proving that Defendants' statements were materially false and misleading when made.  RH was never required to restate or amend any of its financial statements, and Defendants have consistently asserted that their

statements were accurate when they were made.  ¶¶ 59-62.   Defendants would continue to argue at trial and subsequent stages that their statements were not false when made.  For example, with respect to their statements made prior to RH Modern's launch, Defendants would point to evidence showing that unexpected problems encountered *after* RH Modern's launch were the cause of the launch's failures. Specifically, they would continue to contend that one key overseas vendor experienced unforeseen difficulties scaling up their production of RH Modern products, which was the major cause of supply chain difficulties they later suffered.  ¶ 60.  They would further contend that they reasonably relied on assurances from their vendors in making the statements and had a good faith belief that their vendors would meet their production deadlines.  *Id*.  Lead Plaintiffs recognize that, while they have responses to these arguments, there is a meaningful risk that a fact-finder might find these arguments, backed by RH employee testimony, persuasive and determine that Defendants' statements prior to the launch of RH Modern were not false and misleading.  *Id*.

With respect to Defendants' statements after RH Modern's launch, Defendants would also continue to argue that their statements were accurate, and that RH did not realize that its major vendor would be unable to meet its commitments until after they made their statements.  ¶ 61.  Defendants would further contend that they did not omit anything when they spoke to investors, but rather candidly disclosed to investors how RH's in-stock position was "not great."  *Id*.  In addition, Lead Plaintiffs expect that Defendants would offer expert opinion to support their public statements that macro-economic factors—including oil and home prices—adversely impacted RH's business.  *Id*.

***Scienter.***  Assuming that Lead Plaintiffs were able to prove to a jury that Defendants' statements were materially false, they would still need to prove that Defendants made the alleged false statements with the intent to mislead investors or with deliberate recklessness.   As courts have recognized, defendant's state of mind in a securities case "is the most difficult element of proof and one that is rarely supported by direct evidence."  *See In re Amgen Inc. Sec. Litig*., 2016 WL 10571773, at *3 (C.D. Cal. Oct. 25, 2016).; *see also In re Immune Response Sec. Litig.*, 497 F. Supp. 2d 1166, 1172 (S.D. Cal. 2007) (noting that scienter is a "complex and difficult [element] to establish at trial").

Pointing to contemporaneous documents, Defendants would argue that they reasonably made their statements based on assurances from RH's vendors.  Defendants would contend that they believed,

based on the information received from RH's vendors and other sources, that the statements were accurate when made.   ¶ 64. They would also point to the fact that RH made several cautionary statements to investors about possible delays in deliveries during the Class Period which, they would argue, were inconsistent with Lead Plaintiffs' allegations of intentional fraud on this issue.   *Id.* Moreover, Defendants would argue that they had no motive to commit fraud.  For example, they would point to their absence of "insider sales" as evidence of a lack of intent.   ¶ 63.  They would also point to the absence of any "whistleblowers" or SEC inquiry or criticism as further evidence of an absence of scienter.   *Id.*  Finally, they would argue that there was no logical basis for Defendants to engage in the alleged fraud because they would have known that the truth would be quickly revealed.   *Id.*

***Loss Causation and Damages.***    Lead Plaintiffs also confronted considerable hurdles in establishing loss causation and full damages.   These risks were a meaningful factor in assessing the value of this case.   Specifically, Lead Plaintiffs faced substantial challenges in proving that the revelation of the truth about Defendants' false and misleading statements caused the declines in the prices of RH stock.   ¶¶ 65-67.  Lead Plaintiffs and Lead Counsel anticipate that Defendants, backed by their expert's testimony, would argue at trial and appeal that the declines in the price of RH common stock identified by Lead Plaintiffs were not caused entirely—or at all—by the alleged corrective disclosures.   ¶ 66.  As Defendants have noted, on the same dates as certain of the alleged corrective disclosures, Defendants revealed other, unrelated, negative financial news, including that quarterly revenue would be at the low end of prior guidance or below prior guidance.   *Id.*  With the support of their experts, Defendants would argue that this non-fraud related news, rather than any correction of prior misstatements, was responsible for the subsequent declines in RH's stock price following the disclosures.   Defendants also would have argued that Lead Plaintiffs could not, as they must, "disaggregate" the declines caused by disclosure of the alleged fraud from the declines caused by this unrelated, non-fraud related news.   ¶ 67.

Moreover, Defendants would contend that, even if Lead Plaintiffs could disaggregate the fraud-related news, such disaggregation would substantially reduce damages.   ¶ 67.  For example, Defendants would continue to argue that the revelation on June 8, 2016 that RH had spent $18 million to "elevate customer experience" represented only a small fraction of RH's earnings-per-share and thus could, at

most, account for only a small percentage of the stock price decline on a date that also involved disclosure of other disappointing financial results. *Id.* If Defendants were able to prevail on any of these arguments, the amount of the Class's potential damages would have been severely reduced. *Id.*

The resolution of these disputed issues regarding damages and loss causation would have boiled down to a "battle of experts," and Defendants would undoubtedly have been able to present a well-qualified expert who would opine that the Class's damages were small or nonexistent. ¶ 66. As Courts have long recognized, the uncertainty as to which side's expert's view might be credited by the jury presents a substantial litigation risk in securities actions. *See In re Celera Corp. Sec. Litig.*, U.S. Dist. LEXIS 157408, at *17 (N.D. Cal. Nov. 20, 2015) (finding that risks related to the "battle of experts" weighed in favor of settlement approval); *In re Global Crossing Sec. & ERISA Litig.*, 225 F.R.D. 436, 459 (S.D.N.Y. 2004) ("[P]roof of damages in securities cases is always difficult and invariably requires expert testimony which may, or may not be, accepted by a jury.").

### 3. The Duration and Costs of Continued Litigation

Courts consistently recognize that the likely duration and costs of continued litigation are key factors in evaluating the reasonableness of a settlement. *See, e.g.*, *Torrisi*, 8 F.3d at 1376 (finding that "the cost, complexity and time of fully litigating the case" rendered the settlement fair). "Generally, unless the settlement is clearly inadequate, its acceptance and approval are preferable to lengthy and expensive litigation with uncertain results." *In re LinkedIn User Privacy Litig.*, 309 F.R.D. 573, 587 (N.D. Cal. 2015). Due to the "notorious complexity" of securities class actions in particular, settlement is often appropriate because it "circumvents the difficulty and uncertainty inherent in long, costly trials." *In re AOL Time Warner, Inc. Sec. & "ERISA" Litig.*, 2006 WL 903236, at *8 (S.D.N.Y. Apr. 6, 2006); *see also In re Heritage Bond Litig.*, 2005 WL 1594403, at *6 (C.D. Cal. June 10, 2005) (finding that class actions have well-deserved reputation as most complex litigation).

Continuing litigation through the conclusion of fact discovery, expert discovery, summary judgment, trial, and appeals would have delayed any recovery for Class Members, possibly for years. *See Zynga*, 2016 WL 537946, at *10; *Amgen*, 2016 WL 10571773, at *3 ("A trial of a complex, fact-intensive case like this could have taken weeks, and the likely appeals of rulings on summary judgment and at trial could have added years to the litigation."). And even with a verdict at trial affirmed on

appeal, the Class would have faced a potentially complex, lengthy, and contested claims-administration process.[3]  Barring settlement, there is no question that resolution of this case would take considerable time and require additional expenses, with the end result far from certain.  *See Hartless v. Clorox Co.*, 273 F.R.D. 630, 640 (S.D. Cal. 2011) ("Considering these risks, expenses and delays, an immediate and certain recovery for class members . . . favors settlement of this action."), *aff'd in relevant part*, 473 F. App'x 716 (9th Cir. 2012).

Thus, the risk, complexity, and likely duration of further litigation support approval of the Settlement.  The present value of a certain recovery now, as opposed to the mere chance for a possibly greater one years later, supports approval of a settlement that eliminates the expense and delay of continued litigation and the risk that the Class could receive no recovery.  *See Velazquez v. Int'l Marine & Indus. Applicators, LLC*, 2018 WL 828199, at *4 (S.D. Cal. Feb. 9, 2018) (holding that courts "shall consider the vagaries of litigation and compare the significance of immediate recovery by way of the compromise to the mere possibility of relief in the future, after protracted and expensive litigation").

### 4.     All Other Factors Set Forth in Rule 23(e)(2)(C) Support Approval of the Settlement

Rule 23(e)(2)(C) also instructs courts to consider whether the relief provided for the class is adequate in light of "the effectiveness of any proposed method of distributing relief to the class, including the method of processing class-member claims," "the terms of any proposed award of attorney's fees, including timing of payment," and "any agreement required to be identified under Rule 23(e)(3)."  Fed. R. Civ. P. 23(e)(2)(C)(ii)-(iv).  Each of these factors also supports approval of the Settlement or is neutral and does not suggest any basis for inadequacy of the Settlement.

First, the procedures for processing Class Members' claims and distributing the proceeds of the Settlement to eligible claimants are well-established, effective methods that have been widely used in

---

[3]   In other securities-fraud class actions that have gone to trial, the time from a verdict to a final judgment has been as long as seven years.  *See Jaffe Pension Plan v. Household Int'l, Inc.*, No. 1:-02-cv-05893, Verdict Form, ECF No. 1611 (N.D. Ill. May 7, 2009) & Final Judgment and Order of Dismissal With Prejudice, ECF No. 2267 (N.D. Ill. Nov. 10, 2016); *see also Vivendi Universal, S.A. Sec. Litig.*, Civ. No. 02-5571 (RJH/HBP), Verdict Form, ECF No. 998 (S.D.N.Y. Feb. 2, 2010) (jury verdict issued on Jan. 29, 2010) & Final Judgment Approving Class Action Settlement of All Remaining Claims, ECF No. 1317 (S.D.N.Y. May 9, 2017).

securities class action litigation.  The proceeds of the Settlement will be distributed to Class Members who submit eligible Claim Forms with required documentation to the Court-approved Claims Administrator, A.B. Data, Ltd. ("A.B. Data").  A.B. Data, an independent company with extensive experience administering securities class actions, will review and process the claims under Lead Counsel's supervision, provide claimants with an opportunity to cure any deficiencies in their claims or request review of the denial of their claims by the Court, and then mail or wire claimants their *pro rata* share of the Net Settlement Fund (as calculated under the Plan of Allocation) upon approval of the Court.[4]  This type of claims processing is standard in securities class actions and has long been used and found to be effective.  This claim procedure is necessary because neither Lead Plaintiffs nor Defendants possess data regarding investors' transactions in RH common stock that would allow the Parties to create a claims-free process to distribute Settlement funds.

Second, the relief provided for the Class in the Settlement is also adequate when the terms of the proposed award of attorney's fees are taken into account.  Lead Counsel requests a fee of 15% of the Settlement Fund to be paid upon approval by the Court.  As discussed in the Fee Memorandum, the requested fee is well below the 25% benchmark for percentage fee awards in the Ninth Circuit and below the range of percentages that courts within this Circuit award for similarly sized settlements.  Most importantly, with respect to the Court's consideration of the fairness of the Settlement, is the fact that approval of the requested attorneys' fees is entirely separate from approval of the Settlement, and neither Lead Plaintiffs nor Lead Counsel may terminate the Settlement based on this Court's or any appellate court's ruling with respect to attorneys' fees.  *See* Stipulation ¶¶ 20, 22.

Lastly, Rule 23(e)(2)(C) asks the Court to consider the proposed Settlement's fairness in light of any agreements required to be identified under Rule 23(e)(3).  *See* Fed. R. Civ. P. 23(e)(2)(C)(iv).  Here, the only such agreement (other than the Stipulation itself) is the Parties' Supplemental Agreement, which was previously submitted to the Court.  *See* ECF No. 137.  This agreement affords RH the option to terminate the Settlement if the number of Class Members who request exclusion from the Class

---

[4] The Settlement is not a claims-made settlement.  If the Settlement is approved, Defendants will have no right to the return of any portion of the Settlement based on the number or value of claims submitted. *See* Stipulation ¶ 16.

exceeds a specified threshold.  Such agreements are standard in securities class actions and other similar class actions.  These agreements indirectly benefit the class because they encourage defendants to agree to larger class action settlements by providing assurance that they will have the right to terminate if the number of opt outs is unexpectedly high.  Courts have consistently found that such provisions have no negative impact on the fairness of the Settlement.  *See In re Online DVD-Rental Antitrust Litig.*, 779 F.3d 934, 948 (9th Cir. 2015) (rejecting objector's argument that such a provision rendered the settlement unfair); *Hefler v. Wells Fargo & Co.*, 2018 WL 6619983, at *7 (N.D. Cal. Dec. 18, 2018) ("The existence of a termination option triggered by the number of class members who opt out of the Settlement . . . does not weigh against approval" of settlement); *Thomas v. MagnaChip Semiconductor Corp.*, 2017 WL 4750628, at *7 (N.D. Cal. Oct. 20, 2017) (agreement permitting defendant to terminate the settlement if an opt-out threshold is reached "does not render the settlement unfair").

### D.  The Settlement Treats Class Members Equitably Relative To Each Other

In determining whether a class action settlement is "fair, reasonable, and adequate," the Court must also consider whether the Settlement treats class members equitably relative to each other.  *See* Fed. R. Civ. P. 23(e)(2)(D).  The proposed Settlement here treats members of the Class equitably.  As discussed below in Part II (discussing the Plan of Allocation), eligible claimants approved for payment by the Court will receive their *pro rata* share of the recovery based on damages they suffered that were attributable to the alleged fraud.  No subset of the Class is receiving any special treatment and Lead Plaintiffs will receive the same level of *pro rata* recovery under the Plan of Allocation (based on their Recognized Claims as calculated under the Plan) as all other Class Members.

### E.  Additional Factors Considered by the Ninth Circuit Support Approval of the Settlement

Two additional factors considered in assessing a proposed settlement are "the experience and views of counsel" and "the reaction of the class members to the proposed settlement."  *Churchill*, 361 F.3d at 575.  Both of these additional factors support the Settlement.

As courts in this Circuit explain, "[t]he recommendation of experienced counsel carries significant weight in the court's determination of the reasonableness of the settlement." *Kirkorian v. Borelli*, 695 F. Supp. 446, 451 (N.D. Cal. 1988); *see Nat'l Rural Telecommc'ns Coop. v. DIRECTTV,*

1  221 F.R.D. 523, 528 (C.D. Cal. 2004) ("'Great weight' is accorded to the recommendation of

2  counsel . . . because 'parties represented by competent counsel are better positioned than courts to

3  produce a settlement that fairly reflects each party's expected outcome in the litigation'").  Here, Lead

4  Counsel—based on a thorough understanding of the Action—concluded that the Settlement represents a

5  favorable outcome for Class Members in light of the range and probability of potential outcomes.

6  Likewise, the positive reaction of the Class to the Settlement is another factor that favors

7  approval of the Settlement.  *See Amgen*, 2016 WL 10571773, at *4.  Pursuant to the Preliminary

8  Approval Order, the Court-appointed Claims Administrator, A.B. Data, sent a total of 76,685 copies of

9  the Notice Packet to potential Class Members and nominees as of September 13, 2019.  *See* Miller Decl.

10  (Ex. 3) ¶ 8.  In addition, the Summary Notice was published in *The Wall Street Journal* and transmitted

11  over the *PR Newswire* on July 23, 2019.  *See id.* ¶ 11.  The Notices set out the essential terms of the

12  settlement and informed potential Class Members of, among other things, their right to opt out of the

13  Class or object to any aspect of the Settlement.  While the October 1, 2019 deadline for Class Members

14  to exclude themselves or object has not yet passed, to date, no objections to the Settlement or the Plan of

15  Allocation have been received, *see* Uslaner Decl. ¶ 77, and no requests for exclusion from the Class

16  have been received, *see* Miller Decl. ¶ 17.   The absence of any objections or requests for exclusion

17  supports approval of the Settlement here.

18  *            *            *

19  In sum, all of factors to be considered under Rule 23(e)(2) support a finding that the Settlement

20  is fair, reasonable, and adequate.

21  **II.    The Plan of Allocation Is Fair and Reasonable**

22  In addition to seeking final approval of the Settlement, Lead Plaintiffs seek approval of the

23  proposed Plan of Allocation for the Settlement proceeds.  The Plan of Allocation is set forth at pages 11

24  to 15 of the Notice mailed to Class Members.  It is the same Plan of Allocation as that which was

25  contained in the Notice approved by the Court in its Preliminary Approval Order.

26  The standard for approval of a plan of allocation in a class action under Rule 23 is the same as

27  the standard applicable to the settlement as a whole: the plan must be "fair, reasonable, and adequate."

28  *Class Plaintiffs*, 955 F.2d at 1284-85; *see also Omnivision*, 559 F. Supp. 2d at 1045.  An allocation

formula need only have a reasonable basis, particularly if recommended by experienced class counsel. *See Heritage Bond*, 2005 WL 1594403, at *11. Courts hold that "[a] plan of allocation that reimburses class members based on the extent of their injuries is generally reasonable." *In re Oracle Sec. Litig.*, 1994 WL 502054, at *1 (N.D. Cal. June 18, 1994).

Lead Counsel developed the Plan of Allocation with the assistance of Lead Plaintiffs' damages expert. ¶ 79. The Plan provides for the distribution of the Net Settlement Fund to Class Members on a *pro rata* basis based on the extent of their injuries attributable to the alleged fraud. ¶ 79. In developing the Plan of Allocation, Lead Plaintiffs' expert calculated the estimated amount of artificial inflation in the per-share closing prices of RH's common stock that was allegedly proximately caused by Defendants' alleged false and misleading statements and omissions. ¶ 84. To calculate the estimated artificial inflation, the expert considered the price changes in RH common stock in reaction to the public disclosures that allegedly corrected the alleged misrepresentations and omissions, adjusting for price changes attributable to market or industry factors. *Id.*

The Plan of Allocation calculates a "Recognized Loss Amount" for each purchase of RH common stock during the Class Period that is listed in the Claim Form and for which adequate supporting documentation is provided. The calculation of Recognized Loss Amounts will depend upon several factors, including when the claimant's stock was purchased and sold and the purchase or sale price. In general, Recognized Loss Amounts will be the lower of: (i) the difference between the estimated artificial inflation on the date of purchase and the estimated artificial inflation on the date of sale, and (ii) the difference between the actual purchase price and sales price. Notice ¶¶ 61, 71. For shares sold during or after the 90-day period following the end of the Class Period, the Plan also limits Recognized Loss Amounts based on the average price of the stock during that 90-day period, consistent with the PSLRA. Notice ¶¶ 71(C), 71(D). Under the Plan of Allocation, claimants who purchased shares during the Class Period but did not hold those shares through at least one of the alleged corrective disclosures will have no Recognized Loss Amount as to those transactions because any loss they suffered would not have been caused by revelation of the alleged fraud. Notice ¶¶ 61, 71. The sum of a claimant's Recognized Loss Amounts for all of his, her, or its Class Period purchases is the Claimant's

1   "Recognized Claim," and the Net Settlement Fund will be allocated to Authorized Claimants on a *pro*
2   *rata* basis based on the relative size of their Recognized Claims.  Notice ¶¶ 72, 80-81.

3        One hundred percent of the Net Settlement Fund will be distributed to Class Members who
4   submit eligible claims.  If any funds remain after an initial distribution to Authorized Claimants, as a
5   result of uncashed or returned checks or other reasons, subsequent cost-effective distributions will also
6   be conducted.  Notice ¶ 83.  In the event any residual funds remain after all cost-effective distributions
7   of the Net Settlement Fund to Eligible Claimants have been completed, the Plan of Allocation identifies
8   the Investor Protection Trust as the proposed *cy pres* recipient.  Notice ¶ 83.  The Investor Protection
9   Trust is a 501(c)(3) nonprofit organization devoted to investor education.  *See* Uslaner Decl. ¶ 87.  The
10  Investor Protection Trust is an appropriate *cy pres* recipient because its mission is related of the nature
11  of the securities fraud claims asserted in the Action, and courts in this District have approved it as a *cy*
12  *pres* recipient in other securities fraud class actions in recent years, including *In re Volkswagen "Clean*
13  *Diesel" Mktg., Sales Practices, & Prods. Liab. Litig.*, ML No. 2672 CRB (JSC) (Breyer, J.), *Hefler v.*
14  *Wells Fargo & Company*, Case No. 4:16-cv-05479-JST (N.D. Cal.) (Tigar, J.), and *In re HP Securities*
15  *Litigation*, Case No. 3:12-CV-05980-CRB (N.D. Cal.) (Breyer, J.).  As noted, payment will only be
16  made to this charity when the residual amount left for re-distribution to Class Members is so small that a
17  further re-distribution would not be cost effective—for example, in the event the administrative costs of
18  conducting an additional distribution would largely subsume the funds available.

19       Of note, as of September 13, 2019, more than 76,000 copies of the Notice, which contains the
20  Plan of Allocation and advises Class Members of their right to object to the Plan, have been mailed to
21  potential Class Members.  *See* Miller Decl. ¶ 8.  To date, no objections to the Plan of Allocation have
22  been received.  *See* Uslaner Decl. ¶ 77.

23       In sum, Lead Plaintiffs respectfully submit that the proposed Plan of Allocation is fair and
24  reasonable and should be approved.

25  **III.     Notice to the Class Satisfied the Requirements of Rule 23 and Due Process**

26       In accordance with the Court's Preliminary Approval Order, A.B. Data, the Court-approved
27  Claims Administrator, began mailing copies of the Notice Packet to potential Class Members and
28  nominees on July 9, 2019.  *See* Miller Decl. ¶¶ 3-5.  As of September 13, 2019, A.B. Data had mailed

LEAD PLAINTIFFS' MOTION FOR FINAL APPROVAL                                    Case No. 4:17-00554-YGR
OF SETTLEMENT AND PLAN OF ALLOCATION

76,685 copies of the Notice Packet by first-class mail to potential Class Members and nominees.  *See id*.

¶ 8.  In addition, A.B. Data arranged for the Summary Notice to be published in *The Wall Street Journal*

and transmitted over the PR Newswire on July 23, 2019.  *See id*. ¶ 11.  A.B. Data established a dedicated

settlement website, RHSecuritiesLitigation.com, to provide potential Class Members with information

concerning the Settlement and access to downloadable copies of the Stipulation, the Complaint, and any

related orders entered by the Court.  *See id*. ¶ 16.  Copies of the Notice and Claim Form are also made

available on Lead Counsel's website, www.blbglaw.com.  *See* Uslaner Decl. ¶ 76.

  The Notice provided to the Class in accordance with the Court's Preliminary Approval Order

satisfied all the requirements of due process, Rule 23, and the PSLRA.  For any class certified under

Rule 23(b)(3), due process and Rule 23 require that class members be given "the best notice that is

practicable under the circumstances, including individual notice to all members who can be identified

through reasonable effort."  Fed. R. Civ. P. 23(c)(2)(B); *see also Eisen v. Carlisle & Jacquelin*, 417 U.S.

156, 173-75 (1974).  Notice of a class action settlement "is satisfactory if it generally describes the terms

of the settlement in sufficient detail to alert those with adverse viewpoints to investigate and to come

forward and be heard."  *See Churchill*, 361 F.3d at 575; *Luna v. Marvell Tech. Grp.*, 2018 WL 1900150,

at *2 (N.D. Cal. Apr. 20, 2018) (same); *Spann v. J.C. Penney Corp.*, 314 F.R.D. 312, 330 (C.D. Cal.

2016) ("Settlement notices must fairly apprise the prospective members of the class of the terms of the

proposed settlement and of the options that are open to them in connection with the proceedings.").

  The Notice program's combination of individual first-class mail to all Class Members who could

be identified with reasonable effort, supplemented by notice in a widely circulated publication,

transmission over a business newswire, and publication on internet websites, was "the best notice . . .

practicable under the circumstances."  Fed. R. Civ. P. 23(c)(2)(B); *see, e.g.*, *Hayes v. MagnaChip

Semiconductor Corp.*, 2016 WL 6902856, at *4-5 (N.D. Cal. Nov. 21, 2016) (approving similar notice

program); *Zynga*, 2016 WL 537946, at *7 (finding individual notice mailed to class members combined

with summary publication constituted "the best form of notice available under the circumstances").

  The contents of the Notice, which was approved by the Court in the Preliminary Approval Order

and structured in the same way as notices previously approved by Court in *Hatamian v. Advanced Micro

Devices*, No. 4:14-cv-00226-YGR, and *Nathanson v. Polycom, Inc.*, No. 13-3476-YGR, provided the

necessary information for Class Members to make an informed decision regarding the Settlement and contained all of the information required by Rule 23(c)(2)(B), the PSLRA (15 U.S.C. § 78u-4(a)(7)), and this District's Procedural Guidelines for Class Action Settlements.  The Notice informed Class Members of, among other things, (1) the nature of the Action and the claims asserted; (2) the definition of the Class; (3) the amount of the Settlement; (4) the reasons why the parties are proposing the Settlement; (5) the estimated average recovery per affected class member; (6) the maximum amount of attorneys' fees and expenses that will be sought; (7) the identity and contact information for the representatives of Lead Counsel who are reasonably available to answer questions from Class Members; (8) Class Members' right to opt out of the Class or to object to the Settlement, the Plan of Allocation, or the requested attorneys' fees or expenses; (9) the binding effect of a judgment on Class Members; and (10) the dates and deadlines for Settlement-related events.  The Notice also contained the Plan of Allocation and provided Class Members with information on how to submit a Claim Form in order to be eligible to receive a distribution from the Net Settlement Fund.

In sum, the Notice fairly apprised Class Members of their rights with respect to the Settlement, is the best notice practicable under the circumstances, and complied with the Court's Preliminary Approval Order, the Federal Rules of Civil Procedure, the PSLRA, and due process.

## CONCLUSION

For these reasons, Lead Plaintiffs respectfully requests that the Court grant final approval of the proposed Settlement and approve the Plan of Allocation.

Dated:  September 17, 2019

Respectfully submitted,

**BERNSTEIN LITOWITZ BERGER & GROSSMANN LLP**

By: *s/ Jonathan D. Uslaner*
JONATHAN D. USLANER
jonathanu@blbglaw.com
2121 Avenue of the Stars, Suite 2575
Los Angeles, CA 90067
Tel:  (310) 819-3472

   --and--

GERALD H. SILK
jerry@blbglaw.com
AVI JOSEFSON
avi@blbglaw.com
JOHN C. BROWNE (*Pro Hac Vice*)
johnb@blbglaw.com
1251 Avenue of the Americas, 44th Floor
New York, NY 10020
Tel:  (212) 554-1400
Fax:  (212) 554-1444

*Counsel for Lead Plaintiffs Public School Teachers' Pension & Retirement Fund of Chicago and Arkansas Teacher Retirement System, and Lead Counsel for the Class*

#1321022